# EXHIBIT 1

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>STUDENT,<br><br>　　　　　　Petitioner,<br><br>v.<br><br>PALMDALE ELEMENTARY SCHOOL DISTRICT,<br><br>　　　　　　Respondent. | OAH CASE NO. N 2006100458 |

## DECISION

Stella L. Owens-Murrell, Administrative Law Judge (ALJ), Office of Administrative Hearings, Special Education Division (OAH), heard this matter on January 3 and 4, 2007, April 18 and 19, 2007, and on May 22, 2007, in Palmdale, California.

Petitioner/Student (Student) was represented by Angela L. Gilmartin, Attorney at Law.  Student's mother (Mother) was present at the hearing on Student's behalf only on April 18, 2007.

Respondent Palmdale Elementary School District (District) was represented by Lee G. Rideout, Attorney at Law, Fagen Friedman & Fulfrost.  Dr. John Porter, Director of Special Education, and David B. Brown, Assistant Superintendent, Special Education/Student Services, were also present throughout the hearing on behalf of District.

PROCEDURAL HISTORY

On October 5, 2006, Student filed his due process hearing request (Complaint).  The hearing on the Complaint was initially scheduled to commence on December 5, 2006, but was continued to January 3, 2007.  On December 20, 2006, District filed a motion to dismiss the case in its entirety on grounds that the issues raised therein were moot.  District asserted that it agreed to and offered to resolve the issues raised by Student in his Complaint.  District contended that because of its offer, OAH should dismiss the matter because there were no remaining issues ripe for adjudication and the matter was moot.  The ALJ ruled that the

issues for due process hearing were not resolved. The parties did not execute a binding agreement or otherwise stipulate to dismiss the complaint. District's motion was denied.

The due process hearing was set for three days beginning January 3, 2007. Testimony was taken on January 3, 2007. On January 4, 2007, Student moved for a continuance on the grounds of death in the family. District did not object and stipulated to continue the hearing to February 6 through February 8, 2007.

On January 29, 2007, Student again moved for a continuance on the ground that Student's expert witness was out of the country and unavailable for the hearing. District did not object to the continuance and the matter was continued to April 17 to and including April 19, 2007.

On March 28, 2007, Student moved to continue the due process hearing for two weeks based upon a schedule conflict for Student's attorney who was scheduled to appear in Superior Court on an unrelated matter for one day on April 17, 2007. The ALJ denied the motion but permitted the hearing to go dark April 17, 2007, to accommodate Student's attorney. The hearing reconvened on April 18, 2007.

On April 19, 2007, after Student rested his case in chief, Student moved in District's direct case, for contempt sanctions and in the alternative to reopen his case, and for monetary sanctions for an alleged bad faith refusal of a District witness to comply with Student's subpoena duces tecum. The ALJ denied Student's motion for contempt sanctions, and ordered Student to file a noticed motion for monetary sanctions. The ALJ granted Student's motion to reopen his case. Because Student wanted time to review documents produced by the witness at hearing on April 19, 2007, and confer with his expert witness, the matter was continued to May 22, 2007. District filed opposition to the motion for sanctions. The ALJ issued an order denying Student's motion on May 17, 2007.

Sworn testimony and documentary evidence were received at the hearing. At the conclusion of the hearing, Student requested time up to and including June 18, 2007, for the parties to file closing briefs. The parties timely filed closing briefs. The ALJ closed the record and submitted the matter for decision on June 18, 2007.

## ISSUES

1.    Did District deny Student a free and appropriate public education (FAPE) for the 2006-2007 school year, by reason of the following:

A.    Failing to provide properly trained teachers and aides to implement Student's February 28, 2006 Individualized Education Program (IEP)?[1]

---

[1] Student originally framed the issue to state: Did District deny Student a FAPE for the 2006-2007 school by failing to provide a safe classroom environment free from harm? The ALJ has clarified the issue statement based

B.   Failing to provide Designated and Instructional Services (DIS) in Speech and Language (LAS) and Occupational Therapy (OT) pursuant to the February 28, 2006 IEP?

C.   Failing to offer Student an appropriate placement?[2]

2.   Is Student entitled to compensatory education, in the form of OT, LAS, behavioral services, social skills training, a social recreational program, and a change of placement at another public school within the District or placement at a non-public school (NPS)?[3]

## CONTENTIONS OF THE PARTIES

Student contends that District failed to implement Student's IEP dated February 28, 2006, in the 2006-2007 school year. Specifically, Student alleges that District failed to identify Student's needs and to provide Student with DIS in speech and language therapy and occupational therapy, as required in the IEP. Student contends that Student is currently placed at Manzanita Elementary School in a severely handicapped special day class (SDC) where he was mishandled by his teacher, and para educators or special circumstances aides (SCA) who lacked sufficient training in the proper behavior intervention techniques required to instruct Student. As a result, Student was improperly restrained in the classroom, and was locked out of the classroom and left unattended with no supervision. Student also alleges District failed to fully implement the IEP when Student was placed for substantial periods of time each week alone sleeping in the "sensory room," depriving him of the ability to interact with his peers, which denied Student educational benefit. Student further contends that he was mishandled by at least two of the aides assigned to the classroom in the presence of his classroom teacher, he was left to feed himself without proper assistance, which exposed him to choking hazards, and he was neglected and left to wear soiled and wet clothes all day in the classroom. Student contends that the February 28, 2006 IEP denied Student a more appropriate placement, and that the preferred placement is at another school within the District, or placement in a NPS. Student contends that he is entitled to a change of placement in another school, whether a NPS or another District school. Student also

---

upon the Complaint and according to the evidence presented at the hearing. Moreover, District objected to Student's statement of the issue, for the first time, in its closing brief, on grounds that OAH lacked jurisdiction under the Individuals with Disabilities in Education Act (IDEA), and California Education Code, section 56501, subdivision (a), to hear Student's claim he was denied a safe classroom environment, which caused him harm. Though District did not object to Student's statement of this issue at the prehearing conference or at trial, subject matter jurisdiction is not waived and may be raised at any time during the proceedings. However, the ALJ's clarification of the issue obviates the need to reach the question of OAH's jurisdiction to decide Student's safety claim.

[2] Issue 1C was not specifically set forth in the Prehearing Conference Order but was raised in the Due Process Complaint, (California Education Code, section 56502(i)). Student also presented evidence at hearing concerning the IEP offer of placement. Accordingly, this issue has been framed by the ALJ for decision.

[3] Prior to hearing, Student modified his proposed remedy in the Complaint to reflect that a change in placement-included placement at another public school within the District.

contends he is entitled to the following compensatory education: OT, LAS, behavioral services, social skills training, and a social recreational program.

District contends that it has consistently offered and provided Student a FAPE. District contends that Manzanita was an appropriate placement for Student, and that its teachers and personnel were trained and qualified to provide Student with the appropriate interventions and services. District further contends that the February 28, 2006 IEP was fully implemented commencing in September 2006, after Student's mother consented to the IEP, and that the IEP provided Student a FAPE in the least restrictive environment. District denies that Student is entitled to relief.

## FACTUAL FINDINGS

*Jurisdiction*

1.      Student was born on July 16, 1996. He is 10 years and 11 months old, and he resides with his adoptive mother in the District. Student has attended Manzanita Elementary School (Manzanita) since September 2004. He is enrolled in a sixth grade Special Day Class-intensive (SDC), a self-contained special education program designed for students with moderate to severe disabilities and with intensive needs. During the 2006-2007 school year, the SDC class contained approximately 9 to12 students and five adults. Student is eligible for special education services as a child with severe mental retardation and autistic-like behaviors.[4]

*Background*

2.      Prior to his adoption Student lived with his biological parents until he was two years old. Student was removed from his biological parents' custody after an incident where his father threw him out of a window. According to the medical history in evidence, Student began to walk at two years of age and he developed his first words at seven years of age. Student is considered to be nonverbal. He suffers from a seizure disorder and is on several medications. As of February 2006, the medication included Adderal for Attention Deficit Hyperactivity Disorder (ADHD), Tegretol for the seizure disorder and Risperdal for adverse behaviors.

3.      Student is a client of the North Los Angeles County Regional Center (Regional Center) where he currently receives services. Student was initially medically diagnosed with ADHD, severe mental retardation, seizure disorder, and chronic otitis media[5]

---

[4] District determined Student's secondary eligibility under the category of autistic-like behaviors in a subsequent IEP issued on October 27, 2006, after Student had filed the Complaint at bar. Student did not amend his Complaint to include the matters considered in the subsequent IEP. On the fourth day of hearing the parties stipulated that Student was also eligible as a child with autistic-like behaviors.

[5] Otitis media is an infection or an inflammation of the middle ear.

4

with some hearing loss in his right ear, a repaired cleft palate, and a history of prolonged bleeding. The Regional Center subsequently had Student reevaluated, and diagnosed Student with autism spectrum disorder.

4.     The Regional Center referred Student to District in 1999. On September 17, 1999, an initial IEP found Student eligible for special education services under the category of mental retardation, and speech and language services were provided. The IEP recommended a referral for consideration of placement with the Los Angeles County Office of Education (LACOE). In November of 1999, a special IEP was held to discuss Student's placement because of behavioral concerns. These behaviors included banging his head, temper tantrums, and breaking and throwing items. The IEP noted that Student needed behavioral interventions. Student was placed with LACOE in 1999. In an IEP dated January 2000, LACOE recommended Student's return to the Palmdale Elementary School District. Student was returned to District where he attended Manzanita in an SDC for students with severe disabilities. He continued to receive speech and language services and adapted physical education (APE). Student was placed in Mesquite Elementary within the District in September 2000. In February 2001, an IEP team meeting was held to discuss Student's behaviors. Student was beginning to demonstrate more protesting behaviors, including hitting, yelling, screaming, tantrums, throwing objects. The IEP team added a Behavior Intervention Plan (BIP). The BIP addressed Student's self-injurious behavior, aggression toward others, and his high activity level. Student was returned to Manzanita in September 2004.

*The February 28, 2006 Triennial IEP*

5.     District convened Student's IEP team meeting on February 28, 2006. Student's mother attended on his behalf. District was represented by Mike Ohren, IEP administrator; Irene Orloff, special day class teacher; Joanne V. Brace, general education teacher; Elaine Hooker, R.N., school nurse; John Corugedo, program specialist; Carmen Duran, occupational therapist; Kathy Rheinhart, language-speech pathologist; Tom Jorgenson, adapted physical education specialist; and Joan Monarch, school psychologist. The IEP noted that Student required a small group specialized instructional setting for more than 50 percent of the day, and itinerant DIS services. Student required an alternate setting for specialized instruction. Student spent 85 percent of the school day outside of the general education setting in non academic curriculum. Student was receiving APE and LAS services in a group setting. Student also had a special circumstances assistant (SCA) assigned to him for the entire six and one-half hours school day. The IEP discussed Student's current classroom setting and noted that the SDC class served the needs of children with moderate to severe disabilities, and also implemented a functional curriculum. The IEP team reviewed previous goals and objectives, and specifically discussed discontinuation of a previous goal that focused on Student developing and maintaining eye contact.[6] The IEP noted that while

---

[6] The IEP noted this goal was discontinued because requiring Student to maintain eye contact with his classroom aide or teacher sometimes created an adversarial situation where Student would become frustrated. The IEP team determined that another method to alleviate the situation would be to provide verbal prompts to Student

Student consistently needed visual and verbal prompting and redirection in his classroom activities, Student had improved in his interaction with others in the classroom.   Student also showed improvement in his receptive language skills meeting one of his goals by demonstrating an understanding of prepositional concepts such as the words "in" or "on". The IEP also noted that Student had improved in a particular area of concern in that he no longer engaged in stripping activities where he would remove his clothes. The IEP team attributed this change in Student's behavior to the classroom staff becoming more proactive and because Student's mother clothed him in belted jeans with high top shoes. Student also demonstrated an understanding of the toileting process but he still did not initiate the process with any degree of independence.  The IEP also noted a significant decrease in Student's protesting behaviors and tantrums except when he was receiving medications or when he grew tired in the afternoons.

      6.     The IEP team reviewed Student's triennial academic, psychoeducational, speech and language, health, APE, and OT assessments.  The academic assessment report noted that Student demonstrated interest in preferred objects such as books but not consistently.  Student did not yet demonstrate an interest in colors and could not recognize or name colors.  The assessment report noted that Student's teacher had considered developing an icon exchange system to help Student communicate his interests and needs.  The overall psychoeducational assessment established that Student functioned in the severe range of mental retardation.  The speech and language assessment demonstrated that while Student's strength was in articulation of sounds, his delays in both expressive and receptive language continued to require the support of the speech and language therapy program.  The health assessment noted that while Student had a history of seizures, he was generally in good health and continued to take a variety of medications including medications to control his seizures.  The APE assessment noted improvement in Student's gross motor and object control skills, which fell in the three- to five-year range, and that he was most likely to perform tasks when prompted by his SCA.  The assessment concluded with a recommendation that Student continue participation in the APE program.  The OT assessment noted that Student exhibited sensory processing deficits and recommended Student continue to receive OT services to develop his attention span, and behavioral integration.  The assessment also noted that OT services were needed to develop Student's fine-motor skills and oral-motor skills to reduce Student's drooling and to improve his saliva control.  The general education teacher discussed the appropriateness of a general education program for Student.  The District IEP team concluded that because of Student's short attention span and inability to stay focused, Student would best be served by continuing to participate in "reverse mainstreaming."  Reverse mainstreaming is a process by which one or two of Student's nondisabled peers from a general education sixth grade classroom attended Student's classroom and spent 15 to 30 minutes a day interacting with Student and his classroom peers. [7]

---

and allow him to use an icon exchange system to push a switch on a specially designed device to express his needs and wants.

[7] These activities included reading a story, assembling puzzles, playing with Legos, matching and sorting exercises, coloring, and assisting students with clean up activities.

7.     The IEP team also reviewed Student's Functional Analysis Assessment (FAA) which had recently been conducted. The FAA identified crying as one specific target behavior to be replaced with a more appropriate behavior that met the same need for Student. Antecedents for the crying behavior were identified as when: Student was tired and sleepy; he was given an undesirable request or task to perform; and he was taken to receive medication. The crying behaviors were indicative of Student's desire to avoid or escape his need for sensory input. As a result of the FAA a Positive BIP (PBIP) was developed to replace Student's inappropriate behaviors with more appropriate ones. These included Student communicating his needs and wants through verbal requests or a sign or gesture. The PBIP also included a segment to teach Student through modeling and role-playing. The assessment team recommended the use of a "buddy book" at school. Staff was to implement the PBIP by collecting data on a daily basis. The plan also included a schedule for the school psychologist to consult with Student's teacher and staff for a 20 minute period every other week to monitor Student's progress.

8.     In addition to these assessments, the IEP team also reviewed Student's areas of need, and then-present levels of performance in the areas of social, emotional and behavioral domains, functional academics, independent living/self-help skills, language and communication, health and medical, and motor skills development. The team established annual goals and objectives based on needs and Student's level of performance in areas of need. The IEP team discussed the areas where Student had met his goals and areas where further improvement was needed. The IEP offered Student the following program and services for the remainder of the 2005-2006 school year and for the 2006-2007 school year: (1) placement in a SDC-intensive at Manzanita; (2) speech and language provided twice per week for 20 minutes in a group session, and once per week for 20 minutes in an individual session; (3) APE services two times per week for 30 minutes in a group session; (4) OT once per week for 30 minutes in an individual session; (5) an SCA daily for the entire school day; (6) consultation between psychologist and staff for 20 minutes every other week to review Student's behavior program; and (7) door-to-door transportation to and from school. District's offer also included extended school year (ESY) for Student to participate in his SDC program with LAS, APE, OT, and the assignment of a SCA for four hours a day.[8]

9.     Student's mother did not consent to the IEP at the time of the IEP team meeting and she did not write in the IEP the basis for her disagreement with the IEP offer. Instead, Mother requested time to review the IEP with her attorney, who did not attend the meeting. Sometime after the IEP team meeting Mother stated that she disagreed with the offer of placement, but eventually consented to the IEP in September 2006. Thereafter, District began to implement the IEP.

10.     As of the date of the IEP, Student remained eligible for special education and services solely under the category of mental retardation. Based upon the triennial

---

[8] At hearing, Ms. Orloff testified that Student could have attended the ESY for 2005-2006 but mother took Student out of the state for the summer.

assessments, and other factors considered by the IEP team, the February 28, 2006 IEP offered Student a FAPE. The IEP addressed Student's unique needs in academics, social, emotional and behavioral domains, independent living/self-help skills, language and communication, health and medical and motor skills development.[9] The IEP was reasonably calculated to provide Student with some educational benefit, and as will be discussed more fully in the decision, the IEP offered Student the appropriate placement in the least restrictive environment.

*Did District deny Student a FAPE in the 2006-2007 school year by failing to provide staff properly trained to implement the IEP?*

11.     Student contends that the classroom teacher and aides were inadequately trained in implementation of the programs and services offered in the February 28, 2006, IEP, specifically Student focused on the staff's implementation of the PBIP.

12.     A failure to implement a Student's IEP will constitute a violation of the Student's right to a FAPE if the failure was material. There is no statutory requirement that a District must perfectly adhere to an IEP and, therefore, minor implementation failures will not be deemed a denial of FAPE. A material failure to implement an IEP occurs when the services a school district provides to a disabled student fall significantly short of the services required by the Student's IEP.

13.     Irene Orloff was Student's SDC teacher in the 2006-2007 school year. Ms. Orloff was a credentialed special education teacher with extensive knowledge, training, and experience in working with moderate to severely disabled pupils with mental retardation and autism. She earned a master's degree in educational leadership from Pepperdine University. She also earned certifications in moderate to severe, including behavior modification techniques. Ms. Orloff held a multi subject credential, a single subject credential in mild to moderate and moderate to severe disabilities, an administrative credential, she was also trained in nonviolent crisis intervention. Ms. Orloff took the classes offered by the Antelope Valley Special Education Local Planning Area (AV SELPA) in the 2005-2006 school year on instructing children with moderate to severe disabilities. Ms. Orloff was responsible for supervising the adult aides, including SCAs, who supported her in the classroom. She was responsible for implementing portions of Student's IEP goals and objectives in the classroom, including Student's PBIP. Ms. Orloff also communicated with Student's mother to keep her aware of any concerns about Student's performance in the classroom. Ms. Orloff was qualified to teach Student's SDC.

---

[9] Student's expert witness Betty Jo Freeman, PhD, a licensed Clinical Psychologist, testified that the IEP did not meet Student's needs. Dr. Freeman's testimony concerning Student's educational needs was based on her opinion, without having conducted an eligibility assessment, that Student exhibited autistic-like behaviors and was obviously autistic. Further, Dr. Freeman did not evaluate Student until September 2006, several months after the IEP. Dr. Freeman's opinion is not persuasive because the IEP must be evaluated in light of the information available at the time it was developed. As of February 28, 2006, the IEP team appropriately relied on and considered the assessments available to them which identified Students needs as a child with severe mental retardation.

14.    Ms. Orloff conducted Student's academic assessment and wrote portions of Student's goals and objectives, and the PBIP, included in the February 28, 2006 IEP. The IEP was not fully implemented until around September or October, 2006 because Student's mother did not consent to the IEP until sometime in September 2006. Ms. Orloff continued to implement Student's 2005 IEP until Student's mother signed the February 2006 IEP. Following mother's consent to the IEP Ms. Orloff prepared lists of Student's goals and objectives and provided them to his SCA for implementation. Ms. Orloff made daily progress notes and logs to track Student's performance.

15.    During the 2006-2007 school year, Ms. Tawnya Pauley was employed as Student's SCA. Ms. Pauley was assigned to assist and work with Student for the entire school day. She was trained to work with severely impaired children, and trained in nonviolent crisis intervention. She was responsible for providing for all of Student's needs in the classroom including his toileting needs. She was familiar with Student's goals and objectives and worked with Ms. Orloff to implement some of Student's goals in the classroom. She considered Student to be a generally happy individual who always wanted to help in the class. Ms. Pauley testified that she was one of five adult aides in the classroom and she was assigned exclusively to Student. Ms. Orloff or another of the aides in the classroom worked with Student only in Ms. Pauley's absence or during Ms. Pauley's breaks. Ms. Pauley was a qualified SCA.

16.    The academic assessment, written by Ms. Orloff and considered by the IEP team, noted that Student was demonstrating less protesting behaviors including yelling, screaming, tantrums, throwing objects, and destruction of property, such as tearing books and tearing up bulletin boards. The assessment also noted that Student's tendency toward task avoidance had somewhat decreased, especially when Student was allowed to work with a preferred adult or aide. However, Student still continued to cry and tantrum under certain circumstances.

17.    When a child exhibits a serious behavior problem, such as self-injurious or assaultive behavior, California law imposes specific and extensive requirements for the development of a functional analysis assessment and a behavior intervention plan. An IEP team must consider whether a child's behavior impedes his or her learning or that of others. If the team determines that it does, it must consider the use of positive behavioral interventions and supports, and other strategies to address the behavior.

18.    As discussed in Findings of Fact 4 and 7, Student demonstrated a history of significant behaviors that impeded his learning. District's FAA, conducted on February 24, 2006, identified crying as one specific target behavior to be replaced with a more appropriate behavior that met the same need for Student. Antecedents for the crying behavior were identified as well as the principal reasons for the behaviors. As a result of the FAA, a Positive BIP (PBIP) was developed to replace Student's inappropriate behaviors with more appropriate ones. These included Student communicating his needs and wants through

verbal requests or a sign or gesture.[10]  The PBIP also included a segment to teach Student through modeling and role-playing, and the assessment team recommended the use of a "buddy book" at school and staff was to implement the PBIP by collecting data on a daily basis. The plan also included a schedule for the school psychologist to consult with Student's teacher and staff for a 20 minute period every other week to monitor Student's progress.

19.    Ms. Orloff and Ms. Pauley worked together to implement the relevant portions of Student's IEP in all aspects including the PBIP. Ms. Pauley emphasized that Student occasionally required the use of two adult aides to physically prompt or assist him from one activity to another in the classroom and that this was primarily because Student was short but heavy.

*The Incident Report of October 2, 2006*

20.    The parties dispute that a series of incidents took place in early October 2006 where Ms. Orloff and/or adult aides failed to address Student's needs in the classroom. Ms. Kathy Carillo described four incidents that Student claims support his contention that the teacher and aides were inadequately trained in the implementation of his IEP. Ms. Kathy Carillo, was employed by a non-public agency (NPA) called Going Onward and Living Successfully, G.O.A.L.S., Inc.  She was hired through G.O.A.L.S., Inc. to work as a one-to-one aide for another child in Student's SDC class at Manzanita. She began working in the classroom in either late September or early October 2006. Ms. Carillo did not know Student prior to this assignment and she was not assigned to work with Student, but she believed that she may have worked with Student ten percent of the day during learning center time and at recess. She believed she observed Student being grabbed, pulled by his arm, and seated in a forceful manner, left to eat and drink without assistance, left with soiled clothes after eating his meal, and locked outside the classroom for twenty minutes while screaming and crying. She also believes that Student was placed in learning center activities[11] that exceeded his actual capabilities. Ms. Carillo wrote a report and referred it to individuals outside the District, including the Los Angeles County Sheriff's Department. Ms. Carillo did not identify the aides she believes she observed mishandling Student. She had experience working with disabled pupils but she was not a credentialed special education teacher, nor was she a trained therapist. Ms. Carillo's account of these incidents was refuted by both Ms. Orloff and Ms. Pauley. Ms. Pauley testified that as Student's SCA she was responsible for accommodating his needs and at no time was Ms. Carillo assigned to Student. Ms. Orloff also explained that Student was generally able to feed himself. When he was permitted to do

---

[10]  According to Ms. Orloff, Student was "somewhat non verbal" but had the capacity to speak certain phrases such as "please," "thank you," "I want my hat," and other phrases when communicating with his aide and other District staff. The IEP also noted that Student had the ability to inconsistently initiate one to two word phrases. He generally paired with the word "please" with the name of a desired object or activity in imitation of a model provided by his teacher or aide.

[11]  The SDC classes at Manzanita shared a learning activity center where students would rotate to centers containing different subject matter. This allowed a team teaching approach.

so, he would spill food or liquid on himself, which prompted staff to change his clothes. Student's mother was aware of this and provided the staff with at least two changes of clothes for instances where Student may spill food on himself.

21.    Student's mother testified only briefly at the hearing. Mother testified that Student had been moved from another SDC to Ms. Orloff's classroom because of allegations Student was abused by an aide in another classroom at Manzanita. This move was part of the resolution of a prior due process complaint filed by Student's Mother pertaining to alleged incidents occurring in the 2004-2005 school year, and was not factually related to the due process complaint filed on October 5, 2006. [12] Mother further testified that Ms. Orloff spoke nicely of Student to her. Mother visited Student's classroom approximately three to four times during the 2006-2007 school year and never saw the teacher, Student's SCA, or any other aides handling Student inappropriately. She always sent at least two outfits to school with Student so that he could be changed if necessary, and she never saw Student arrive at home wearing soiled or wet clothes. He did arrive home on one occasion with his wet clothes in a bag. Mother related one incident where Student came home from his class with a couple of scratches but she did not know "who to blame." Mother related another incident where Student came home wearing a change of clothes with someone else's belt. Other than these accounts, Mother testified that Student did not come home from Ms. Orloff's class with bruises nor did he appear to have been physically mishandled at school.

22.    There is no credible evidence to support Student's contention that these incidents took place, as reported, on October 2, 2006. Dr. John Porter, Director of Special Education testified that he was not in the classroom on the day of the alleged incidents. However, he was involved in the investigation of Ms. Carillo's report by the Los Angeles County Sheriff, who concluded that Ms. Carillo's allegations were unsubstantiated.

23.    Student's expert Dr. B.J. Freeman visited Student's class on two separate occasions between September and October 2006, and observed that the class was somewhat chaotic. [13] She also observed, on one of those occasions, Student being prompted by two aides who picked him up from the ground by the arms and carried or "dragged" him to a learning center activity. She generally questioned the training and qualifications of Ms. Orloff and the aides to apply appropriate behavior interventions with Student. Dr Freeman believed Ms. Orloff and the classroom aides needed more behavior management training and proper methods to more appropriately address Student's tantrums. Dr. Freeman admitted she

---

[12] Student made allegations of abuse and cruelty in a prior due process complaint, OAH Case Number N2006010878, filed January 18, 2006, which was resolved by settlement in or about July, 2006. Student alleged he was abused by an aide and/or teacher employed by District at Mesquite Elementary School, and that the alleged perpetrator was prosecuted by the Los Angeles County District Attorney in an unrelated civil or criminal action involving other students at Manzanita. Those claims of alleged abuse did not go to a due process hearing and are in no way relevant to the current due process complaint.

[13] One of Dr. Freeman's visits was specifically to audit the special education classes at Manzanita and to develop a proposal for an Autism Training Program. This visit was not connected with Dr. Freeman's evaluation of Student. There is no evidence whether District accepted Dr. Freeman's proposal.

did not personally witness incidents like those alleged by Ms. Carillo, but she felt that keeping Student in his current classroom environment was in and of itself inappropriate. Dr. Freeman's testimony was largely based upon her in-office assessment of Student and her two brief visits to Manznita. Dr. Freeman's opinion testimony was not persuasive and is insufficient to support Student's contention concerning the District's failure to provide trained staff to implement Student's IEP.

24.     Student failed to prove District denied him a FAPE in its implementation of the February 28, 2006 IEP.

*The Sensory Room*

25.     Student also contends he was inappropriately placed by the teacher and aide in the sensory room unattended for substantial periods of time where he would sleep, and that his placement in the room deprived him of interaction with his peers, which deprived him of educational benefit.

26.     The PBIP established reactive strategies to be employed in the event of a recurrence of Student's problem behaviors. The first step was to prompt Student to switch to a replacement behavior. The second step was to describe how staff should handle the problem behavior should it recur, the third step called for positive discussion with Student after the behavior ends, and the fourth step called for informing Student of any necessary classroom consequences, and the plan established an alternative procedure, which allowed Student to move to a quiet area of the classroom or the sensory room to rest or calm down, or to take a break by walking. The sensory room appeared to be the preferred strategy as it related to Student's problem behaviors. Ms. Orloff credibly testified that the sensory room was utilized for numerous purposes. The room was used when aides or the teacher needed a quiet place to work with a pupil or when a pupil needed to calm down. In Student's case, he had been placed in the sensory room, on occasion, to calm down when he went into a tantrum. Ms. Orloff explained that Student had a tendency to become fatigued in the afternoons and he was prone to fall asleep while in the sensory room because of his daily medication regimen. Ms. Pauley presented as a credible witness. She referred to Student as "her child." She took Student into the sensory room to work with him, he was not in the sensory room for more than 20-30 minutes at a time, and at no time was he left unattended or unsupervised during the time she was assigned as his SCA.

27.     There is no credible evidence that Student's placement in the sensory room unreasonably deprived him of interaction with his peers.

*Did District deny Student a FAPE by failing to provide Speech and Language and Occupational Therapy services offered in the February 28, 2006 IEP?*

28.     Student contends that District denied a FAPE because it did not provide the OT and the LAS offered in the IEP.

12

29.    Children with disabilities have the right to a FAPE that emphasizes special education and related services designed to meet their unique needs and to prepare them for employment and independent living.  To provide a FAPE, school districts are required to provide access to specialized instruction and related services which are individually designed to provide educational benefit.  If the school district's program was designed to address the student's unique educational needs, was reasonably calculated to provide the student with some educational benefit, and comported with the student's IEP, then the school district provided a FAPE.

30.    Ms. Orloff recounted, that Student began receiving both LAS and OT within weeks after Mother consented to the IEP sometime in the fall of the 2006-2007 school year. Ms. Orloff could not state the quantity of these services Student had received.

31.    Before Student rested on the fourth day of hearing, the parties stipulated to provide Student with compensatory education in the amount of 240 minutes of OT and 420 minutes of LAS (including 270 minutes of individual SAL and 150 minutes of group LAS). As a result, no additional evidence was presented on this issue. The stipulation resolved the issue and Student is entitled to compensatory OT and LAS services in accordance with the stipulation.

*Did the IEP offer Student an appropriate placement in the Least Restrictive Environment?*

32.    Student contended that Manzanita was not a suitable environment for him, and the IEP offer of placement at Manzanita was not appropriate.  Student requested placement at another school within the District, or in the alternative, placement in a NPS.

33.    A student's placement must be in the least restrictive environment.  In order to measure whether a placement is in the LRE, four factors must be considered: (1) the academic benefits available to the disabled student in a general education classroom, supplemented with appropriate aids and services, as compared with the academic benefits of a special education classroom; (2) the non-academic benefits of interaction with children who are not disabled; (3) the effect of the disabled student's presence on the teacher and other children in the classroom; and (4) the cost of mainstreaming the disabled student in a general education classroom.  Removal from the regular education environment should occur only when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

*Academic and Non-Academic Benefits*

34.    Student did not have an academic curriculum.  Student's placement was in an intensive SDC class where he was taught under a functional curriculum.  He was placed in a class specially designed to deliver intensive services to disabled students with a small teacher to student ratio.  The SDC also provided Student opportunities to participate in reverse mainstreaming where he mingled with general education students during lunch, recess, and for 15 to 30 minutes each day in the classroom.  Para educator, Charles Sims credibly

13

testified that during the 2006-2007 school year he worked as an aide in another SDC at Manzanita. He had some contact with Student during the school day on some days when the SDC classes shared the learning center activities. Mr. Sims also testified that Student was a loveable individual with whom he got along quite well. He further testified that Student was well received by the other students and Student appeared to get along with others during this activity.

*Student's Classroom Presence*

35.    Dr. Freeman believed that Student's behaviors were "out of control" such that he needed to be placed in a more restrictive environment until appropriate behavior interventions were applied for his benefit as well as that of his peers. Her testimony suggested that Student's presence in the classroom compromised the learning environment for his fellow students and staff. Contrary to Dr. Freeman's beliefs there is no evidence that Student is a disruptive or dangerous presence in the classroom. The evidence also establishes that Student's negative behaviors had improved since the last IEP. The PBIP developed in the February 28, 2006 IEP put in place behavior interventions that were utilized in Student's classroom. The testimony of Student's teacher and aide describe Student as happy, loveable, and helpful and to others. The IEP offered Student appropriate supplementary aids and services sufficient to support his placement in the SDC at Manzanita.

*Cost of Mainstreaming Student*

36.    Dr. Porter related that, while there were SDC programs in other schools in the District, none of them provided the intensive services designed to meet Student's unique educational needs, with opportunities for mainstreaming as were offered at Manzanita. As described in Finding of Fact 6, District's program consisted of "reverse mainstreaming" where general education students spent time in Student's SDC class interacting with the special education students. The cost of mainstreaming Student was not raised as a factor. Dr. Porter believed that Manzanita was the most appropriate placement for Student.

37.    Dr. Freeman knew of no NPS that would be appropriate for Student and offered no suggestion of what would be a more appropriate placement for Student in the District. However, her opinion that Student should be removed from the classroom and placed in a smaller setting until the implementation of more effective behavior interventions, suggested that Student be placed in a more restrictive environment. Such a placement would be inappropriate, given Student's progress toward some of his goals. Student offered no evidence of more appropriate placements, whether a NPS or another school within the District.

38.    The evidence overwhelmingly establishes that Student's placement at Manzanita constituted a far less restrictive environment than that suggested by Student. Under these circumstances, Student's contention that the IEP offer of placement at Manzanita was inappropriate is without merit. Student presented no specific credible evidence that any aspect of the school environment negatively impacted his progress or his

14

ability to access his education. District presented evidence that Student's placement and program at Manzanita were appropriate for him. The law defers to the school district with respect to the type of program selected for a student. Student's placement at Manzanita was appropriate, and it was in the least restrictive environment.

*Compensatory Education*

39.     Student contends that he was also entitled to compensatory education in the areas of behavioral services, social skills training, and a social recreational program.

40.     Compensatory education is an equitable remedy that courts may employ to craft appropriate relief for an aggrieved party. Equitable relief requires review of the conduct of both parties to determine whether relief is appropriate.

41.     Except for the stipulated award in Finding 31of LAS and OT, there is no support for an additional award of compensatory education in the areas enumerated in Finding of Fact 39, above. Compensatory education can only be awarded where it is found that there was a procedural or substantive denial of FAPE. Student did not prove he was entitled to compensatory education in the areas discussed in 39, above. Moreover, even if Student had proved a procedural violation and hence his entitlement to compensatory education, Student presented no evidence of how compensatory education would or should be determined for behavioral services, social skills training or a social recreational program.


LEGAL CONCLUSIONS

*Applicable Law*

1.     The burden of proof in an administrative hearing challenging an IEP is on the party seeking relief, whether it is the disabled child or the school district. *Schaeffer v. Weast, Superintendent, Montgomery County Public Schools, et al., Weast* (2005) 546 U.S. 126 S.Ct. 528, 163 L.Ed.2d 387.) In the case at bar, Student has the burden of proof. (*Schaeffer v. Superintendent, Montgomery County Public Schools, et al., Weast* (2005) 546 U.S. 49, [126 S.Ct. 528, 163 L.Ed.2d 387].)

2.     Pursuant to California special education law, the Individuals with Disabilities in Education Act (IDEA) and, effective July 1, 2005, the Individuals with Disabilities in Education Improvement Act (IDEIA), children with disabilities have the right to a FAPE that emphasizes special education and related services designed to meet their unique needs and to prepare them for employment and independent living. (Ed. Code, § 56000.)[14] FAPE consists of special education and related services that are available to the student at no charge to the parent or guardian, meet the state educational standards, include an appropriate school

---

[14] All statutory citations to the Education Code are to California law, unless otherwise noted.

education in the State involved, and conform to the child's IEP. (20 U.S.C. § 1402(9).) "Special education" is defined as specially designed instruction, at no cost to parents, to meet the unique needs of the student. (20 U.S.C. § 1402(29).)

3.    In *Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley* (1982) 458 U.S. 176, 200, [102 S.Ct. 3034] (hereafter, *Rowley*), the United States Supreme Court addressed the level of instruction and services that must be provided to a student with disabilities to satisfy the requirement of the IDEA. The Court determined that a student's IEP must be reasonably calculated to provide the student with some educational benefit, but that the IDEA does not require school districts to provide special education students with the best education available or to provide instruction or services that maximize a student's abilities. (*Id.* at pp. 198-200.) The Court stated that school districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instructional and related services, which are individually designed to provide educational benefit to the student. (*Id.* at p. 201.)

4.    To determine whether a school district substantively offered FAPE to a student, the adequacy of the school district's proposed program must be determined. (*Gregory K. v. Longview School District* (9th Cir. 1987) 811 F.2d 1307, 1314.) Under *Rowley* and state and federal statutes, the standard for determining whether a district's provision of services substantively and procedurally provided a FAPE involves four factors: (1) the services must be designed to meet the student's unique needs; (2) the services must be reasonably designed to provide some educational benefit; (3) the services must conform to the IEP as written; and (4) the program offered must be designed to provide the student with the foregoing in the least restrictive environment. While this requires a school district to provide a disabled child with meaningful access to education, it does not mean that the school district is required to guarantee successful results. (20 U.S.C. § 1412(a)(5)(A); Ed. Code, § 56301.)

5.    School districts are required to provide each special education student with a program in the least restrictive environment, with removal from the regular education environment occurring only when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services could not be achieved satisfactorily. (20 U.S.C. § 1412, subd. (a)(5)(A); Ed. Code, § 56031.) Mainstreaming is not required in every case. (*Heather S. v. State of Wisconsin* (7th Cir. 1997) 125 F.3d 1045, 1056.) However, to the maximum extent appropriate, special education students should have opportunities to interact with general education peers. (Ed. Code, § 56031.) In order to measure whether a placement is in the LRE, four factors must be considered: (1) the academic benefits available to the disabled student in a general education classroom, supplemented with appropriate aids and services, as compared with the academic benefits of a special education classroom; (2) the non-academic benefits of interaction with children who are not disabled; (3) the effect of the disabled student's presence on the teacher and other children in the classroom; and (4) the cost of mainstreaming the disabled student in

a general education classroom. *Sacramento Unified School District v. Holland* (9th Cir. 1994) 14 F.3d 1398, 1403.)

6.    School districts receiving federal funds under IDEA are required under 20 United States Code, section 1414, subd. (d)(1)(A)(i) to establish an IEP for each child with a disability that includes: (1) a statement regarding the child's then-present levels of academic achievement and functional performance; (2) measurable annual goals, including academic and functional goals designed to meet the child's educational needs and enable the child to make progress; (3) a description of how the child's progress will be measured; (4) a statement of the special education and related or supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child; (5) a statement of the program modifications or supports that will be provided; (6) an explanation of the extent to which the child will not participate with nondisabled children in the regular class; and (7) other required information, including the anticipated frequency, location, and duration of the services. (See also, Ed. Code, § 56345, subd. (a).)

7.    An IEP is evaluated in light of information available at the time it was developed; it is not judged in hindsight. (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.) "An IEP is a snapshot, not a retrospective." (*Id.* at p. 1149, citing *Fuhrmann v. East Hanover Bd. of Education* (3d Cir. 1993) 993 F.2d 1031, 1041.) It must be evaluated in terms of what was objectively reasonable when the IEP was developed. (*Ibid.*) The focus is on the placement offered by the school district, not on the alternative preferred by the parents. (*Gregory K. v. Longview School Dist, supra*, 811 F.2d at p. 1314.)

8.    A failure to implement a Student's IEP will constitute a violation of the Student's right to a FAPE if the failure was material. There is no statutory requirement that a District must perfectly adhere to an IEP and, therefore, minor implementation failures will not be deemed a denial of FAPE. A material failure to implement an IEP occurs when the services a school district provides to a disabled student fall significantly short of the services required by the Student's IEP. (*Van Duyn, et al. v. Baker School District 5J* (9th Cir. 2007) 481 F.3d 770 (hereafter, *Van Duyn*).)

9.    An IEP team must consider whether a child's behavior impedes his or her learning or that of others. (20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i), (b); Ed. Code, § 56341.1, subd. (b)(1).) if the team determines that it does, it must consider the use of positive behavioral interventions and supports, and other strategies to address the behavior.

10.    When a child exhibits a serious behavior problem, such as self-injurious or assaultive behavior, California law imposes specific and extensive requirements for the development of a functional analysis assessment and a behavior intervention plan. (Cal. Code Regs., tit. 5, §§ 3001, subd. (f), 3052.) There are many behaviors that will impede a child's learning or that of others that do not meet the requirements for a serious behavior problem requiring a behavior intervention plan.

17

11.    These less serious behaviors require the IEP team to consider and, if necessary, develop positive behavioral interventions, strategies and supports. (20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i); Ed. Code, § 56341.1, subd. (b)(1).) Behavioral interventions should be designed to provide the student with access to a variety of settings and to ensure the student's right to placement in the least restrictive educational environment. (*Ibid.*) An IEP that does not appropriately address behavior that impedes a child's learning denies a student a FAPE. (*Neosho R V Sch. Dist., v. Clark* (8th Cir. 2003) 315 F.3d 1022, 1028; *Escambia County Bd. of Educ. v. Benton* (S.D. Ala. 2005) 406 F.Supp.2d 1248, 1265.)

12.    An Administrative Law Judge may order a school district to provide compensatory education to a pupil who has been denied a FAPE. (*Student W. v. Puyallup Sch. Dist.* (9th Cir. 1994) 31 F.3d 1489, 1486.) Compensatory education is an equitable remedy that courts may employ to craft appropriate relief for an aggrieved party. The law does not require that day-for-day compensation be awarded for lost or missed time. Equitable relief requires review of the conduct of both parties to determine whether relief is appropriate. (*W.G. v. Bd. Of Trustees of Target Range Sch. Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.) As the court indicated in *Miller v. San Mateo-Foster City Unified School District*, supra, 318 F.Supp.2d 851, 859-860: "equitable relief is a fact-specific inquiry in which the Ninth Circuit had held that 'the conduct of both parties must be reviewed to determine whether relief is appropriate.'"

*Determination of Issues*

Based on the factual findings and applicable law, it is determined as follows:

Issue 1A:    Did District deny Student a free, appropriate, public education (FAPE) for the 2006 – 2007 school year by failing to failing to provide adequately trained staff, including teacher and aides, to implement the IEP?

13.    Relying upon Factual Findings 1 to 27 and Legal Conclusions 1 to 8, the February 28, 2006 IEP provided Student a FAPE. District's SDC teacher and Student's SCA were more than adequately trained and sufficiently competent to implement Student's IEP, including the PBIP.

Issue 1B:    Did District deny Student a free, appropriate, public education (FAPE) for the 2006 – 2007 school year, by failing to provide speech and language and occupational therapy services under the February 28, 2006 IEP?

14.    As set forth in Factual Findings 38 to 40 and Legal Conclusions 1 to 8, and 12, the issue was resolved by stipulation. Student will receive an award of OT and SAL as compensatory education.

Issue 1C:    Did District deny Student the appropriate placement in the least restrictive environment?

15.    Based upon the standards enunciated by the ninth circuit in *Sacramento Unified School District v. Holland, (Rachel H), Supra,* as set forth in Legal Conclusion 5 to 7, to the maximum extent appropriate, special education students should have opportunities to interact with general education peers.  Applying the four pronged test of *Rachel H.,* the IEP considered that Student required placement in a small specialized instructional setting for more than 50 percent of the day.  The SDC intensive at Manzanita provided such a setting. The evidence established Student derived some educational benefit from his placement where he participated in reverse mainstreaming with general education students. Moreover, Student presented no persuasive evidence that he should be removed and placed in an even more restrictive environment where he should remain until he developed other social skills.  The IEP clearly addressed whether Student's continued placement at Manzanita was of benefit and correctly concluded that it was appropriate.  Also of note is the absence of any evidence by Student of other placements that Student might deem appropriate.

Based upon the Findings of Fact 1 to 10 and 33 to 38, and Legal Conclusions 5 to 7, the IEP offer of placement at the Manzanita SDC was the appropriate placement for Student in the least restrictive environment.

Issue 2:    Is Student entitled to compensatory education in the area of behavioral services, social skills training and a social recreational program?

16.    Relying on Findings of Fact 39-41 and Legal Conclusions 12, Student did not meet his burden of proof that he is entitled to compensatory education in the area of behavioral services, social skills training and a social recreational program.

## ORDER

1.    District is ordered to provide Student compensatory education in the amount of 240 minutes of OT and 420 minutes of LAS (including 270 minutes of individual LAS and 150 minutes of group LAS).

2.    The offer of placement in the Manzanita SDC was appropriate, in the least restrictive environment, and provided Student a FAPE.

3.    District provided adequately trained teachers and aides to implement Student's February 28, 2006 IEP.

4.    Student is not entitled to compensatory education in the area of behavioral services, social skills training and a social recreational program.

PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter. Pursuant to this mandate, it is determined that the Student prevailed on issue 1A and District prevailed on issues 1B, 1C and 2.

RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by this Decision. Pursuant to Education Code section 56505, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt.

July 2, 2007

STELLA L. OWENS-MURRELL
Administrative Law Judge
Office of Administrative Hearings

**EXHIBIT 2**

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>STUDENT,<br><br>        Petitioner,<br><br>v.<br><br>PALMDALE ELEMENTARY SCHOOL<br>DISTRICT,<br><br>        Respondent. | OAH CASE NO. N2006110471 |

## DECISION

Elsa H. Jones, Administrative Law Judge (ALJ), Office of Administrative Hearings, Special Education Division (OAH), heard this matter on January 12, 2007, and on February 15 and 16, 2007, in Palmdale, California.

Petitioner/Student (Student) was represented by Angela L. Gilmartin, Attorney at Law. Student's mother (Mother) was present throughout the hearing on Student's behalf. Student's father (Father) was also present on the first day of the hearing.

Respondent Palmdale Elementary School District (District) was represented by Lee G. Rideout, Attorney at Law, Fagen Friedman & Fulfrost. John Porter, Director of Special Education, and David B. Brown, Assistant Superintendent, Special Education/Student Services, were also present throughout the hearing on behalf of District.

Sworn testimony and documentary evidence were received at the hearing. At the conclusion of the hearing, the matter was continued until February 28, 2007, for the parties to file closing briefs. The parties timely filed closing briefs. Student's closing brief was marked as Student's exhibit 17. District's closing brief was marked as respondent's exhibit B. On February 28, 2007, the matter was submitted for decision.

## ISSUES

1.     Did District deny Student a free, appropriate, public education (FAPE) from May 2006, through the present, by reason of the following:

      A.     The failure of Student's June 20, 2006 Individualized Education Program (IEP) to include appropriate annual goals and short-term objectives based upon Student's assessment results, and which were reasonably calculated to provide him with an educational benefit;

      B.     District's failure to provide Student with the Designated Instructional Services (DIS), behavioral support, and assistive technology necessary to access his education;

      C.     The failure of Student's June 20, 2006 IEP to provide Student with an appropriate placement in the least restrictive environment; and

      D.     District's failure to provide qualified personnel to render special education and related services to Student? [1]

2.     Did District fail to assess Student in all areas of suspected disability and/or fail to appropriately assess Student from May 2006 through the present?

3.     Is Student entitled to reimbursement for the assistive technology/augmentative alternative communication device (AT/ACC) assessment performed on July 19, 2006, by Dynamic Therapy Solutions?

4.     Is Student entitled to placement at another school, compensatory education, assistive technology devices, and additional services, including occupational therapy (OT), speech and language therapy, assistive technology therapy, a functional analysis assessment (FAA), a behavioral intervention plan (BIP), and a one-to-one aide? [2]

---

[1] The most recent version of the IDEA generally eliminated the requirement that IEPs contain short-term objectives. However, this requirement remains for children who take alternative assessments, such as Student. (20 U.S.C. § 1414(d)(1)(A)(i)(I)(cc).)

[2] In his due process complaint, Student alleges that he is entitled to be moved to another school setting based upon his school's status as a Program Improvement Year 4 school under the No Child Left Behind Act of 2001. Student withdrew this contention at the commencement of the hearing.

CONTENTIONS OF THE PARTIES

Student contends his June 2006 IEP, denied him a FAPE. Specifically, Student contends that his June 2006 IEP, failed to include appropriate annual goals and short-term objectives, because it was not based upon Student's most recent assessment results from his previous school district in Washington. Further, Student contends that District failed to provide Student with the necessary and appropriate speech and language services, OT, a one-to-one aide, adaptive physical education (APE), and an augmentative alternative communication device (AAC device). Student further contends that his placement at Manzanita Elementary School (Manzanita) was not an appropriate environment, as the school was not clean, was not safe, and the teachers and personnel were unqualified, untrained, and hostile to students. Student alleges that District failed to perform necessary assessments, such as an FAA and an AT/ACC assessment, which would have revealed that Student required behavioral support and an AAC device. Student contends that he is entitled to the following: (1) compensatory education and additional services in the area of OT, to be provided by Carmen Rojas Duran, Student's current provider; (2) compensatory education and additional services in the area of speech and language services, to be provided by an NPA; (3) a one-to-one aide, including during transportation to and from school; (4) an FAA and a BIP, (5) placement in another school, whether a non-public school (NPS) or another District school; (5) reimbursement for the AT/ACC assessment obtained by Student's parents; and (6) an AAC device.

District denies that Student is entitled to any relief. District contends that, at all relevant times, it has consistently offered and provided Student a FAPE. District contends that it relied upon the assessments upon which the Washington IEP was based, and its own OT assessment, and that it provided appropriate services in accordance with Student's unique needs. District contends that Manzanita was an appropriate placement for Student, and that its teachers and personnel were qualified. District further contends that it was in the process of performing an AT/ACC assessment when it learned that Student, without District's knowledge, had already arranged for such an assessment. District further contends that it was attempting to schedule an IEP meeting to discuss the results of the AT/ACC assessment, and was also in the process of performing a behavioral observation of Student, when, without prior notice, parents elected not to send Student to school.

FACTUAL FINDINGS

*General Background and Jurisdictional Matters*

1.    Student was born on January 1, 1996. He is currently 11 years old, and in the fifth grade. When he was approximately three years old, he was diagnosed with autism. Student has deficits in the areas of sensory modulation, self-care skills, fine motor skills, and visual motor skills. He is nonverbal and communicates through a combination of facial expressions, physical closeness, vocalizations, and some use of photographs and picture symbols. Student has also used various communication devices of various levels of

3

technology.  These include the Picture Exchange Communication Systems (PECS), a
communication notebook, and a display voice output communication aid known as a
Tech/Speak.  The Tech/Speak device has an array of icons on it, and, when Student pushes
an icon, a pre-recorded voice states what the icon represents.

      2.     Student commenced residing in the District in April 2006, when his family
moved to the District from the state of Washington.  Student was then 10 years old and in the
fourth grade.  Immediately preceding his family's relocation to California, Student received
special education services in Washington as a student with autism.  He attended a special day
class (SDC) in a local school, Chinook Elementary School (Chinook), for two hours a day.
For the remainder of the school day, he was home-schooled by Mother.  Mother has no
teaching credentials, and is not formally trained as a classroom teacher.  The services Student
received at Chinook were supplemented by a variety of services provided by the state and by
private providers.  His most recent IEP from Washington, dated April 20, 2006, (the
Washington IEP) noted that Student's unique needs were in the areas of academics, social
skills, adaptive skills, communication, and fine motor skills.

      3.     When Student enrolled in the District, Student was placed in an SDC in
Manzanita.  He attended Manzanita until the end of the 2005-2006 school year in late June
2006.  In July 2006, he attended Buena Vista School, also in the District, for extended school
year (ESY) services.  The ESY session ended at approximately the end of July 2006.  On
approximately September 5, 2006, when Student commenced fifth grade, Student returned to
an SDC class at Manzanita.  His last day of attendance at Manzanita was approximately
October 20, 2006.  Thereafter, his parents elected not to send him to school, but have kept
him at home.  District has offered no services to Student since he ceased attending school.

*Student's Initial Placement by the District*

      4.     On May 5, 2006, as part of the process of enrolling Student in the District,
Student's Mother filled out and submitted a District internal form entitled "Special Education
Intake and Placement Determination."  On the form, Mother stated that Student's primary
disability was "Autistic" and noted that he was non-verbal.  She circled only two items on
the form to describe Student's previous program: SDC and LSS (speech and language).  She
also stated on the form that Student received OT and was in a self-contained classroom.  The
form permitted a parent to indicate other services, such as APE, Counseling and AB 3632,
but Mother did not circle any of those items.

      5.     Mother also filled out a section of the form entitled "Special Needs/Concerns."
Under "Equipment," she listed "Augmentative Communication Device."  She also noted that
Student was unaware of danger and will wander off, and that he uses some sign language.  In
a part of the form labeled "Other Special Requirements," Mother wrote ambiguous language
regarding Student's requirements for one-to-one help, that he needed help with
communication, and referenced a "trained person."  Language on the form advised Mother
that Student would be placed in an interim placement for 30 days, and that by the end of that

4

period, an IEP team would review the placement and make a final recommendation. Mother signed the form, indicating her consent to the interim placement.

6.      Underneath Mother's signature, at the bottom of the form, District completed the Placement Determination section of the form. District assigned Student to Manzanita, with Ms. Orloff as his teacher. The form indicated that Student's records would be distributed to the District File, SDC Teacher, LSS Teacher, APE teacher, and to the school nurse and the OT.

7.      On May 23, 2006, at approximately the same time as Student commenced attending Manzanita, District convened an IEP meeting. The meeting was attended by Mother, Father, Ms. Monarch (the school psychologist), Ms. Orloff, Student's special education teacher, and Ms. Rhinehart, a speech and language therapist. The IEP is denoted as an "addendum IEP," and was not the interim IEP to review the Washington IEP. Rather, the May 23, 2006 "addendum IEP" was convened because the Washington IEP only provided for Student's attendance at school for two hours per day. The Manzanita IEP team felt this was not sufficient for Student, and agreed that he should participate in a full-day program. The IEP team also noted that Student would benefit from ESY, which was not provided by the Washington IEP, and agreed that specialized transportation would be provided "home to school." The team also noted that Student would be placed in an SDC in an integrated facility, for five days per week, that Student would receive speech and language therapy two times weekly, for 30 minutes per session, and that he would receive OT for 30 minutes, once per week. The IEP was signed by both of Student's parents, indicating their consent to the IEP.

*1.      Whether the IEP of June 20, 2006, and its Implementation Provided a FAPE*

        *A.      IEP of June 20, 2006*

8.      Student contends that his June 20, 2006 IEP did not provide him a FAPE. He alleges that the IEP goals and objectives were not based upon Student's assessment results and were not reasonably calculated to provide him with an educational benefit. In particular, Student contends that the June 20, 2006 IEP did not provide for APE, a one-to-one aide, sufficient speech and language and OT services, behavioral services, or assistive technology in the form of a communication device.

9.      A school district provides a FAPE if the school district's program was designed to address the student's unique educational needs, was reasonably calculated to provide the student with some educational benefit, and comported with the student's IEP. If the school district's program meets these requirements, then the district has provided a FAPE even if the student's parents preferred another program, and even if parents' preferred program would have resulted in greater educational benefit. An IEP is evaluated in light of information available to the IEP team at the time it was developed; it is not judged in hindsight.

10.     If a student who is receiving special education services transfers during the academic year into another school district which is in a different Special Education Local Plan Area (SELPA), the new school district shall, within 30 days, adopt the student's previously approved IEP, or it shall assess the student in all areas of disability and develop, adopt, and implement a new IEP.

11.     A school district must perform an assessment every three years, but it has no obligation to assess a student more frequently than annually, unless the district and the parent agree otherwise.

12.     An IEP team must consider whether the student requires assistive technology and, if so, the nature and amount of such services must be set forth in the IEP. If assistive technology is required to meet the student's unique needs, and to provide the student with an educational benefit, then the district's failure to provide it is a denial of a FAPE.

13.     On June 20, 2006, District convened the statutory 30-day interim IEP meeting to review Student's placement and program. The IEP team consisted of Mother, Father, Ms. Monarch (the school psychologist), Ms. Orloff (the special education teacher), Ms. Rhinehart (the speech and language pathologist), and the school nurse.[3] The team noted Student's primary disability as autism, and determined that 85 percent of Student's day should be spent outside of the general education setting. The team determined that Student would participate in breakfast, lunch, recess, and assemblies with the general education students. The team determined that Student should be placed in an SDC, five days per week, with DIS services, and would be taught a functional skills curriculum. Student was also to receive ESY services. The team agreed that Student would receive speech and language therapy two times per week, for 30 minutes per session. The team also agreed that Student would receive OT one day per week, for 30 minutes per session.

14.     The team agreed that Student would receive door-to-door transportation services. The team noted Student's use of an icon communication system, and recommended that District perform an AT/ACC assessment. As of the date of this IEP, District had concluded no assessments of Student, but a report of an OT evaluation was pending, as is further discussed below.

15.     The team did not recommend any behavior plan. Rather, the team decided that the "School/Classroom Management System" was sufficient. The team did not provide for a one-to-one aide.

16.     The team determined that Student would take alternative statewide and district assessments. The team also designated various testing and classroom accommodations. For

---

[3]Student contended that no general education teacher was present at the meeting. This contention was raised only in passing in the due process complaint, and Student did not contend that this alleged failure constituted a denial of a FAPE. In any event, there was no defect in the composition of the IEP team, as Ms. Orloff was also credentialed as a general education teacher

testing, these included giving extra time, testing over more than one day, testing individually, simplifying test directions, giving on-task reminders and verbal encouragement, and turning the pages for Student. The team also agreed upon classroom accommodations, to apply to all subjects. These included reading aloud, giving extra time, minimizing distractions, oral testing, no spelling or handwriting penalty, preferential seating, and giving extra space. Instructional strategies included checking work in progress, giving immediate feedback, using a multi-sensory approach, giving concrete examples, reviewing and repeating instructions, pre-teaching content, giving visual reminders and visual reinforcement, providing models, giving extra practice, and monitoring assignments.

17.     The team noted that Student was receiving DIS services in speech and language and OT as of the date of the IEP. The team noted that Student liked to participate in group activities, enjoyed the outdoors and playing with a ball, that he was developing some eye contact, and that his attention span had increased. The IEP refers to the parents' concerns about "behavioral issues," such as Student's screaming and making noises, "which have decreased." The IEP reflects that parents discussed Student's integration into the general education population. The team found, however, that Student's cognitive, communication, social/emotional, self-help/independent living, and motor skills, as well as his general attention span, were significantly below the level of his peers, and those skills were not directly addressed in the general education curriculum.

18.     The team reviewed Student's present level of performance, and his goals and objectives, as set forth in the Washington IEP, and concluded that the goals and objectives contained in the Washington IEP continued to be appropriate. The IEP team attached pages from the Washington IEP to the June 20, 2006 IEP. Those pages stated goals and objectives in the areas of pre-academic skills, fine motor/pre-writing skills, daily living skills (ability to follow classroom structure and routine), adaptive/daily living skills (following a bathroom schedule) behavior (functional dining skills); and receptive and expressive language skills.

19.     The Washington IEP was based upon several assessments of Student that occurred at various times in 2005. They included: (1) a speech and language evaluation completed on July 21, 2005, that was performed by Puget Sound Therapy Services (PSTS), a private clinic; and (2) a psychoeducation evaluation that occurred in either September or May of 2005.[4] The Washington IEP stated that the meeting was convened at Mother's request because of the family's relocation to California. The team included Mother, a special education teacher, an OT, a speech and language specialist, a program specialist, and the school principal. Mother approved of the services provided in the Washington IEP.

20.     The Washington IEP contained a "Summary of Services Matrix" that specified Student would receive communication services from a speech/language pathologist for 30

_____

[4]The first page of the Washington IEP states, "Date of Most Recent Evaluation: 9/9/2005." The initial page of the Present Levels of Educational Performance refers to an evaluation completed by an evaluation team on May 25, 2005.

minutes, two days per week, and OT services for 30 minutes, one day per week. No APE services were specified, and no present levels of performance or goals and objectives for APE were identified in the body of the IEP. However, the body of the IEP noted that Student needed breaks involving physical activity, and structured motor learning activities. The Washington IEP stated, "For example: Chinook provided an adaptive PE class for [Student] for 20 minutes, 3 x a week." The Washington IEP specifically stated that Student was not in need of ESY. The Washington IEP, like the June 20, 2006 IEP, did not include a behavioral plan, nor recommend a behavioral assessment. The Washington IEP, like the June 20, 2006 IEP, noted that, due to developmental delays, Student was unable to benefit from the curriculum in the general education environment. The Washington IEP stated that Student would join his general education peers at assemblies, recess, lunch, special social classroom activities and projects, field trips, after school activities, and at any other activity deemed appropriate by the IEP team.

21.    The Washington IEP contained boxes that the Washington team checked to indicate whether Student had various needs. The Washington IEP team specifically checked the "No" box as to whether Student "requires assistive technology in order to receive FAPE."[5]

22.    The June 20, 2006 IEP team discussed Student's classroom schedules and activities. The team also discussed speech and language services. The team stated that the Washington IEP provided 60 minutes weekly of speech and language services individually, but the Washington IEP did not describe group services. At the June 20, 2006 meeting, Mother expressed a desire for more individualized speech and language services. The team agreed to investigate the services provided in Washington, and to reconvene by October 15, 2006, to address Student's needs. The team also noted that Student had previously been using a manual communication device, on which he had been working with two-word commands, and that he had worked with devices using 8-32 icons. The IEP does not reflect that Student's parents mentioned a need for APE or for a one-to-one aide at the meeting.

23.    The team agreed that Student's then-current program was the most appropriate and least restrictive to meet his current needs. The team noted that progress reports would be provided each trimester. Mother and Father consented to the IEP, including, specifically, the eligibility determination, the goals and objectives, and the placement.

24.    The June 20, 2006 IEP did not reference at least one matter that was mentioned in the present levels of performance section of the Washington IEP. The Washington IEP team noted that Student required "one-to-one supervision" in the classroom.

_____

[5] Student contends that this is an error. In support of his contention, Student cites the fact that the box referring to whether the Student has "communication needs," is also checked "No." Checking the communication needs box "No" is obviously an error, in view of the numerous references to Student's communication needs throughout the IEP, and the fact that the IEP provides speech and language services. In contrast, the directions next to the box regarding AT require that, if the box is checked "Yes," the necessary AT devices and services are to be described in "appropriate sections" of the IEP. The Washington IEP has no descriptions of AT devices, such as Student's AAC device. Further, Chinook did not provide Student with an AAC device.

The team also remarked that Student required close supervision because he can dart out of a room "at any opportunity" and that he moves "VERY fast. The Washington IEP does not designate a one-to-one aide, however, and does not specify any duties for such person.

25.    The June 20, 2006 IEP also does not refer to two progress reports of Student that were generated by PSTS, but that were not relied upon in the Washington IEP because they post-dated the Washington IEP. One of the reports is an "Occupational Therapy Discharge Summary" dated April 26, 2006. The other report is a "Speech/Language Therapy Progress Summary/Discharge Note" dated May 16, 2006. Mother testified that she provided Ms. Orloff and the Manzanita receptionist with copies of these reports, but she was unable to remember when she delivered the reports. There was no evidence that the reports were mentioned by any participant at either the May 23 or June 20, 2006 IEP meetings, or were produced at either of these meetings. Mother does not recall whether she received the May 16, 2006 speech and language report prior to the June 20, 2006 IEP meeting.

26.    The PSTS OT report reflects that Student had been receiving OT services at Chinook, as well as from PSTS. According to the report, PSTS rendered OT services once per week from September 17, 2003, through May 11, 2005, and again from October 26, 2005, through April 19, 2006. The length of time for each session is not noted. The OT report recommended that Student continue to receive OT services at school. The report also recommended that Student receive outpatient OT, "to continue addressing self-help skills, visual motor and fine motor skills, and especially to assist in sensory processing." The report does not suggest the duration of the recommended OT sessions.

27.    The PSTS Speech/Language Therapy Progress Summary/Discharge Note reflected that Student received services once to twice weekly during the period from September 2003 to June 2005, at which time services were discontinued due to Student's family relocation to California. The report reveals that services were re-initiated weekly from January 2006, after Student's family returned to Washington from California, through April 19, 2006, when PSTS discharged Student due to the family's second relocation to California. The report specifically states that Student's "*previous goals were re-established during this reporting,*" and notes that those goals remain appropriate for Student as of the time of his discharge. [Emphasis added.] The report discusses the goals, and Student's progress with respect to them. The report notes that Student lost his Tech Speak device during the family's move back to Washington from California in 2005, and that PSTS had generated a Letter of Medical Necessity so that another such device could be obtained. The report mentions that the Letter of Medical Necessity also requested certain communication software for Student's functional communication skills. The report recommended that Student continue weekly speech and language service sessions, but does not recommend a duration for the sessions, nor specify whether the services should be provided on a group or individual basis. The report recommended that Student's educational program offer a "total communication approach" to language learning, through use of visual supports such as signs, picture symbols, and voice output devices in the classroom. The report also recommended that visual supports, such as a visual timer, and picture/photograph schedules be an integral part of Student's day; that his communication notebook should continue to be used, and that

Student's use of additional communication software programs should be investigated and addressed.

28.    District's program as set forth in the IEP of June 20, 2006, was appropriately based upon the Student's assessment results that were relied upon in the Washington IEP. District was entitled to rely upon those assessment results, as no triennial assessments were due, and District was entitled to implement the Washington IEP rather than to perform its own assessments and develop its own IEP. The June 20, 2006, IEP provided the OT and speech and language services that were comparable to those designated in the Washington IEP, insofar as the team was able to determine at that time. The team agreed to further investigate the speech and language services provided in Washington and to meet by October 15, 2006, to further consider student's needs. The June 20, 2006 IEP did not provide services that were not designated in the Washington IEP, such as APE, behavioral support services, an AAC device, and a one-to-one aide. Student's assessment results, as described in the Washington IEP, did not specify that such services were required for Student to benefit from and access his education.

29.    There is conflicting evidence as to whether District received the subsequent OT and speech and language reports prepared by PSTS, and there was no evidence that those reports were given to District prior to the June 20, 2006 IEP. However, those reports did not recommend any changes in the levels of OT and speech and language services Student was receiving as of the date of those reports. In this regard, neither the PSTS OT report nor the PSTS speech and language report recommended a specified number of hours of services that should be provided. Student presented no evidence that the District's failure to consider the PSTS reports at the IEP meeting of June 20, 2006, caused Student any loss of educational benefit, or caused the IEP team to be misinformed about Student's educational needs. To the contrary, the PSTS speech and language report specifically stated that the goals from its previous report were still appropriate. The speech and language goals from a previous PSTS report dated July 21, 2005, were specifically incorporated into the Washington IEP, and those goals were incorporated into the June 20, 2006 IEP. The IEP team was clearly aware that Student required OT and speech and language services. The speech and language report recommended the use of a communication device, but District's IEP team had already recommended that an AT/ACC assessment be performed to determine whether a communication device was necessary. Student presented no evidence of any specific aspect of the PSTS report that would have affected the IEP team's analysis of Student's needs and its recommendations for services.

30.    Judged from the perspective of the IEP team as of the time of the IEP meeting, the program set forth in the June 20, 2006 IEP provided Student a FAPE. It addressed Student's unique needs in preacademic skills, motor skills, social skills, adaptive skills, and communication skills, by incorporating the goals and objectives of the Washington IEP, which were, in turn, based upon the results of appropriate assessments. The IEP was reasonably calculated to provide Student with an educational benefit. Indeed, the IEP team's determination to provide Student with an educational benefit is demonstrated by its

recommendation at the May 23, 2006 IEP meeting that Student be provided with ESY, which is a service that was not provided by the Washington IEP.

B.    *Services Provided by the District*

31.    Student contends that District denied a FAPE because it did not provide the OT and the speech and language therapy Student required, behavioral support, APE, a one-to-one aide, and an AAC device.

32.    To provide a FAPE, school districts are required to provide access to specialized instruction and related services which are individually designed to provide educational benefit. Additionally, the IEP team determines whether assistive technology and services are required, and the nature and amount of such services must be included in the IEP. If the school district's program was designed to address the student's unique educational needs, was reasonably calculated to provide the student with some educational benefit, and comported with the student's IEP, then the school district provided a FAPE.

33.    After the June 20, 2006, IEP, Student completed the 2005-2006 school year in Ms. Orloff's special day class. The class contained approximately 10 students, with at least two or three adult aides in addition to Ms. Orloff. At the time Student joined the class, District had commenced instituting a "Center" program. This program consisted of various classrooms, each focusing on different skills that the students rotated through during a portion of the day. Student received both OT and speech and language services, pursuant to the May 23 and June 20, 2006 IEPs, and he was undergoing an OT evaluation, as is further described below. The level of OT services was subsequently increased, pursuant to an addendum to the June 20, 2006 IEP, which is also described below. Student received APE, because other students in his class had IEPs which required APE. Since APE often requires small group involvement, it was convenient for District to provide the APE to all of the children in Student's class. Student joined the general education environment for breakfast, lunch, and recess.

34.    During the month of July 2006, Student attended Buena Vista Elementary School (Buena Vista), also in the District, for ESY. He received OT there from Ms. Duran, pursuant to the addendum IEP of June 22, 2006, which is further discussed below. He also received speech and language therapy there, pursuant to his June 20, 2006 IEP. His ESY special education teacher was Ms. Fonda Abbey, whom Ms. Duran described as a highly skilled teacher.

35.    On approximately September 5, 2006, Student commenced the 2006-2007 school year at Manzanita, in an SDC taught by Mr. Haddad with the assistance of four adult aides. Student's class consisted of seven to eight students. The Center system continued to be implemented. Student received speech and language therapy, pursuant to his June 20, 2006 IEP, and OT at the increased level specified in the addendum to the June 20, 2006 IEP. However, District delayed providing Student's OT and speech and language services for the 2006-2007 school year until approximately the first week in October, because District had

11

difficulty contracting for staff for such services. Other than these lapses in OT and speech and language services, Student presented no specific evidence that he did not receive the speech and language and OT services as set forth in his May 23, 2006 IEP, or in his June 20, 2006 IEP and its addendum. Student presented no specific evidence that the OT and speech and language therapy that he received was insufficient to meet his unique needs and provide him with an educational benefit.

36.    As he did during the 2005-2006 school year, Student participated in APE with other children in his class. He joined the general education environment for breakfast, lunch, and recess, as set forth in his June 20, 2006 IEP. Student used the PECS system, and Mr. Haddad and his aides used picture schedules in the classroom. Student did not have an AAC device. Mr. Haddad testified, without contradiction, that Student progressed in his curriculum during the time that Student was in Mr. Haddad's class.

37.    As was discussed above, Student received APE, even though no such service was specified in his IEP. District never provided Student with a one-to-one aide, behavioral support, or an AAC device. With respect to the one-to-one aide, the student/adult ratio in Ms. Orloff's classroom and, in particular, in Mr. Haddad's classroom, almost reached the level of one-to-one assistance. District provided the "close supervision" mentioned in the Washington IEP. Significantly, there was insufficient evidence that Student required a one-to-one aide. Whatever his conduct in Washington, there was no evidence that he ever ran away from class while at Manzanita, or that he required a one-to-one aid to help him communicate his needs. Ms. Duran testified that Student needed a one-to-one aide, but she did not include any such recommendation in her report of June 20, 2006, nor did she make any such recommendation to the District while she was providing OT services to Student during the ESY session in July 2006. Further, she had never observed Student at Manzanita during the 2006-2007 school year, while he was in Mr. Haddad's classroom and receiving nearly one-to-one assistance. Ms. Duran's testimony was largely based upon her talks with Mother and upon her recent observations of Student in connection with the private OT services she commenced providing him approximately two weeks before the hearing. Ms. Duran's testimony is insufficient to support Student's contention regarding his need for a one-to-one aide.

38.    Both the Washington IEP and Student's June 20, 2006 IEP noted that Student did not require a behavioral support plan. Student presented no evidence that, as of the time of the IEPs, Student required any behavioral support. With respect to the AAC device, as is further discussed below, District was attempting to arrange an IEP meeting to discuss the recommendations of the AT/ACC assessment that the June 20, 2006 IEP team had agreed should be performed, including the recommendation that Student receive an AAC device that was different than the Tech-Speak device that Student had previously used. Such an IEP meeting could also have included a discussion of the report's recommendation that Student receive an FAA and behavioral intervention, and also the recommendations contained in the PSTS speech and language report dated April 21, 2006, which recommended the use of the Tech-Speak. These efforts were thwarted when parents removed Student from school. District is under no legal obligation to follow the recommendation of an assessment unless

the IEP team meets to discuss the assessment and agrees upon appropriate services. Indeed, this situation illustrates the wisdom of holding an IEP to discuss assessors' recommendations, since, in this case, there are two reports, each of which recommends a different AAC device.

39.    Under all of these circumstances, Student's contention that District's failure to deliver appropriate services and technology denied Student a FAPE is not persuasive, except for the brief lapses in OT and speech and language services during the month of September 2006. The remedy for this denial of a FAPE is discussed below.

*Student's Placement at Manzanita*

40.    Student contends that his placement at Manzanita was not in the least restrictive environment. Student further contends that, in general, Manzanita was not a suitable environment for Student, since it was not clean and not safe, and the Center program was not an appropriate program for Student.

41.    A student's placement must be in the least restrictive environment. Removal from the regular education environment should occur only when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. The district's choices of programs are entitled to deference.

42.    Student's placement in the SDC at Manzanita was in the least restrictive environment. He had opportunities to mingle with general education students during breakfast, lunch, recess, and assemblies. Student's own expert, his privately retained OT therapist Carmen Rojas Duran, testified that Student was not ready to engage in more inclusion in a general education environment. Additionally, Student's placement in the District constitutes a far less restrictive environment than his environment in Washington, where he was home-schooled for much of the day. Under these circumstances, Student's contention that his placement at Manzanita was not in the least restrictive environment is unpersuasive.

43.    Mother visited Manzanita approximately three times per week while Student attended school there, occasionally staying on campus for several hours. She communicated many times with Student's teachers, aides, and providers during her visits. She testified regarding her observations, and comments made by the teachers and aides during her visits. She presented no other witnesses or documentary evidence in support of her testimony regarding these matters. She testified that the school was unclean, and she cited two of Student's absences from school in fall 2006 due to illness as evidence of the school's uncleanliness. She also testified that a beanbag chair being used by another child in one of the classrooms during Center time was not clean. She testified to isolated incidents in which she observed a child who was unsupervised, or who was in an inappropriate classroom. She testified that she once observed that Student was not engaged while in the sensory room during Center time, and, on a few occasions, he was not engaged in a group activity. Mother

13

also testified that one or two aides had mentioned that she should be careful that Student was supervised. Mother considered the school personnel "hostile" to students. However, the only evidence of any such hostility was Mother's testimony of hearing Ms. Orloff "yell" at a child in the bathroom, and that Student appeared to Mother to be reluctant to attend school on two or three occasions. There was no evidence of any hostility of a teacher or an aide that was directed to Student. Student sustained a minor injury at school in October 2006, when another child bit him while he was on the playground.

44.    The police had been called to the school twice during 2006 because of allegations of abuse of special education students at the school, and one parent had complained of such abuse at the school in 2006.

45.    Ms. Duran, Student's expert witness, had observed Manzanita's Center program when the school commenced implementing it during the latter part of the 2005-2006 school year. She testified that, because the program was just being implemented at that time, the school environment then was chaotic and stressful. She did not observe Student's participation in the Center program at that time. Nor did she observe the Center program, or Student's participation in it, during September and October 2006. Student presented no evidence that his participation in the Center program adversely impacted his education.

46.    Student's contentions regarding the suitability of the school environment are neither legally nor factually sufficient to warrant any relief. Mother's dissatisfaction with the Center system is not determinative of the adequacy of Student's educational program. With respect to Mother's concerns regarding the general environment and ambience of the school, Student presented no evidence, besides Mother's subjective and untrained opinion, that Student's two absences from school during the fall of 2006 due to illness were due to an unclean school environment. Student presented no evidence that Student or any other child had been abused, or that any adults at school were hostile to him. Except for the incident when another child bit him, there was no evidence that Student was directly harmed or even adversely affected by any lack of safety or security at Manzanita.

47.    Student presented no specific evidence that any aspect of the school environment negatively impacted his progress or his ability to access his education. District presented evidence that Student's placement and program at Manzanita were appropriate for him. The law defers to the school district with respect to the type of program selected for a student. Student's placement at Manzanita was appropriate, and it was in the least restrictive environment.

5.    *Qualifications of Student's Teachers and Service Providers*

48.    Student contends that his teachers, service providers, and aides were not qualified to teach autistic students such as Student. Specifically, Student contends that Mr. Haddad was not familiar with the acronym ABA (Applied Behavior Analysis), which is a teaching method for autistic students. Mother also testified that Ms. Martinez, Student's OT during October 2006, had stated to her that Ms. Martinez "did not know how to teach

Student." Mother testified that when Ms. Martinez first commenced providing OT to Student, she had requested that Mother sit with Student to assist during an OT session, because she did not know how to engage Student.   Mother also testified that she had queried several classroom aides regarding their training in the areas of supporting students' attempts to communicate, and behavioral modifications.  In Mother's opinion, the aides were not properly trained so as to be able to assist Student.

49.    Student's classroom teachers, Ms. Orloff and Mr. Haddad, possessed special education credentials which permitted them to teach autistic students.  They both had received training in crisis prevention and intervention from the Non-Violent Crisis Institute. District was fully compliant with respect to staff's qualifications pursuant to the No Child Left Behind Act.  Mr. Haddad had been a special education teacher for seven years at the time of the hearing.  During Mr. Haddad's first six years of teaching, he had taught children whose primary eligibility was emotional disturbance.  Ms. Duran testified that she did not know Mr. Haddad, but that Ms. Orloff was qualified to teach Student.

50.    Mr. Haddad was familiar with Student's goals, as set forth in the June 20, 2006 IEP.  Mr. Haddad was also familiar with discrete trial teaching.  Discrete trial teaching is a form of ABA.  He and Ms. Orloff, Student's teacher at the end of the 2005-2006 school year, used a variant of TEACHH (Teaching and Education of Autistic and Related Communication-handicapped Children) in their classrooms.

51.    Student presented no evidence as to any of his OT therapists' credentials, except for those of Ms. Duran, Student's expert witness, who provided OT to Student during the 2005-2006 extended school year, and privately after he ceased attending school.  Student has raised no issue regarding the qualifications of Ms. Duran.  Ms. Martinez provided OT services to Student during October 2006.  No evidence was presented as to the context in which Ms. Martinez's comment regarding teaching Student occurred.  Mother presented no witnesses or documents to support her testimony regarding Ms. Martinez's comment.  No evidence was presented as to what Ms. Martinez meant in making this comment.  In view of the evidence that Mother was frequently present at school, and commonly spoke with school personnel, evidence as to the context in which this comment was made is particularly important.  The comment could have been intended as an offhand, flippant remark, or could indicate nothing more than that Ms. Martinez was venting a passing frustration to a familiar face.  Ms. Martinez's invitation to Mother to observe and assist during an OT session is also insufficient to demonstrate that Ms. Martinez was not qualified to provide OT services to Student.  Rather, such an invitation, depending upon the context, could demonstrate Ms. Martinez's dedication to providing the best OT services possible to Student, by seeking Mother's input and advice, especially when Student and Ms. Martinez were just becoming acquainted with each other.  Ms. Martinez's conduct and conversation may have made Mother uncomfortable, but Student has not provided sufficient evidence that Ms. Martinez was unqualified to provide OT services to Student.

52.    Student presented no evidence as to the credentials of Student's speech and language therapists, nor any other evidence which would bear upon their qualifications to

provide services to Student. Student presented no evidence that the classroom aides lacked sufficient education or training such that they were unqualified or unable to perform their duties.

53.     Under these circumstances, Mother's contentions that Student's teachers, providers, and aides were not qualified are not persuasive.

*District's Assessments of Student*

54.     Student contends that District failed to assess Student in all areas of suspected disability and/or failed to appropriately assess Student.

55.     The student must be assessed in all areas related to his or her suspected disability, and no single procedure may be used as the sole criterion for determining whether the student has a disability or whether the student's educational program is appropriate. A school district must perform an assessment every three years, but it has no obligation to assess a student more frequently than annually, unless the district and the parent agree otherwise. Assessments must be performed in a timely manner. A failure to properly or to timely assess may be a procedural violation of the IDEA. A procedural violation is a denial of a FAPE if it significantly impeded the ability of the student's parents to participate in decisions regarding the student's education, or deprived the student of an educational opportunity.

56.     A functional analysis assessment (FAA) is performed and a behavioral intervention plan is developed when the student exhibits a serious behavior problem that significantly interferes with the IEP's implementation. Behavioral interventions are designed to eliminate maladaptive behaviors that inhibit the student's ability to access the student's education, and to encourage positive behavior so that the student may be educated in the least restrictive environment. A failure to perform an FAA may be a procedural violation of the IDEA.

57.     District did not perform a psychoeducational assessment of Student upon his enrollment in the District. According to the Washington IEP, the most recent psychoeducational assessment occurred in 2005. Consequently, a triennial assessment was not due until 2008. During Student's attendance at the District, the District performed an OT assessment and an informal behavioral observation, and was in the process of arranging an IEP meeting to discuss the AT/ACC assessment that the June 20, 2006 IEP team had recommended.

*A.     OT Evaluation*

58.     Shortly after Student enrolled at Manzanita, Ms. Orloff requested that Ms.
Duran, who provided OT services under contract with the District, evaluate Student.[6]  On
June 20, 2006, Ms. Duran produced an occupational therapy progress report, based upon an
evaluation of Student. Ms. Duran based the report on clinical evaluation and observations,
on a standardized Sensory Profile, and on a Neuro-Kinesthetic handwriting evaluation. The
report noted that Student had numerous defects in sensory processing, visual
perception/perceptual-motor skills, motor planning, bilateral motor coordination, fine motor
skills, ocular-motor control, written communication skills, and school performance
behaviors.  The report set forth goals and objectives relating to most of these areas, and
outlined a treatment plan sequence. In her report, Ms. Duran recommended OT for 60
minutes, one time per week. On June 22, 2006, District promptly created an addendum IEP,
reflecting that Student's OT would be increased to 60 minutes, one time per week, pursuant
to Ms. Duran's report. Mother signed this IEP.[7]

59.     District appropriately assessed Student with respect to OT. District did not
seek nor obtain parental consent to assess Student for OT, but there is no evidence that these
lapses deprived Student's parents of the opportunity to participate in Student's education, or
deprived Student of an educational benefit.  Indeed, Mother was pleased with the services
Ms. Duran provided, and, as of the time of the hearing, had retained Ms. Duran to provide
private OT therapy to Student as well as to serve as an expert witness at hearing.  District
promptly acted upon the results of Ms. Duran's evaluation, and provided the OT for 60
minutes, one time per week, as she recommended.

*B.     Assistive Technology/AAC Assessment*

60.     On June 20, 2006, at the IEP meeting, Father signed an assessment plan for an
AT/AAC assessment.  The assessment was recommended by the IEP team to determine
Student's need for an AAC device.  Student's use of such a device had been listed by Mother
in the intake form she completed at the time of Student's enrollment in the District.  Student
had used such a device previously, until no later than December 2005, by which time the
device was lost during a move by Student's family from Washington to California.

61.     When District contacted the assessor, Dynamic Therapy Solutions, at some
point prior to July 19, 2006, the assessor informed District that Student, through his Kaiser
Health Plan, had already retained them to assess Student.  Therefore, assessor stated that

---

[6] District's initiation of its own OT assessment lends credibility to its position that it did not have the PTST
OT report discussed elsewhere in this Decision by the time of the June 20, 2006 IEP meeting. If District indeed had
the report, then there would have likely been no need to perform another assessment.

[7] Mother testified that no meeting was held to formulate this addendum IEP.  Student raised no issue
regarding the validity of the addendum IEP by reason of the failure to notice and hold an actual IEP meeting to
implement the recommendations of Ms. Duran's report.

there was no need for District to order an additional assessment, as the results would be the same.

62.     Dynamic Therapy Solutions evaluated Student on July 19, 2006, and produced a report dated August 15, 2006, during the District's summer vacation period. The report evaluated Student's motor abilities and sensory abilities, and discussed the features of appropriate AAC devices for Student. The report concluded that a MiniMerc communication device would best meet Student's needs, and that it should be carried with him across all environments. The report recommended four individual AAC therapy sessions and three-week rental of a MiniMerc to develop a home based AAC program, to provide training in use of PECS and use of the MiniMerc, and to determine if the MiniMerc was the optimal system for Student. After the individual sessions and the rental of the MiniMerc, the report recommended that Student be re-evaluated for AAC. The report also recommended that Student receive an FAA and a behavioral intervention plan (BIP), as his behaviors were significantly impacting his communication skills; that Student continue to use his other communication methods, such as PECS and word boards; and that a communication logbook be used, both to improve communication among Student's teachers, therapists, and parents, as well as to document Student's attempts to communicate.

63.     District received the Dynamic Therapy Solutions report at approximately the time it was generated. Mr. Haddad, who became Student's SDC teacher in September, commenced efforts to arrange an IEP meeting with Student's parents to discuss the recommendations of the report. Mr. Haddad attempted to arrange the meeting to be held by October 15, 2006, as was contemplated by the IEP of June 20, 2006, but Mother stated that she wanted Father to attend the meeting, and Father was not available until November 2006. Mr. Haddad continued attempting to communicate with Mother to set the meeting for November 2006. However, Mother did not respond to his efforts. Student did not return to school after approximately October 20, 2006, but the parents did not advise Mr. Haddad, or any other District personnel, that they were removing Student from school. Mr. Haddad and his classroom aides unsuccessfully attempted to contact Mother, on several occasions, both to learn why Student was no longer attending school, and to arrange a date for the IEP meeting. Mother eventually responded to these inquiries and advised that Student would not be returning to Manzanita, and that she and Father would not attend an IEP meeting.

64.     District acted properly with respect to the AT/AAC assessment. District promptly presented parents with an assessment plan, and obtained consent to assess. District timely contacted the assessor regarding the assessment, and received the report during the District's summer break. When school commenced in September, District, through Mr. Haddad, attempted to convene an IEP meeting by October 15, 2006, as had been previously agreed to by the IEP team, to review the assessment. Mother requested that the meeting be held in November. Despite District's attempts to arrange the meeting, the meeting was never held, because, after approximately October 20, 2006, Student's parents refused to permit Student to attend Manzanita. Under these circumstances, District fulfilled its obligations with respect to this assessment. It was prevented, by the parents' own conduct, from doing anything further with respect to this assessment. District was not legally required to provide

Student with any services or devices recommended by the assessment in the absence of an IEP meeting to discuss the assessment. District did not deny Student a FAPE by not proceeding with the recommendations of the assessment, and by not providing Student with an AAC device.

### C.    Behavioral Screening

65.    In mid-October 2006, approximately two days before Student's parents elected not to send him to school, Student's Mother verbally requested that District perform a behavioral evaluation. Mother was concerned about Student's tendency to grunt loudly. Mother wished to determine the significance of the grunting, and was concerned that the grunting was socially unpleasant and distracting. Ms. Monarch, the school psychologist, was also District's Behavioral Intervention Case Manager. Ms. Monarch advised Student's Mother that she was qualified to observe Student's grunting behavior, and that she would do so. The next day, Ms. Monarch observed Student during his school day, and concluded that she needed to conduct additional observations of Student to obtain more data regarding his grunting. She discussed her observations with Mother. Ms. Monarch assumed that she would continue to observe Student and that her findings would be discussed at the IEP that was in the process of being scheduled.

66.    District acted properly with respect to the behavioral screening. The Washington IEP did not include any behavioral support program, nor did the June 20, 2006 IEP. The only indications that Student required behavioral intervention were Mother's concerns, as expressed to Ms. Monarch, and the Dynamic Therapy Solutions AT/ACC report. The AT/ACC report was vague as to the particular behaviors which Student exhibited so as to support the report's recommendation for an FAA and a BIP. Further, as was discussed above, District never had the opportunity to convene an IEP to discuss the recommendations of the Dynamic Therapy Solutions AT/ACC report.

67.    Ms. Monarch promptly responded to Mother's concerns by observing Student. Because Mother had removed Student from school, District was unable to formally consider Ms. Monarch's observations, or to take further action. Under these circumstances, District did not deny a FAPE by not providing an FAA or behavioral support services to Student.

### Reimbursement for Assessment by Dynamic Therapy Solutions

68.    Student seeks reimbursement for the assessment that his parents privately obtained from Dynamic Therapy Solutions. A district may be required to reimburse parents for an IEE if the parents requested an assessment, and the district unreasonably refused the parents' request, or if the parents did not agree with an assessment performed by the district.

69.    Neither of these situations exists here. District agreed to perform the AT/ACC assessment, and was in the process of timely arranging for the assessment when District learned that Student's parents had initiated the assessment themselves. Furthermore, the parents' assessment was being performed by the same provider, Dynamic Therapy Solutions,

with whom District intended to contract to perform the assessment. Student's parents did not give District sufficient time to perform the assessment prior to arranging for a private assessment. Moreover, Student failed to provide any evidence as to the cost of the assessment that his parents obtained.[8] Under these circumstances, Student is not entitled to reimbursement for the assessment.

*Compensatory Education*

70.    Compensatory education is an equitable remedy that is available to a Student who has been denied a FAPE. District denied Student a FAPE by failing to provide speech and language services and OT services, pursuant to his IEPs and the addendum IEP, during the month of September 2006. Compensatory education is appropriate to offset this deprivation. According to Ms. Duran's testimony, one hour per week of individual OT services would be sufficient compensatory education for OT.

71.    Student missed approximately four hours of speech and language services, by reason of District's failure to provide such services during the month of September 2006. Since speech and language is a major area of need for Student, and since Student is currently being home-schooled, the Student is entitled to compensatory education in the amount of four hours of individual speech and language services.

72.    District is to provide the OT and speech and language services over a period of 60 consecutive days, at a location to be selected by and convenient to Student.

## LEGAL CONCLUSIONS

*Applicable Law*

1.    Pursuant to California special education law and the Individuals with Disabilities in Education Act (IDEA), as amended effective July 1, 2005, children with disabilities have the right to a FAPE that emphasizes special education and related services designed to meet their unique needs and to prepare them for employment and independent living. (20 U.S.C. §1400(d); Ed. Code, § 56000.) FAPE consists of special education and related services that are available to the student at no charge to the parent or guardian, meet the state educational standards, include an appropriate school education in the state involved, and conform to the child's IEP. (20 U.S.C. § 1402(9).) "Special education" is defined as

---

[8]Dr. Porter, District's Director of Special Education, testified that District would have incurred a charge of $600 for the Dynamic Therapy Solutions assessment and report. This is not sufficient evidence, however, of the actual cost of the subject report incurred by Kaiser, which is the amount of the reimbursement that Student seeks. Student offered no proof as to the cost of the assessment to Kaiser. It is possible that Dynamic Therapy Solutions does not charge a public entity, such as District, the same price as it would charge Kaiser. Volume discounts, or other factors, may also apply to vary the charges of the assessment and the report, depending upon the entity for which the assessment and report are generated.

specially designed instruction, at no cost to parents, to meet the unique needs of the student. (20 U.S.C. § 1402(29).)

2.     Similarly, California law defines special education as instruction designed to meet the unique needs of individuals with exceptional needs coupled with related services as needed to enable the student to benefit fully from instruction. (Ed. Code, § 56031.) The term "related services" includes transportation and such developmental, corrective, and other supportive services as may be required to assist a child to benefit from special education. (20 U.S.C. § 1402(26).) In California, related services may be referred to as designated instruction and services (DIS). (Ed. Code, § 56363, subd. (a).) Special education teachers in California must be credentialed. (Ed. Code, § 44265.)

3.     Under both California law and the IDEA, a child is eligible for special education if the child needs special education and related services by reason of mental retardation, hearing impairments, speech or language impairments, visual impairments, ED, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities. (20 U.S.C §1401 (3)(A)(i) and (ii); Cal. Code Regs., tit. 5, § 3030.)

4.     The IEP is a written document for each child who needs special education and related services. The contents of the IEP are mandated by the IDEA, and the IEP must include an assortment of information, including a statement of the child's present levels of academic achievement and functional performance, a statement of measurable annual goals that are based upon the child's present levels of academic achievement and functional performance, a description of how the child's progress toward meeting the annual goals will be measured, when periodic reports of the child's progress will be issued to the parent, and a statement of the special education and related services to be provided to the child. (20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. §§ 300.346, 300.347.) For each area in which a special education student has an identified need, annual goals establish what the student has a reasonable chance of attaining in a year. If the child is to take alternative assessments, then the IEP must include short-term objectives in addition to annual goals. (20 U.S.C. § 1414(d)(1)(A)(i)(I)(cc).)

5.     In developing the IEP, the IEP team shall consider the strengths of the child, the concerns of the parents for enhancing the child's education, the result of the most recent evaluation of the child, and the academic, developmental, and functional needs of the child. (20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. § 300.346(a).)

6.     If a student who is receiving special education services transfers during the academic year into another school district which is in a different local plan area, the new school district shall, within 30 days, adopt the student's previously approved IEP, or shall develop, adopt, and implement a new IEP. (Ed. Code, § 56325, subd. (a)(1).)

7.     Reassessments of the student shall be conducted if the school district determines that a reassessment is warranted, or if the student's parents or teacher requests a reassessment. (Ed. Code, § 56381, subd. (a)(1).) A reassessment shall occur not more

frequently than once a year, unless the parent and the district agree otherwise, and shall occur at least once every three years, unless the parent and the district agree, in writing, that a reassessment is unnecessary. (Ed. Code, § 56381, subd. (a)(2).)

8.      The student must be assessed in all areas related to his or her suspected disability, and no single procedure may be used as the sole criterion for determining whether the student has a disability or whether the student's educational program is appropriate. (20 U.S.C. § 1414 (a)(2), (3); Ed. Code, § 56320, subds. (e) & (f).) A school district's failure to conduct appropriate assessments or to assess in all areas of suspected disability may constitute a procedural denial of a FAPE. (*Park v. Anaheim Union High School District, et al.* (9th Cir. 2006) 464 F.3d 1025 at pp. 1031-1033.)

9.      A parent is entitled to obtain an independent educational evaluation (IEE) of a child. (20 U.S.C. § 1415(b)(1).) An IEE is an evaluation conducted by a qualified examiner not employed by the school district. (34 C.F.R. § 300.502(a)(3)(i).) A parent has the right to an IEE at public expense if the parent disagrees with an evaluation obtained by the school district. (34 C.F.R. § 300.502(b)(1); Ed. Code, § 56329, subd. (b).) When a parent requests an IEE at public expense, the school district must, "without unnecessary delay," either initiate a due process hearing to show that its evaluation is appropriate, or provide the IEE at public expense, unless the school demonstrates at a due process hearing that the evaluation obtained by the parent does not meet its criteria. (34 C.F.R. § 300.502(b)(2); Ed. Code, § 56329, subd. (c).)

10.     California law provides that a functional analysis assessment (FAA) and the behavior intervention plan (BIP) which is derived from the FAA, occur after the IEP team finds that instructional/behavioral approaches specified in the student's IEP have been ineffective, or after a parent has requested an assessment pursuant to Education Code section 56320 et seq. (Cal. Code Regs., tit. 5, § 3052, subd. (b).)   The BIP is a written document, based upon the FAA, which is developed when the student exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives of the student's IEP. (Cal. Code Regs., tit. 5, § 3001, subd. (f); Cal. Code Regs., tit. 5, § 3052, subd. (a)(3).) Such interventions are designed to eliminate maladaptive behaviors that inhibit the student's ability to access the student's education,  and to encourage positive behavior so that the student may be educated in the least restrictive environment. (Ed. Code, §56520, subd. (a).)

11.     The United States Supreme Court recently ruled that the student in a special education due process administrative hearing has the burden to prove his or her contentions at the hearing. (*Schaffer v. Weast* (2005) 546 U.S. 49 [126 S.Ct. 528].)

12.     The issue of whether a school district has offered a FAPE has both procedural and substantive components. States must establish and maintain certain procedural safeguards to ensure that each student with a disability receives the FAPE to which the student is entitled, and that parents are involved in the formulation of the student's educational program. (*W.G., et al. v. Board of Trustees of Target Range School District, etc.*

22

(9th Cir. 1992) 960 F.2d 1479 at p. 1483.) Citing *Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley* (1982) 458 U.S. 176, 200 [102 S.Ct. 3034], the court also recognized the importance of adherence to the procedural requirements of the IDEA, but noted that procedural flaws do not automatically require a finding of a denial of a FAPE. (*Id.* at p. 1484.) Procedural violations may constitute a denial of a FAPE if they result in the loss of educational opportunity to the student or seriously infringe on the parents' opportunity to participate in the IEP process. (*Ibid.*) These requirements are also found in the IDEA and California Education Code, both of which provide that a procedural violation only constitutes a denial of FAPE if the violation (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision making process; or (3) caused a deprivation of educational benefits. (20 U.S.C. § 1415 (f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2).)

13.     In *Rowley, supra,* the United States Supreme Court addressed the level of instruction and services that must be provided to a student with disabilities to satisfy the substantive requirements of the IDEA. The Court determined that a student's IEP must be reasonably calculated to provide the student with some educational benefit, but that the IDEA does not require school districts to provide special education students with the best education available or to provide instruction or services that maximize a student's abilities. (*Id.* at pp. 198-200.) The Court stated that school districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instructional and related services which are individually designed to provide educational benefit to the student. (*Id.* at p. 201.)

14.     To determine whether a school district offered a student a FAPE under the substantive component of the analysis, the focus must be on the adequacy of the district's proposed program. (*Gregory K. v. Longview School District* (9th Cir. 1987) 811 F.2d 1314.) If the school district's program was designed to address the student's unique educational needs, was reasonably calculated to provide the student with some educational benefit, and comported with the student's IEP, then the school district provided a FAPE, even if the student's parents preferred another program and even if his parents' preferred program would have resulted in greater educational benefit. (*Ibid.*) Educational benefit in a particular program is measured by the degree to which the student is making progress on the goals set forth in the IEP. (*County of San Diego v. California Special Education Hearing Office, et al.* (9th Cir. 1996) 93 F.3d 1458 at p. 1467. School districts are also required to provide each special education student with a program in the least restrictive environment, with removal from the regular education environment occurring only when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services could not be achieved satisfactorily. (20 U.S.C. § 1412 (a)(5)(A); Ed. Code, § 56031.)

15.     An IEP is evaluated in light of information available to the IEP team at the time it was developed; it is not judged in hindsight. (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.) "An IEP is a snapshot, not a retrospective." (*Id.* at p. 1149,

citing *Fuhrmann v. East Hanover Bd. of Education* (3d Cir. 1993) 993 F.2d 1031, 1041.) It must be evaluated in terms of what was objectively reasonable when the IEP was developed. (*Ibid.*)

16.    Each public agency must ensure that assistive technology devices and assistive technology services are available to a student with a disability, if required as part of a student's special education or related services. (34 C.F.R. § 300.308.) As part of the IEP process, the IEP team must consider whether the child requires assistive technology devices and services. (20 U.S.C. § 1414(d)(3)(b)(v); (34 C.F.R. § 300.346(a)(2)(v)). If the IEP team determines that a student needs assistive technology to receive a FAPE, the IEP must include a statement to that effect, and the nature and amount of such services. (34 C.F.R. § 300.346(c); Off. of Special Education Programs, interpretative letter (November 27, 1991), 18 IDELR 1697.)

17.    School districts may be ordered to provide compensatory education or additional services to a student who has been denied a FAPE. (*Student W. v. Puyallup School District* (9th Cir. 1994) 31 F.3d 1489, 1496.) These are equitable remedies that courts may employ to craft "appropriate relief" for a party. An award of compensatory education need not provide a "day-for-day compensation." (*Id.* at p. 1497.) Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA. (*Ibid.*)

*Determination of Issues*

Based on the factual findings and applicable law, it is determined as follows:

Issue 1A:    Did District deny Student a FAPE from May 2006, through the present, by the failure of Student's IEP of June 20, 2006, to include appropriate goals and objectives which were based upon Student's assessment results and which were reasonably calculated to provide him with an educational benefit?

18.    As is stated in Legal Conclusions 1 through 6 and 10 through 15, District provides a FAPE if its program was designed to address the Student's unique educational needs, and was reasonably calculated to provide the Student with some educational benefit. Based upon Factual Findings 1 through 7, and 13 through 30, District did not deny Student a FAPE.

Issue 1B:    Did District deny Student a FAPE from May 2006, through the present, by failing to provide Student with DIS, behavioral support, a one-to-one aide, and assistive technology necessary to access his education?

19.    Relying on Legal Conclusions 1 through 6 and 10 through 16, and based upon Factual Findings 1 through 7, 13 through 30, and 33 through 39, District provided Student with all of the services necessary to access his education, except that, during the month of

September 2006, District did not provide Student with all of the OT and speech and language services required by the June 20, 2006 IEP and its addendum.

Issue 1C:    Did District deny Student a FAPE from May 2006, through the present, by failing to provide him with an appropriate placement in the least restrictive environment?

20.    As is stated in Legal Conclusions 1 through 6, and 10 through 15, District must place Student in the least restrictive environment. As long as District's program provides a FAPE, it does not matter that the Student or his parents prefer another program. Based upon Factual Findings 1 through 7, 13 through 30, 33 through 39, and 41 through 47, District placed Student in the least restrictive environment, and in an appropriate environment. District did not deny Student a FAPE.

Issue 1D:    Did District deny Student a FAPE from May 2006, through the present, by failing to provide qualified personnel to render special education and related services to Student?

21.    Relying on Legal Conclusions 1 through 5, and 10 through 15, and based upon Factual Findings 1 through 7, 13 through 30, and 43 through 53, District personnel were qualified to render special education and related services to Student.

Issue 2:    Did District deny Student a FAPE from May 2006 through the present, by failing to assess him in all areas of suspected disability, or by failing to appropriately assess Student?

22.    Relying on Legal Conclusions 1 through 16, and based upon Factual Findings 1 through 7, 13 through 30, 33 through 38, and 57 through 67, District properly assessed Student with respect to OT, properly engaged in the assessment process with respect to AT/ACC, and properly commenced a behavioral observation. There was no evidence that Student's classroom behavior demonstrated the need for an FAA and a BIP.

Issue 3:    Is Student entitled to reimbursement for the AT/ACC assessment performed on July 19, 2006, by Dynamic Therapy Solutions?

23.    Relying on Legal Conclusions 8, 9 and 11, and based upon Factual Findings 1 through 7, 13 through 30, 37 through 39, 57, 60 through 64, and 69, Student is not entitled to reimbursement for the AT/ACC assessment performed on July 19, 2006, by Dynamic Therapy Solutions.

Issue 4:    Is Student entitled to placement at another school, compensatory education, assistive technology devices and additional services, including additional OT, speech and language therapy, assistive technology therapy, and one-to-one aides?

24.    Relying on Legal Conclusions 1 through 17, and based upon Factual Findings 1 through 7, 13 through 30, 33 through 39, 42 through 47, 49 through 53, 57 through 67, and 69 through 72, Student is entitled to compensatory education for OT and speech and language therapy, because District denied her a FAPE during the month of September 2006. He is not entitled to additional services or other relief, because the District did not otherwise deny him a FAPE.

## ORDER

1.    District shall provide one-to-one OT to Student for 60 minutes, one time per week, for four weeks, over the course of 60 consecutive days.

2.    District shall provide one-to-one speech and language services to Student for 60 minutes, one time per week, for four weeks, to be provided over the course of 60 consecutive days.

3.    All services are to be provided at a location convenient to Student, with District responsible for providing transportation for Student to and from the site where the services are rendered if they are rendered at a location other than Student's home.

4.    All speech and language services ordered herein are to be provided through qualified personnel.  The personnel providing the services may be on the staff of District, or, at District's option, it may contract with a qualified NPA to provide the services ordered herein.

## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter.  Pursuant to this mandate, it is determined that the Student prevailed on a portion of Issue 1B and a portion of Issue 4.  District prevailed on Issues 1A, 1C, 1D, a portion of Issue 1B, Issues 2 and 3, and a portion of Issue 4.

## RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by this Decision. Pursuant to Education Code section 56505, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt.

Dated:        April 2, 2007

*Elsa H. Jones*

ELSA H. JONES
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

26