# EXHIBIT 3

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

|  |  |
|---|---|
| In the Matter of:<br><br>STUDENT,<br><br>            Petitioner,<br><br>v.<br><br>WALNUT VALLEY UNIFIED SCHOOL DISTRICT,<br><br>            Respondent. | OAH CASE NO. N 2005120382 |

## DECISION

Vincent Nafarrete, Administrative Law Judge, Office of Administrative Hearings, heard this matter in Walnut on March 20 and 22 - 24, 2006, and May 10, 2006.

Petitioner (Student) was represented by Omar Naime, Attorney at Law, of Adams ESQ.

Respondent Walnut Valley Unified School District (District) was represented by J. Robert Roice. Student's father was present throughout the hearing.

On December 8, 2005, Student's counsel filed the Request for Due Process Hearing and Motion for Stay Put with the Special Education Division of the Office of Administrative Hearings (OAH). On December 9, 2005, OAH issued a Notice of Motion. On December 14, 2005, District by its counsel filed an opposition to the motion. On January 3, 2005, OAH denied Student's motion for stay put.

On January 24, 2006, Student filed a request for mediation. On February 6, 2006, OAH scheduled a mediation for February 16 and a due process hearing for March 1, 2006. On March 1, 2006, the parties agreed to the continuance of the hearing until March 20 and the convening of the prehearing conference on March 7, 2006. On March 7, 2006, the parties stipulated to continue the prehearing conference for one day. The due process hearing commenced on March 20, 2006, and was heard for three additional days that week. On

March 24, 2006, the hearing was then continued until April 24 to allow the parties to call additional witnesses. On April 24, 2006, the Administrative Law Judge was unavailable for the hearing due to a family medical emergency. The parties stipulated to a continuance of the evidentiary portion of the hearing till May 10, 2006. The hearing was completed on May 10, 2006.

At the conclusion of the hearing on May 10, 2006, the parties requested that they be allowed to file written argument and the hearing was continued for the parties to file written argument. On May 24, 2006, District filed its Closing Brief which was marked as District Exhibit 38. On May 25, 2006, Student filed his Closing Brief which was marked as Exhibit JB 42.

## ISSUES

The issues presented for decision in this due process matter concern the school years from September 2003 through December 2005 and are categorized as follows:

1.     Did respondent school district fail to conduct assessments of student in all areas of suspected disability by not assessing Student for depression, hearing, vision, and fine motor skills necessary for writing?

2.     Did respondent school district deny the Student a free appropriate public education by failing to fulfill its child find obligations beginning in November 2004 when he demonstrated emotional and/or social problems?

3.     Did respondent school district deny the Student a free appropriate public education by failing to provide an appropriate transition plan at the time that Student turned 16-years old?

4.     Did respondent school district violate any procedural rights or safeguards by:

A.     Failing to give prior written notice of refusals to provide speech therapy, counseling, and the FastForward reading program.

B.     Failing to convene an IEP meeting or develop an IEP within 60 days of the consent to an assessment plan.

C.     Failing to hold an IEP meeting within 30 days of the parent's request.

D.     Failing to conduct a timely triennial assessment.

5.     Did respondent school district deny the student a free appropriate public education by failing to provide special education and related services that conformed to his

individual education programs by failing to provide (A) speech and language programs after December 2004; and (B) counseling after December 2004?

6.    Did respondent school district deny the student a free and appropriate public education in the 2003-2004, 2004-2005, and 2005-2006 school years by failing to design an educational program that met his unique needs, was reasonably calculated to provide some educational benefit, and/or comported with the student's individualized educational program by:

A.    In school year 2003-2004, placing Student in a general education classroom English setting without a special education aide or other supports.

B.    In school year 2003-2004, failing to provide appropriate instruction or services in reading and counseling.

C.    In school years 2004-2005, discontinuing speech and counseling services after Student began receiving home instruction late in the fall semester?

7.    Is Student entitled to reimbursement for a private or independent psycho-educational assessment performed by Dr. Robert J. Rome in November 2005?

## FACTUAL FINDINGS

1.    Student is a seventeen-year child who lives with his father in Diamond Bar, which is within the jurisdictional boundaries of the Walnut Valley Unified School District. He is a rising senior at the District's Diamond Bar High School and is currently enrolled in independent study and/or home instruction.   Student has been a pupil in the District since in or about October 2002 and is eligible for special education and services based on a diagnosis of a specific learning disability.

### Prior School Years

2.    (A) Student was first referred for assessment while attending elementary school in the Bonita Unified School District.  In first grade, he received special services in speech; his first grade teacher recommended daily practice in reading.  In second grade, his teacher reported that the student's attitude and reading improved.  In third grade, he struggled in language arts and with his fine motor skills but his parents did not want him assessed for or placed in special education.  He received private tutoring.  The school nurse reported to the mother that Student engaged in facial grimacing, violent bilateral hand flapping, and nose picking in the classroom.   The mother replied her son had not been evaluated by a medical doctor because the father did not believe there was anything abnormal about him.  In fourth grade, Student's teacher stated the he had trouble when material was presented to him visually and queried whether the parents were going to allow him to be tested further.

Student was tested and found to need resource specialist placement. A neurological screening showed that Student had poor auditory memory. His mother was concerned about her son's difficulties in reading, writing, spelling, and attention. In fifth grade, Student began seeing psychiatrist, Paul H. Brown, M.D., for counseling and was prescribed Prozac for depression. He continued his facial grimacing and hand flapping for which he had not seen a medical doctor and the mother felt was related to stress and excitement. In sixth grade at the middle school, Student was placed in resource specialist program (RSP) classes in reading and English. He attained "A's" in RSP reading and a "C" and "D+" in RSP English.

3.        (A) For seventh and eighth grades, Student attended intermediate school in the Corona Norco Unified School District. In or about September 2001, parents removed from the speech and language program because they felt services were no longer warranted or helpful for their son.

(B) In an IEP dated September 3, 2002, Student was determined by the Corona Norco school district to be eligible for special education due to specific learning disability. There were discrepancies in his reading and written expression and he had processing disorders in attention and sensory motor skills. He was placed in a general education classroom for 71 percent of the school day and in a special education classroom for language arts for 29 percent of the school day. He received consultation services for all of his classes and collaboration services in science and algebra. He was provided designated instructional services (DIS) in occupational therapy and received a modified curriculum as well as training in specific and study skills. Student was to receive assistive technology in the form of a word processor or AlphaSmart device and help with note taking.

(C) As set forth in the September 2002 IEP, Student was successful in his academic work when he was motivated. He was thoughtful, loved to work on projects, and had a variety of interests. His father expressed concerns about his son's sensitivity, his tendency to shut down, and the legibility of his writing. His grandmother was worried whether he could copy from the classroom board. As for his then present levels of performance, Student did not meet his goal for writing legibly and partially met his goals for organization, paragraph writing, and vocabulary. He could write short paragraphs when prompted, could not write legibly in either cursive or printing, and had stronger oral comprehension skills. Student had difficulty communicating with his teacher. Occupational services were offered. Student's father signed the IEP and agreed with the IEP goals, benchmarks, and services.

(D) At the beginning of eighth grade during the 2002-2003 school year, and after he was found eligible for special education, Student was suspended from school for five days for causing or attempting to cause physical injury and disrupting school activities. He was receiving "F" grades in eighth grade language arts, U.S. history, algebra, and science at the time.

4

(E) As set forth in the September 2002 IEP document, Student received a triennial evaluation or review in September 2001 by the Corona Norco district. His next triennial review was scheduled to occur in September 2004.

4.    (A) Sometime at the beginning of eighth grade during the 2002-2003 school year, and after he was found eligible for special education, Student was suspended from school for five days for causing or attempting to cause physical injury and disrupting school activities. He was receiving "F" grades in eighth grade language arts, U.S. history, algebra, and science at the time.

(B) Shortly thereafter, on or about October 25, 2002, Student and his father moved from the Corona Norco district into Diamond Bar and within the jurisdictional boundaries of the District. He transferred into and finished eighth grade at the District's Chaparral Middle School. Pursuant to his September 2002 IEP, he was initially placed in a resource specialist program. At Chaparral Middle School, Student improved his grades although he had a "D" in social science and "F" in algebra towards the end of the fall semester. The IEP team at the middle school recommended that he receive special education assistance in language arts and study skills as well as assistive technology for improving his writing skills.

5.    On January 8, 2003, the District held an annual IEP meeting for Student who was in eighth grade. He was deemed eligible for special education due to a specific learning disability. He was found to have disorders in attention and sensory motor skills and a severe discrepancy between his intellectual ability and achievement in basic reading skills and written expression. With respect to his present levels of performance, the IEP team found that Student struggled with spelling and writing essays. He tended to rush through his work which was not legible. The IEP team placed him in a general education class with daily resource specialist support in language arts. Student was given accommodations for test taking. The father, however, disagreed with the conclusion that his son had a problem with basic reading skills, stating his son had "no problems with reading at home." Nevertheless, the father signed the IEP document, agreeing with his son's placement; the father also consented to an assistive technology assessment.

6.    (A) Later during eighth grade, on March 19, 2003, Student was assessed by an assistive technology (AT) specialist. His grandmother had expressed concerns about his writing and spelling. For the assessment, the AT specialist interviewed the father and Student, obtained writing samples from the Student, and had the Student use an AlphaSmart writing device and Franklin Speller program. The AT specialist found Student's writing to be largely illegible and his spelling poor.

(B) During his interview with the AT specialist, the father stated that his son's main difficulty was written language. Student wrote too quickly which resulted in his writing being sloppy and difficult to read. He would "shut down with the writing" when the assignment seemed too difficult for him. He was a poor speller and the father felt his son hid his poor spelling with sloppy writing. He had used the AlphaSmart writing device but he

5

was self-conscious about using the device and being seen as different from other students. The father was also concerned about Student's transition into high school when writing assignments would become more complex.

(C) During the AT assessment, Student rested his head on his arm on the table and the AT specialist had to elicit information or answers from him. He stated that he had the most trouble with spelling because he guessed and his misspellings were so poor that spell check programs were of no help. He preferred to print but admitted his printing was sloppy because he rushed and he also wrote illegibly when having to print a word he could not spell. On some homework writing assignments, Student dictated to his father or grandmother and he typed the transcribed work on the computer. Student admitted that he liked using the AlphaSmart writing device in class only when the rest of the class was using it as well. He said it did not bother him that he was a poor speller and disliked any school subjects that required a lot of writing.

(D) The AT specialist found that Student's writing was sloppy because he rushed but he could spell more accurately when he took more time to think about his writing. In observing Student and talking to his resource specialist, the AT specialist opined that it appeared Student was reluctant to make a great effort in his work and relied on adults to assist him in completing his assignments. It was difficult to obtain a rough draft from him because he would shut down and not try. The AT specialist recommended that Student continue to access writing programs or software to assist in his writing and improve his spelling, possibly use a voice command computer writing program, and have more time in the RSP program so that he could receive more individual attention in preparation for high school.

7.     On March 20, 2003, Student's middle school IEP team, including his father, convened an addendum IEP meeting to review his progress in school and the assistive technology assessment. In language arts, he was showing more confidence and participating in class. He was doing well in his computer class and his teacher recommended that he use a computer in all of his academic classes. He was not showing as much enthusiasm in his social studies class. He was failing math but participating more in class and completing his homework although not consistently. With respect to assistive technology, the IEP team determined to explore Student's use of a dictation device. Student was to begin having all of his teachers in his academic classes sign his binder reminder. The IEP team recommended that he receive RSP support for language arts and study skills when he entered high school in the fall of 2003. Student's father signed the addendum to the IEP but did not give his permission for implementation of the addendum IEP.

2003-2004 School Year—Ninth Grade

8.     (A) In September 2003, Student began his freshman year at the District's Diamond Bar High School. Pursuant to his January 2003 IEP, he was enrolled in general education for all classes except English. For English, he was placed in a RSP class with

6

about 12 other special education pupils. Student did not like being labeled as a special education pupil and was embarrassed about his placement in a RSP English class.

(B) On an undetermined date in or about October 2003, Student asked his father if he could see Dr. Brown, his psychiatrist. Student had been seeing the psychiatrist for treatment of anxiety and mood stability for several years. The father made an appointment with Dr. Brown for the next day. Student told his psychiatrist that other pupils in his RSP English class were "picking on" or harassing him at school. Dr. Brown found that Student was under duress and that his emotional well being was deteriorating. Eventually, the psychiatrist found that Student's adjustment faltered as he became more uncomfortable at school. Dr. Brown found that Student felt better when he was not at school. Student also told his therapist about his stress at school.

(C) On November 14, 2003, Student's therapist told the father that his son had reported being physically and verbally abused in his RSP English class. The therapist recommended that Student be removed from the special education class due to excessive stress and damage to his psyche. Four days later, the father sent an e-mail message to school district's administrative director of pupil personnel, advising of the therapist's statements and requesting an emergency IEP meeting to change his son's placement for English because he was being abused in his RSP English class.

(D) In or about November 2003, the high school principal received a letter from the student's therapist complaining about Student being bullied or abused in his RSP English class. High school personnel investigated the complaint and found no significant evidence of the Student being bullied. When he was interviewed, Student dismissed or downplayed the alleged incidents of bullying. Student replied that the RSP English class was of no benefit to him, the class was not a good learning environment, and he did not respect the teacher.

9.    On November 19, 2003, the high school dean held a telephonic conference with the father to discuss his request to change his son's placement from RSP English. Acceding to the father's request, the dean determined that Student should be placed in a general education English class. As for accommodations for his general education English class, Student was allowed to complete in-class writing assignments at home, he did not have to write group work assignments as those assignments were to be written by other pupils, and he could take vocabulary tests in a collaboration class. The dean noted that Student was earning a "B" in his RSP English class and that his grade would carry-over to his new general education English class.

10.    On December 2, 2003, the District held a conference to discuss accommodations for Student and/or modifications to the curriculum for his general education English class. Student was attaining a "D" grade in the class. Participants included Student's father, general education English teacher, and school psychologist. The District decided that Student should sit in front of the English classroom, a teaching assistant would take class notes or obtain copies of other pupils' notes for him, and the English teacher would e-mail

7

weekly progress notes to the father. In addition, the District advised the father to allow the school psychologist to speak with his son's therapist about his experiences at school. The school psychologist was to continue building rapport with Student to reduce his stress about school. The father did not sign a release to allow the school psychologist to speak to his son's therapist or psychiatrist. With respect to English, if he completed his last English paper, Student's grade in his general education English class was to be changed from a "D" to a "B". Even with accommodations and modifications, Student failed his general education English class in the spring 2004 semester.

11.     (A) It was not established that Student was physically or verbally abused, harassed, or bullied by his classmates or other pupils in his special education or RSP English class at Diamond Bar High School during the fall 2003 semester of ninth grade.

(B) It was not established by the psychiatrist's testimony that Student was abused or bullied by other pupils in his ninth grade special education English class. Dr. Brown testified that Student complained during two visits that he was being "picked on" and made fun of by other pupils in his special education class. Dr. Brown did not testify that Student reported being pushed, shoved, or physically abused by any other pupils. Dr. Brown admitted that Student is not good "historian" and his emotional difficulties increase in the educational setting. At school, he becomes anxious and agitated. Student's emotional status is fine when he is outside of school, such as when he is working. He feels better during breaks from school. According to Dr. Brown, Student would prefer to be passive, put in his time, and not be bothered; he does not want to expend time or energy.

(C) It was not established by the testimony of the father that Student suffered any physical or verbal abuse by other pupils in his special education English class. The father did not witness any abuse. Rather, he testified that his son started high school in fine manner but then his grades dropped for "no reason". On an undetermined date, Student reported to the father that some pupils knocked his books off the table and he asked to see his psychiatrist. The father made an appointment for him with the psychiatrist for the next day. The father did not immediately complain to the high school that his son was being bullied. Moreover, he did not know any of the details of the purported bullying such as names of the other pupils. The father has admitted that his son is embarrassed about being enrolled in special education.

(D) It was not established by Student's testimony that he was verbally and physically abused by other pupils in his ninth grade special education English class. Student did not have a good recollection of ninth grade even though it was only two years ago and he reported that he was abused by pupils from that class. He could not recall the name of his ninth grade English teacher or the names of the four boys who purportedly abused him.

Spring 2004 Semester

12.    On February 4, 2004, the father gave his consent for the District to conduct assessments of his son in several areas, including academic achievement, language and speech development, and cognitive development.

13.    (A) On March 2, 2004, school psychologist, Diana Ketterman, Ph.D., conducted a psychoeducational assessment and team evaluation of Student who was 14 years old. At that time, Student was enrolled in all general education classes after his father requested that he be removed from his RSP English class due to purported bullying. He also received collaborative services through the resource specialist program.

(B) In her report, Dr. Ketterman reviewed Student's health and development and school histories, obtained comments from his current teachers, and summarized prior testing results. In World History class, Student had failed to turn in his most recent assignments and failed to answer most of the questions of a recent quiz. For an English autobiographical essay, he did not do a single assignment, saying nothing happens in his life. Dr. Ketterman performed and summarized the results of tests of his cognitive and intellectual functioning, socio-emotional functioning, and academic achievement. Student had a full scale IQ of 98; had a history of socio-emotional, organizational, and motivational challenges; reported having high levels of resentment towards teachers, social stress, depression, and sense of inadequacy; and had low scores in basic reading skills and reading comprehension. A speech and language assessment showed that Student qualified for DIS services due to an articulation disorder and a language disorder in semantics and pragmatics, which adversely affected his oral communication in an academic environment.

(C) With regard to social and emotional issues, Dr. Ketterman noted in Student's history that he had taken Prozac for depression. The school psychologist administered the Behavioral Assessment System for Children (BASC) to Student to evaluate his behavioral and emotional difficulties in order to prepare intervention strategies. Under the BASC, the school psychologist found significant areas of concern for Student in his attitude toward teachers, locus of control, social stress, depression, and sense of inadequacy. Under Jensen Inventory tests of personality, Student displayed negative attitudes towards authority, family, and school. He described his own behavior as unpredictable, nonconforming, aggressive, and antisocial. His temperament was to question authority and not to follow rules. Dr. Ketterman concluded that Student's social emotional profile indicated the need for intervention and instruction in social skill training and social emotional development.

(D) In summarizing the team evaluation, Dr. Ketterman found that Student had average intelligence, continued to have academic weaknesses in language arts, and had erratic academic progress. His social emotional profile indicated the need for intervention and instruction in both social skills training and social emotional development to manage feelings of anxiety and depression. Due to a specific learning disability, he showed a significant discrepancy between his ability and achievement in reading and written

9

expression and a need for DIS speech and language services. Dr. Ketterman recommended such academic interventions as extended exam time, picture cues, use of a peer to help him keep up in class, small group instruction, training in study skills and motivation, use of collaborative and special education services, use of oral tests, and use of technology to help him access information. Dr. Ketterman further recommended that Student participate in the resource specialist program to receive help in his academic subjects including English and reading, receive speech and language services and increased special education services through the SDC program. In the social emotional area, Dr. Ketterman recommended that Student have opportunities for special recognition and encouragement, DIS counseling with the school psychologist to increase "self-leadership skills" and motivation, AB3632 referral for mental health support, and coordinated treatment plans between his private therapists and school counseling.

14.    On an undetermined date prior to March 2004, Student began receiving speech and language therapy at the high school. In or about March 2004, the father spoke to the school district about his son's speech and language services. Student was embarrassed whenever his teacher announced in front of the class that it was time for him to go to his DIS session. He did not like being singled out as a special education pupil. He began experiencing more academic difficulties in high school.

15.    (A) On April 5, 2004, the District convened a triennial IEP meeting for Student and discussed the results of the recent psycho-educational evaluation. The father participated in the meeting and stated that his son liked coming to school and was always on time. The father indicated that his son said good things about his teachers and the staff, was trying very hard in his classes, and wanted to please his teachers. The IEP team re-confirmed Student's eligibility for special education based on language and speech disorders and specific learning disabilities. His difficulties with abstract categorical reasoning and his language and speech disorders adversely affected his academic achievement.

(B) On April 5, 2004, the IEP team determined that Student should be placed in education general classroom setting with resource specialist programming in his academic subjects including English and reading. DIS services were offered in once weekly speech and language therapy and once or twice monthly counseling. To meet his goals and objectives, he was offered accommodations and modifications in the form of Franklin Speller and Alpha Smart computer programs for writing, receipt of legible notes, and collaboration and note-taking services. His progress was to be monitored with bi-weekly comments from teachers to his parents and evaluated every six weeks. Student was also expected to pass Algebra I and the high school exit examination and meet coursework requirements for graduation.

(C) As set forth in the narratives notes from the triennial meeting, the IEP team learned that Student was doing well in his introductory computer class but was not doing or turning in all of his homework and assignments in his other classes. He had just started going to the school psychologist's office at lunch time to work on his algebra assignments. The school psychologist shared the results of her assessment and suggested

that Student needed DIS counseling and to interact with peers to improve his socialization skills. Strategies were discussed to help him to complete his homework, such as a tutor and mandatory homework before using the computer. The IEP team discussed Student's participation in stage or set building and his possible placement in a sheltered English class. The triennial meeting was continued for two days to give the father time to consider the District's offer of educational services.

(E) On April 7, 2004, the District held a follow-up conference to the triennial IEP. The father was advised that his son may be able to participate in stage or set design in the fall and was given a list of possible student tutors for his son. Classroom modifications and the ELD program were discussed. However, at the end of the conference, the father declined AB3632 counseling and declined to consent to the implementation of the IEP developed at the triennial IEP meeting.

16.    (A) For the progress reporting period ending on April 23, 2004, Student was attaining a "C" in world history, "D's" in introductory computers and algebra, and an "F" in his general education English I class.

(B) From April to July 2004, Student saw the school psychologist on six occasions for 30-minute sessions that usually occurred when he was pulled out from his English class. He worked with the school psychologist on problem-solving skills and was on a behavior plan due to inconsistent compliance with teachers' directives.

2004-2005 School Year—Tenth Grade

17.    Before the start of the fall 2004 semester, Student's father requested an IEP meeting to discuss his son's placement for English for his upcoming tenth grade year. He expressed concerns for his son's safety if he were to be placed in a class with the same boys who purportedly bullied him at the beginning of ninth grade. At a meeting on August 30, 2004, the IEP team discussed what placement would meet Student's needs for emotional well being and academic success. The IEP team considered placing Student in a special education or RSP English class and the school psychologist offered to provide instruction to the class on bullying. The IEP team also considered placing him in a general education English class with accommodations and/or modifications. The father presented an option of one to one tutoring in English for his son and asked for an IEP meeting to discuss his son's placement for tenth grade English.

18.    (A) In September 2004, Student began tenth grade at Diamond Bar High School enrolled in a general education English class. He had been offered speech and language services but did not receive the services at the start of this school year because his father declined to sign the earlier April 2004 IEP. Soon after school started, the father gave his consent for speech and language therapy and Student began receiving the services. Away from school, he continued seeing and receiving treatment from his psychiatrist and therapist.

11

(B) During the course of the fall 2004 semester, Student did not do well in his general education English class. He did not participate in class and did not do the academic coursework. He rarely did the homework. His teacher found him quiet and withdrawn and tried to prod him to do his writing assignments. Student responded by saying he did not know, did not care, or said nothing at all. His grades fell and he became more withdrawn. The teacher became concerned about Student and raised her concerns at an upcoming IEP meeting.

19.     (A) On September 8, 2004, the IEP team met again to discuss Student's placement for English. A goal for paragraph writing and a recommendation of a progress portfolio were discussed. The father presented goals that were not attainable since his son's writing and spelling were at the second grade level and he needed speech therapy for linguistics and oral presentation. Student's general education English teacher advised that he had not completed an English assignment, was non-responsive and non-cooperative in class, and was going to fail. The IEP team, including the father, also agreed that modifying the general education English curriculum was not a reasonable alternative. The IEP team recommended that Student change to a RSP class for English and reading and receive as much supports as possible. The father, however, wanted one-to-one tutoring and a Cisco computer class for his son and would not agree to placement in RSP English class. The school psychologist requested consent to speak to Student's therapist but the father declined to give his consent.

(B) On September 13, 2004, the IEP team met again to discuss Student's placement for English for the school year. The father rejected the school district's recommendations that his son be placed in a RSP reading class or in RSP English with emotional support provided by the school psychologist. The father insisted again on one-to-one tutoring with a specialist. Because the father did not consent to placing his son in a RSP class, the IEP team kept Student in his general education English class but decided to provide him with additional tutoring support before or after school. The IEP team also recommended that Student receive emotional support and coping and problem-solving strategies to assist him in his academic program. The school psychologist offered group counseling and asked again for the father's consent to speak to Student's therapist or psychiatrist. The father once again declined to give his consent. The IEP team also offered an AB3632 referral for county mental health counseling.

(C) From September 12, 2004, until November 22, 2004, Student saw the school psychologist on eleven occasions for 30-minute counseling sessions. The sessions usually occurred on Mondays during the first part of his English class.

20.     (A) Beginning in October 2004, the District arranged for Student to receive tutoring in reading and writing from one of the English teachers at Diamond Bar High School. The tutoring sessions were scheduled for zero period at the start of the school day and Student's work during the tutoring sessions was to be credited toward his grade in his general education English class. After a productive first session, however, Student was not cooperative or communicative thereafter. He did not try to read or write and did not talk

during the tutoring sessions. The teacher tried to bring Student out by sharing things about himself but Student did not respond. He began missing sessions. The tutoring sessions ended after about six weeks because Student stopped coming to the sessions altogether. The teacher found Student had the ability to read and write but chose not to do so.

(B) In addition to the tutor, the District assigned a school psychologist intern to help Student with his vocabulary and to prepare for tests. And while Student's once weekly speech and language therapy was scheduled during the later half of his English class, the speech and language therapist reinforced and reviewed his English assignments during the therapy sessions.

(C) Student remained in his tenth grade, general education English class from September until November 2004. He was able to read materials assigned for the class but his writing ability was below grade level. He was largely apathetic, did not complete assignments, and did not participate in class activities. During class, he often had his head down or slouched in his chair. When the teacher asked him to complete assignments or to participate in class, Student often replied in an aggressive tone and became defensive. On two occasions, he crumbled up class notes that were written by another pupil and given to him to help him in the English class. Student was earning an "F" when he left the general education English class in late November 2004.

21.    (A) On November 3, 2004, the District held an IEP meeting to discuss speech and language services and mental health counseling for Student. He had started speech and language therapy soon after the start of the school year. He was resistant to speech therapy; he did not like being pulled out from his photography class to receive the service. In October 2004, he had refused speech therapy on several occasions. The therapist discontinued therapy after Student laid his head on the desk and did not participate in the sessions.

(B) The father participated in the November 2004 IEP meeting. The IEP team reviewed Student's present level of performance in several areas. For example, he displayed an articulation disorder, had difficulty with expression language activities, did not consistently demonstrate ability to write proper sentences and paragraphs, did not show consistent use of vowels, and did not verbalize an understanding of acceptable grade level skills or requirements. He also had difficulty with tasks requiring abstract reasoning skills and had very limited interest in communicating with adults and other pupils. In the social emotional area, Student was disrespectful to adults at school and did not comply with teacher directives to complete work. The IEP team found that his difficulties in writing and his need for competence resulted in low work production and low motivation to achieve. The IEP team determined that Student should continue to be placed in a general education class with DIS services in the form of once weekly speech and language therapy sessions and once or twice monthly counseling sessions. Accommodations and modifications similar to those in earlier IEPs were offered to Student.

13

(C) Based on his needs and an assessment by the speech and language specialist, the IEP team determined that Student required individual speech and language therapy with a speech and language pathologist once weekly for 30 minutes.  The IEP team found that he had needs in semantics, pragmatics or problem-solving, and articulation.  As an alternative, the father suggested that his son receive software for development of speech and language skills.  However, the IEP team found that such software would not meet Student's goals and objectives in speech and language development and instead offered individual speech and language therapy on Mondays in the latter half of his English class period.  He was to receive vocabulary help during his character development and study skills sessions with the school psychologist intern in the first half of his English class period.  The father was asked to let the District know within two days if he was going to consent to individual speech and language therapy for his son.

(D) The IEP team also discussed that Student had shown resistance to receiving speech and language support.  The father indicated that his son was embarrassed about needing special education and a special education teacher shared a writing of the student in which he expressed his dislike of school.  The English teacher indicated that, on two occasions, Student crumbled up notes given to him by another pupil and was often non-responsive in English class and in his tutoring sessions.   The school psychologist also stated that she wanted to talk with Student's private mental health provider because he was displaying symptoms of depression, lack of motivation, and/or anxiety and these psychological conditions may be contributing to poor academic performance.  The school psychologist opined that Student needed a coordinated treatment plan.

(E) At the end of the meeting on November 3, 2004, the father represented that he would sign the IEP after reviewing it.  However, the father later refused to give his consent to the District to implement this IEP and to the school psychologist to speak with his son's therapists.

22.    For progress reporting period ending November 19, 2004, Student was attaining a "C" in integrated laboratory science, "D's" in photography and algebra, and "F's" in Cisco and English II.   He last attended classes on November 22, 2004.

23.    On November 23, 2004, Dr. Diana Ketterman, school psychologist, informed the father that she was concerned about his son's mental health. Dr. Ketterman indicated that, after a number of teachers stated Student was showing more signs of depression, she tested him on the Adolescent Scale and found his score was significant for depression.  The school psychologist recommended that the father report the matter to his son's psychiatrist and she once again asked permission to speak to the psychiatrist regarding treatment. Dr. Ketterman opined that Student needed mental health assistance beyond what the District could provide and recommended that the father submit a AB3632 referral to the county for free mental health counseling.

14

24.    (A) A few days later, on November 29, 2004, Student obtained a note from his psychiatrist ordering home instruction for him. Dr. Brown wrote that Student's "condition preclud[ed] participation and attendance in a regular school environment" and that he was "to receive home instruction 5 days a week until further notice."

(B) On November 30, 2004, the father forwarded the psychiatrist's note to the school district and asked when the District was going to provide his son with home instruction and speech and language services. The father requested an emergency IEP meeting by December 10th to discuss his son's schedule and progress, home instruction goals and objectives, arrangements for statewide testing, and transition "back into the regular school classes" at the high school. He also asked for an additional IEP meeting in January 2005 to discuss the spring semester.

25.    On December 10, 2004, the District convened an addendum IEP meeting. The IEP team discussed the school psychologist's recent test results showing Student had symptoms of depression and his teachers' concerns that he was more withdrawn at school. The IEP team recommended to the father that his son be referred to the county for mental health services and asked for his consent so that the school psychologist could talk with Student's psychiatrist and coordinate mental health counseling with his educational needs. The father declined the AB3632 referral and refused to sign the consent form because his son had been seeing a psychiatrist for five years and a psychologist for 10 years. The father did not see the AB3632 referral as being helpful for his son. Based on the note from the psychiatrist, the IEP team then placed Student on home instruction wherein he was to receive a total of five hours of instruction in algebra and language arts each school week at home from a teacher. Due to the upcoming winter school break, speech and language as well as counseling services were temporarily suspended until the next IEP meeting on January 10, 2005, when the IEP team planned to discuss the student's return to the high school. The father took the IEP document home to review it. He later returned the document to the District without consenting to its implementation and asking that DIS services resume on January 10, 2005.

26.    (A) On January 10, 2005, the District convened a conference with the father to review Student's home instruction and his transition back to the high school. The father reported that his son's psychiatrist was recommending that Student remain on home instruction. The school psychologist informed the father of his son's results on a depression scale administered to him earlier. Based, in part, on the psychiatrist's recommendation, the IEP team decided that Student would continue with home instruction and have a goal of returning to the high school at the end of the six-week grading period of the spring semester. Home instruction included 90 minute sessions in math and science twice weekly.

(B) On January 10, 2005, the District agreed to resume speech and language therapy on February 6 and start once weekly counseling sessions with the school psychology. The school district offered to provide these DIS services at school. However, those services were not implemented because Student did not ever come to school to receive the services. About a week later, the home instruction teacher in English reported that Student's attitude

and performance were poor and he had poor participation and an "F" grade in home instruction English program.

27.    On February 9, 2005, the District convened an addendum IEP meeting to discuss Student's poor first semester grades and his goals for the second semester. He remained on home instruction. For the first semester, he had incompletes in English and photography, failed science and CISCO, and attained a "C" and "A" in algebra and physical education, respectively. Student frequently failed to do homework for his courses. The IEP team informed the father that his son needed to complete assignments between home instruction sessions; the father said he would monitor his son's behaviors and assignments. For second, or spring semester, the IEP team determined that Student would continue on home instruction and receive two hours of home instruction each week in science, algebra, and English. He was to complete physical education on an independent study basis. The IEP team also discussed Student's placement at the high school, independent study, or home instruction as well as his progress towards graduation and passage of the high school exit exam. Independent study was recommended since Student could earn credits in one hour increments. The father stated he would discuss his son's educational placement with his therapist whom he was seeing once every three weeks. The IEP team scheduled a meeting for March 21 to discuss Student's placement. Speech therapy or counseling was not discussed at the meeting on February 9, 2005. Student did not start speech or counseling services on February 6 because he did not come to school to receive the services. The father expressed concern about the lack of home instruction in science but did not complain about the absence of speech and counseling services.

28. In March 2005, Student took the high school exit examination. He passed the mathematics portion but did not pass the English and language arts section of the examination.

29.    On March 21, 2005, the District held another IEP meeting to discuss Student's grades and expectations. The father revealed that his son would not return to the high school until the summer. The IEP team decided to keep Student on home instruction in math, science, and English. He was to make up assignments in photography, complete fine arts class in the second semester, and drop web design. The IEP team also assigned a substitute teacher to coordinate his coursework. The father indicated he would talk with his son's psychiatrist about whether the student should receive instruction on independent study or home instruction. Subsequently, the father returned the IEP document with notations, including the note that his son would "start going on Monday to independent study on 04/11/05" and receive "one-on-one instruction by a qualified instructor." At the meeting on March 21, 2005, speech therapy and counseling were not discussed and the father did not complain about his son not receiving those DIS services.

30.    (A) On April 4, 2005, the District held an annual IEP for Student who continued to be eligible for special education due to a language and speech disorder and specific learning disability. He had been receiving home instruction and/or independent study since December 2004. He had not been receiving speech therapy or counseling since

16

he did not return to school to receive those services. In reviewing his present levels of performance, the IEP team found, in part, that Student's disorders in attention and sensory motor skills, weaknesses in written expression and basic reading, and disorders in articulation and language adversely affected his academic achievement and progress. He was making progress on home instruction in algebra, science, and English but made no progress towards his goals, including grammar and mechanics of writing, language semantics and pragmatics, and articulation

(B) For the next school year (2005-2006), the IEP team determined that Student should return to the high school and general education classrooms to the fullest extent possible. The IEP team decided that he should be placed in general education classes with designated instruction and services in speech and language therapy and counseling. Student was to be pulled out from class once weekly for speech and language therapy. The IEP team decided Student should receive accommodations and modifications in the form of Franklin Speller and Alpha Smart computer programs to improve his writing and spelling and use collaboration and teacher scribe services as needed. The IEP team further determined that the accommodations and modifications would assist him to attain his long term goals of passing the high school exit exam and attaining his high school diploma. For the remainder of the spring semester, the IEP decided to provide Student with seven hours of tutoring in algebra, science, and English at the independent study center at the high school on Mondays and two hours of instruction at home on Wednesdays.

(C) The father participated in this annual IEP meeting and stated that his son was looking forward to returning to the high school in the fall. Regarding speech and language therapy, the father said he would talk to his son and have an answer for the IEP team whether his son would participate in those services. However, the father did not give his consent for implementation of the IEP, including DIS services in speech and counseling.

31.    (A) On May 18, 2005, the District held a conference with the father, special education director, Student's teacher, and the school principal to review Student's academic status. He was enrolled in home instruction or independent study and doing well in mathematics, science, photography, and web design. He was scheduled to complete coursework for the spring semester. However, he had received a "F" in English for the first or fall semester and the conference group decided to ask his English teacher to change his grade to a "D" based on his completion of notes on the book 'Fahrenheit 451". Student's father signed the Conference Verification form but requested that his son receive the FastForward program beginning in July 2005.

(B) On May 31, 2005, the District denied the father's request for FastForward program for the stated reason that the FastForward program was not a related service that could meet Student's IEP goals or his educational needs. The District special education coordinator indicated that FastForward was a reading improvement program and Student's needs were not in reading but in writing. According to the special education coordinator, Student's recent high school exit exam results showed that his reading skills were within the average range but his writing skills were well below the average range. The District was

providing Student with assistive technology tools, including Dragon software, to help him in his writing, and suggested to the father that his son attend summer school where the District could concentrate on guiding his writing skills.

2005-2006—Eleventh Grade

32.    On August 10, 2005, Student's psychiatrist wrote that he was "medically cleared to return to a regular institutional setting." The father thought his son was looking forward to returning to high school from his home instruction or independent study program. On August 30, 2005, the District held an addendum IEP meeting to confirm Student's return to high school and his class schedule for his junior year.  He was enrolled in general education classes and did not DIS services because his father did not consent to the April 2005 annual IEP.  Student turned 16 years of age on that date.

33.    (A) On September 28, 2005, the District convened a meeting to update Student's IEP since he was returning to high school from home instruction or independent study.  The father participated in the meeting.  The IEP team learned that Student had earned sufficient class credits to graduate on time; he had passed the math portion of the high school exit examination and needed to pass the language arts portion.  After two weeks of school, he was earning "F's" in modern American history and marine science.  He had not completed any homework in marine science; his teacher had allowed him to use notes, books, and word processing to complete tests in collaboration class.  The marine science teacher had another pupil take notes for Student and tried to make him sit up in class and not nod off.  The teacher found he could perform the work but chose not to do so.  In his general education English III, Student had not turned in one home work assignment and had failed two reading quizzes.  His English teacher had given him the opportunity to make up homework assignments.  The father reported that his son was trying very hard in all of his classes.

(B) On September 28, 2005, the IEP team also reviewed Student's goals and objectives in grammar and mechanics of writing, manuscript forms, writing responses to literature, research and technology, language, and articulation.  Due to his difficulty with written language, the IEP team discussed evaluating his progress in writing responses to literature through oral responses.  The father said he would discuss it with his son.  The father agreed to speech and language services as long as his son did not miss any of his academic classes.  The father also requested that the District provide modifications and accommodations for his son and track his academic progress.

(C) Based on the discussion and reports during the meeting, the IEP team offered to continue to place Student in a general education classes and added resource specialist programming.  Addressing the father's concern that his son not miss any time in his academic classes, the IEP team offered twice weekly 30 minute sessions in individual speech and language services and once or twice weekly 30 minute sessions in individual counseling, both of which were to occur during sixth period when he was a teaching assistant.  With respect to modification and accommodations, the IEP team agreed that the

District would provide another pupil to take notes on carbon paper for Student in English, history, and marine science; allow him to use the Franklin speller, Alpha Smart, computer, and collaboration; and have teachers act as scribes to transfer material to print for him. In order to track Student's academic progress, the IEP team proposed that his general and special education teachers monitor his work assignments and progress and provide weekly reports to the IEP team and the parent. The father indicated he did not want his son to receive RSP programming in language arts and wanted to make sure that his general education English teacher was aware that he was a RSP pupil. The father did not give his consent to the school district to implement this September 2005 IEP.

34.    At the IEP meeting on September 28, 2005, the District also discussed and included a transition plan for Student in his IEP document. The IEP team advised the father that his son needed to pass the high school exit exam and meet the algebra I and all other coursework requirements to receive a high school diploma. He had passed the math portion of the high school exit exam, attained 125 class credits, and was on track to graduate. Goals and objectives were reviewed. On an Individual Transition Plan, the IEP team noted that Student desired to attend college and to achieve independent living and transportation arragnements. He had also completed vocational classes in woodworking, driver's education, introductory computers, advanced woodworking, and photography. He was taking business math. In preparation for his transition from high school, Student was noted to have obtained asocial security card, identification card, birth certificate, and resume or portfolio. With respect to needed transition services, the IEP team determined that Student was to use his daily agenda to record all his assignments, projects, and tests; he was to use collaboration services for assistance. He was to work or volunteer with the city recreation department to obtain community experience. To develop his job status and post-school living objectives, he was to apply to the city for a paid position. The father signed the Transition Plan, indicating his participation in the development of the transition plan.

35.    About a week later, on October 4, 2005, the District convened a follow-up IEP team meeting to review Student's progress towards his goals and objectives in writing and grammar, to complete the September 2005 IEP, and to obtain the father's consent to the September 2005 IEP. The father was advised that his son's failure to do homework was affecting his grades in English, history, and marine science. The father wanted to know what the District was going to do help his son pass English. The IEP team discussed a RSP "pull-out" class for Student but the father asked whether the RSP class had the same pupils who allegedly harassed his son two years earlier. The father also requested complete assessments of his son; the District prepared an assessment plan that the father signed. The father asked for more time to review the IEP document. Subsequently, the father did not sign the September 2005 IEP or consent to services or RSP placement.

36.    On October 13, 2005, the high school grade level coordinator wrote to Student's father that his son was failing marine science and English III and receiving a "D" in modern American history. The father was advised of the availability of homework monitoring, weekly progress reports, and peer tutoring for his son.

37.     On October 17, 2005, the IEP team met again to finalize the September 2005 IEP. The IEP team agreed, in part, that Student should see the school psychologist weekly and receive notes for his marine science class. For English, the IEP team determined that he should be placed in independent study where he would receive individual instruction in English by a credentialed teacher twice weekly. He would work on his English assignments in a collaboration class three times weekly. The IEP team indicated that it would review Student's progress in English in about five weeks. The IEP team also determined with the father's assent that Student would not receive "pull-out" speech and language services for the time being. The father indicated he would call the District within four days to indicate his decision whether to consent to the implementation of the September 2005 IEP as revised. However, the father did not consent to the changes in his son's IEP.

38.     For the fall semester of the 2005-2006 school year, Student was enrolled in the general education eleventh grade English III class. His teacher found him to be a congenial pupil who did not disrupt the classroom but he refused to do any of the assignments, including journal writing and reading, or to participate in class. He stated he had nothing to write in his journal and avoided writing. He refused to do the homework and did not want to read. His teacher had to frequently tell him to sit up, for he had a habit of placing his head down on his desk. The teacher tried to help Student by explaining assignments to him, having him sit next to other pupils who could help him, modifying tests that were too difficult for him, allowing him to take tests in a collaboration class without time restraints, and giving him make-up work to improve his grade. The teacher also counseled Student on his apathy and lack of motivation. Student enjoyed the one to one attention and the teacher found that he could comprehend the reading materials, was capable of writing, and could perform the work although not at a high level. Nevertheless, Student failed the English class in the fall 2005 semester. On January 17, 2006, Student announced that his goal in the English class for the spring semester was to achieve a perfect zero. The teacher referred him to the counselor thereafter, adding that Student refused to complete his class assignment. Student would have benefited from a slower paced class for English.

39.     On November 28, 2005, Student's case carrier advised the father by e-mail that his son was receiving "F's" in marine science, modern American history, and English III at the 12-week progress reporting period and that, if his grades remained the same through the rest of the fall semester, he would not have enough class credits. The father was asked to consider returning his son to independent study where he was more successful in the past.

40.     (A) Pursuant to the father's request and the assessment plan that he signed on October 4, 2005, the District conducted a psychoeducational assessment and team evaluation of Student. The evaluation team consisted of school psychologist Dr. Ketterman, the case carrier, a language and speech specialist, a school nurse, an occupational therapist, and the father. On December 13, 2005, Dr. Ketterman prepared a written report.

(B) The father requested updated testing because he said he wanted to know what were his son's three major learning disabilities, what the District could do to meet his educational needs, and whether his mental health issues were interfering with his academic

achievement and school interaction.   The father requested re-testing of his son in all areas of suspected disability.  The school psychologist noted that Student had received a "very thorough psychoevaluation in March 2004 as part of his state mandated triennial assessment."  The father was not specific as what tests he wanted performed, indicating he wanted "assurance that his son [was] being provided a fair and appropriate education based on his unique identified needs."

  (C) During testing sessions with Dr. Ketterman, Student was "somewhat cooperative", for he wanted only to be tested during sixth period and for a very short time. He performed every subtest as fast as he could because he wanted to go talk with office staff or go on the internet at the school library.  While undergoing tests of his academic achievement, Student was cooperative and paid attention but appeared preoccupied with the time that it took to complete the tests.

  (D) In performing the Cognitive Processing System tests, Dr. Ketterman found that Student showed significant delays in planning, attention, and successive processing.  The sensory motor assessment indicated that he was delayed in his development.  In the assessment of his social emotional area, Student had the same results that he had on the Behavior Assessment System for Children administered for the March 2004 triennial evaluation; he continued to have challenges at school in social emotional, organizational, and motivational areas.  Under the Adolescent Test of Problem Solving, Student had scores in the significantly impaired range for critical thinking skills.  In the testing of his academic achievement, he read at the fourth grade level; he had significantly impaired reading and spelling abilities.  He could read basic words and sentences but had difficult with more complex words and writing complete sentences.  His math calculation skills were within the average range.  A speech and language assessment showed that Student still qualified for services in this area.

  (E) In the December 2005 psychoeducational report, Dr. Ketterman and evaluation team did not find anything new or different from the March 2004 assessment. Student continued to have delays in reading, reading comprehension, and written expression that significantly affected his academic progress in all areas.   Dr. Ketterman reconfirmed that Student had processing deficit, needed assistance to plan and stay on track, and performed better when he knew the goal.   The evaluation team made similar recommendations for special education assistance, including support services in reading and writing, small group instruction, participation in the resource specialist program and support with school psychologist.   The evaluation team noted again that Student's social emotional issues affected his academic performance and he needed a treatment that included his private therapists and school counselors and county mental health support.  Placement in a special education class, emotional support and counseling, and speech and language services were recommended once again.

  41. On December 8, 2005, the Request for Due Process was filed on behalf of Student.  On December 9, 2005, the District suspended Student from school for five days beginning on December 12 for misbehavior, disrupting school activities, and/or defying

authority. He was to return to school on January 3, 2006. Student was suspended because his teacher asked him to leave the classroom numerous times but he refused and went towards the teacher in an apparently threatening manner. Student left the classroom only after the teacher said she was going to call security and other pupils came to her aid.

42.    On December 9, 2005, Student underwent an OT evaluation by Gallagher Pediatric Therapy to determine if needed OT to access his educational program. He had previously received OT services to address his writing skills and was receiving accommodations and modifications to his curriculum to improve his writing and spelling. The occupational therapist noted Student was on independent study, failing three subjects, did not try to his school work, and chose not to use the Alpha Smart program. The therapist observed or tested Student's sensory modulation and processing and administered tests of his fine motor skills and visual motor integration. The therapist concluded that Student had the underlying components of sensory processing, sensory modulation, developmental and neuromuscular coordination as well as the cognitive skills necessary for writing and did not recommend OT for him. The therapist observed that the primary area of concern was his lack of motivation to do academic work and engage in school activities.

43.    On February 2, 2006, student's psychiatrist, Dr. Brown, wrote that Student was still under his care and that his "medical condition preclude[d] attendance at his regular school setting. He [was] to be placed in a home hospital program effective today."

44.    On February 9, 2006, the District convened an IEP meeting to discuss the psychiatrist's medical order for home hospital placement. The school psychologist renewed her request for the father's consent to speak to the psychiatrist but the father did not give his consent. The father stated he did not know how long his son would have to be in home hospital placement. Based on the psychiatrist's order and Student's past responsiveness to individual instruction, the IEP team decided to place him on home hospital instruction for five hours per week. The IEP also recommended that Student attend an independent study center one morning each week to receive counseling and work on class credits. He needed to make up credits in English and history from the fall semester and science and to pass the English portion of the high school exit examination. The father indicated he would think about the recommendation. An IEP meeting was scheduled for February 13 to discuss the results of the December 2005 evaluation.

45.    For the spring 2006 semester, Student continued to be enrolled in home instruction and/or independent study with the school district. He received five hours weekly in home instruction and did not receive any speech and language therapy. Since November 2005, he has had a part-time job with the city recreation department. Student testified that, for the summer of 2006, he probably needed to attend the summer session and was planning to go to Japan with a student group. For the fall 2006 semester, which would be the start of his senior year, Student indicated he wanted to attend the high school for social reasons. He testified that he thought he needed speech therapy and counseling. After high school, Student wants to attend college and study business and technology.

Other Assessments

46.    On four occasions in March and April 2006, Student was examined at the Eye Care Center at the Southern California College of Optometry for a comprehensive vision examination, visual efficiency evaluation, visual information processing evaluation, and a dyslexia determination test.  Student reported, in part, tired eyes and headaches when reading, loss of concentration and memory when reading, and difficulties in reading.  On examination, Student's eye health and visual acuity were normal.  While his eye tracking and teaming were adequate, his eye focusing was inadequate which may cause him to have eyestrain and headaches when reading.  Student exhibited deficiencies in visual efficiency and visual information processing which contribute to slow reading, avoidance of reading, and a having a short attention span.  His results on the dyslexia testing suggested that he had deficiencies in sight word recognition, in using visual recall to spell words, and in spelling words by syllabication, phonics, and structural analysis.  The results were suggestive of a severe dyslexia pattern.  A visual therapy program, reading therapy using a multi-sensory approach, reading tutorials, and vision and posture techniques for studying were recommended for Student.

47.    (A) On April 11, 2006, Student was referred by the District to the Assistive Technology Exchange Center to see what assistive technology would be suitable to help him with his difficulty with written expression and spelling.  Student was receiving home instruction and reported to have difficulties in speech articulation, intelligibility, semantics, pragmatics, and morphology.  Student indicated he stopped going to speech therapy about a year ago because it was "a waste of time."

(B) During the assistive technology evaluation, Student resisted speaking and often mumbled.  His speech was clear, however, when expressing displeasure or impatience.  His attitude was uncooperative, disinterested, and stressed.  He did not want to be present for the evaluation and denied having difficulties with writing and spelling.  He declined to try any assistive technology software and, instead, the software was shown to his father.  Due to Student's unwillingness to try any assistive technology software, no recommendation for the use of such technology was made for him.  At the hearing, Student explained that at the time of this evaluation he was tired and sleepy and also in a hurry because he had to get to his job at the city recreation department.

48.    (A) In November 2005, Student was referred by his counsel to Robert J. Rome, Ph.D., of Encino for a psychological-educational evaluation.  The referral was made after the father had already asked the District in October 2005 to conduct another assessment of his son.  As described hereinabove, the District performed the requested assessment in December 2005.  The father did not express any disagreement with the District's December 2005 assessment or any other assessment.

(B) Dr. Rome interviewed Student and his father, reviewed previous reports and tests, made clinical observations, and administered a number of psychological tests. Under the Wechsler Intelligence Scale, Student displayed average intelligence. Results from the Woodcock-Johnson tests of achievement indicated he had weaknesses in several areas including written language and basic reading skills. In the Test of Adolescence and Adult Language, he showed weaknesses in receptive and expressive language areas. Student showed academic achievement in the low end of the average range. As such, Dr. Rome's findings were similar to those made by the District in its assessments

(C) Under his diagnostic impressions, Dr. Rome concluded that Student had an adjustment disorder, reading disorder, and disorder of written expression. The psychologist reached the impression that school and his failures in school and academics were stressors in Student's life. He found that Student showed anxious and depressed reactions to school but had a good self concept and decreased emotional and behavioral reactions outside of school.

(D) Based on his evaluation, Dr. Rome offered several recommendations for Student. He suggested educational therapy from a non-public agency because he believed that Student received no direct supports or assistance from the school district in many academic areas including reading and writing. Dr. Rome suggested DIS counseling to address his emotional and behavioral reactions and stressors related to school. He recommended speech and language therapy, an auditory and vision evaluations, occupational therapy to address his writing method, and assistive technology supports. Dr. Rome also recommended compensatory education for the alleged lack of appropriate services over the past number of years.

(E) In testifying in this matter, Dr. Rome stated that the Fast ForWord program was a phonetic reading program for pupils with typical reading problems. He opined that, while this program could help Student, he had an unusual configuration of reading scores and needed a more individual approach to solve his reading problem. Dr. Rome stated that Student was not a good candidate for the Fast ForWord program.

49.    (A) Dr. Rome's recommendations were not persuasive. He was not altogether familiar with Student's educational history. Dr. Rome wrote that the father "has made repeated requests for an increase in services" as well as "requests for increased time in treatment in individual area" and "for specific programs of treatment." He did not acknowledge that the father has continually declined the District's offers of special education and DIS services in speech and counseling and refused AB3632 referrals for mental health counseling. Dr. Rome did not seem aware that, while Student was receiving home instruction, the father did not have his son go to high school to receive speech therapy and, at one IEP, asked for software for speech in lieu of individual speech therapy. Dr. Rome did not mention that, throughout high school, the father did not agree to have his son enrolled in RSP English classes, insisting on placement in a general education English or asking for individual tutoring.

24

(B) Dr. Rome's statement that Student did not receive direct supports or assistance in reading and writing or appropriate services for years from the school district was contradicted by the evidence of the District's efforts to help Student, including RSP programming, tutoring, and accommodations. His recommendation that Student would benefit from DIS counseling fails to take into account the father's repeated refusals to sign IEP's in which counseling was offered or to accept referrals for county mental health counseling. Dr. Rome's determinations that there was a significant discrepancy between Student's intellectual functioning and his academic skills and achievement, that his work was tedious and sloppy, and that he had significant weaknesses in reading and writing were already established by the District's assessments, the IEP team meetings and documents, and his teachers' evaluations.

(C) In addition, Dr. Rome made speculative statements. In his report, he opined that Student's move to the school district in eighth grade may have contributed to his difficulties in high school.  Dr. Rome also speculated that Student had problems related to his parents' divorce and changes therefrom.  No evidence was presented that showed Dr. Rome obtained any information to support these conclusions.  Among his recommendations, he stated that Student continued to have "auditory perceptual and processing difficulties" which limit his academic and language functioning.  While he administered the Wepman Auditory Discrimination Test, it was not established that Dr. Rome was qualified to make any recommendations in the auditory area based on this single test.

50.     In his evaluation and testimony, Dr. Rome did observe that Student harbored disdain and "marked anger" about all aspects of school and has had these negative and angry feelings about school for a number of years.   When asked about school, he became hostile, sarcastic, and irritable.  Student stated that he received very little help from school and that school was of "no help" to him.  He criticized his teachers, saying that most of them were annoying.  Student dismissed his fellow pupils and indicated he had no need for pupils or teachers at school.  In his view, the most annoying teachers were those that were made to do "all kinds of thing[s]" by his father.  He blamed his father, in part, for the teachers' reactions to him because he continued to pursue help for him at school.  As Dr. Rome testified, Student was angry that his teachers singled him out at school by providing accommodations and angry that his father continued to seek special education services for him.  Student discounts the importance of school, is embarrassed about his academics, and does not believe special education is for him.

Based on the foregoing findings of fact, the Administrative Law Judge makes the following determination of issues:

## LEGAL CONCLUSIONS

1.     Under the federal Individuals with Disabilities Education Act (IDEA) and state law, pupils with disabilities have the right to a free appropriate public education (FAPE).  (20

U.S.C. §1400 (2005); Ed. Code §56000 et seq.)  The term "free appropriate public education" means special education and related services that are available to the pupil at not cost to the parents, meet state educational standards, and conform to the pupil's individualized education program.  (20 U.S.C. §1401(9).)  This right to FAPE arises only after a pupil has been assessed and determined to be eligible for special education.

       In *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 485 U.S. 176, 200-202, 102 S.Ct. 3034 (1982), the United States Supreme Court addressed the level of instruction and services that must be provided to a pupil with disabilities to satisfy the requirements of the IDEA.  The *Rowley* Court determined that a pupil's IEP must be reasonably calculated to provide the pupil with some educational benefit but that the IDEA does not require school districts to provide special education pupils with the best education available or to provide instruction or services that maximize a pupil's abilities.  (*Ibid.* at pp. 198 - 200).  Finding that Congress included no language suggesting an obligation to maximize the potential of disabled pupils, the *Rowley* Court stated school districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instructional and related services which are individually designed to provide educational benefit to the pupil.  (*Ibid.* at p. 201.)

       In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program. (See *Gregory K.. v. Longview School District*, 811 F.2d. 1307 (9th Cir. 1987).)  A school district is not required to place a student in a program preferred by a parent, even if that program will result in greater educational benefit to the student.  (*Ibid.*) The school district's proposed educational program must be evaluated in light of the information available to the school district and what was objectively reasonable when the program was developed. (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.)  For a school district's offer of special educational services to a disabled pupil to constitute a free appropriate public education under the IDEA and the *Rowley* case, a school district's offer of educational services and/or placement must have been designed to meet the student's unique needs, comports with the student's IEP, and was reasonably calculated to provide the pupil with some educational benefit.

       The United States Supreme Court in the *Rowley* case also recognized the importance of adhering to the procedural requirements and protections afforded by the IDEA, which are designed to ensure effective parental participation in the IEP process and careful consideration of a pupil's educational needs. (See 20 U.S.C. §1400 et seq.)  The United States Supreme Court noted in *Rowley* that, "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation" at every step "as it did upon the measurement of the resulting IEP." (*Board of Education of the Hendrick Hudson Central School District* v. Rowley, *supra*, 458 U.S. at pp. 205-206.)  For example, one of the rights afforded to parents is the right to be provided a formal written offer of placement by the school district. (*Union School District v. Smith*, 157 F.3d 1519 (9th Cir. 1994); cert. denied 115 S. Ct. 428 (1994).)  In the *Union* case, the Circuit Court of Appeals noted that one of the reasons for requiring a formal written offer is to

provide parents with the opportunity to decide whether the offer of placement is appropriate and whether or not to accept the offer. (Ibid.)

However, not every procedural flaw constitutes a denial of a FAPE. Procedural flaws must result in the loss of educational opportunity to the student, or seriously infringe on the parent's participation in the IEP process, to constitute a denial of a FAPE. (*Board of Education of the Hendrick Hudson Central School District* v. *Rowley, supra,* 458 U.S. at pp. 206-07; see also *Amanda J.* v. *Clark County School District*, 267 F.3d 877 (9th Cir. 2001).) Procedural violations which do not result in a loss of educational opportunity or which do not constitute a serious infringement of parents' opportunity to participate in the IEP formulation process are insufficient to support a finding that a pupil has been denied a free appropriate public education. (*W.G.* v. *Board of Trustees of Target Range School District No. 23*, 960 F.2d 1479, 1482 (9th Cir. 1992).)

In general, a pupil shall be referred for special education instruction and services only after the resources of the regular education program have been considered and, where appropriate, utilized. (Ed. Code §56303.) All referrals for special education and related services shall initiate the assessment process and shall be documented. (Cal. Code Regs., tit. 5, §3021, subd. (a).) All school staff referrals shall be written and include a brief reason for the referral and documentation of the resources of the regular education program that have been considered, modified, and when appropriate, the results of intervention. (Cal. Code Regs., tit. 5, §3021, subd. (b).) Upon initial referral for assessment, parents shall be given a copy of their rights and procedural safeguards. (Ed. Code §56301, subd. (c).) Education Code section 56320 provides that an individual assessment of the pupil's educational needs must be conducted by qualified persons before any action can be taken with respect to the initial placement of an individual with exceptional needs in a special education instruction.

A school district shall develop a proposed assessment plan within 15 calendar days of referral for assessment, unless the parent agrees in writing to an extension (Ed. Code §56043, subd. (a)), and shall attach a copy of the notice of parent's rights to the assessment plan (Ed. Code §56321, subd. (a)). A parent shall have at least 15 calendar days from the receipt of the proposed assessment plan to arrive at a decision whether to consent to the assessment plan. (Ed. Code §56403, subd. (b).) A school district cannot conduct an assessment until it obtains the written consent of the parent prior to the assessment (unless the school district prevails in a due process hearing relating to the assessment); assessment may begin immediately upon receipt of the consent. (Ed. Code §56321, subd. (c).) Thereafter, a school district must develop an individualized education program required as a result of an assessment no later than 50 calendar days from the date of receipt of the parent's written consent to assessment, unless the parent agrees in writing to an extension. (Ed. Code §56043, subd. (d).)

2.     Issue No. 1--In the Request for Due Process Hearing and Closing Brief, Student asserts that the District denied him a free appropriate public education because it failed to assess him in all areas of suspected disability. Student asserts that the District did

not assess or failed to timely assess him for depression and mental health issues, hearing and vision, and fine motor skills with respect to his writing.   Student's assertions are not supported by the evidence.

Federal law provides that a school district must reevaluate a child with a disability if it determines that the educational or related services needs of the child warrant a reevaluation.  (20 U.S.C. δ1414(a)(2)(A).)  A reevaluation must occur at least once every three years unless the parent and school district agree that it is not necessary.  (20 U.S.C. δ1415(a)(2)(B).) State law adds that a reassessment of a pupil shall be conducted at least once every three years or more frequently, if conditions warrant a reassessment, or if the pupil's parent or teacher requests a reassessment and a new IEP to be developed.  (Ed. Code δ56381, subd. (a).)

In conducting an evaluation, the school district must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information that may assist in determining the content of the child's individualized education program.  (20 U.S.C. δ1414(b)(2)(A).)     No single assessment measure or procedure is used as the sole criterion for determining an appropriate educational program for a child.  (20 U.S.C. δ1414(b)(2)(B); Ed. Code δ56320, subd. (e).)  The assessment and other evaluation materials used to assess a child must be administered by trained and knowledgeable personnel and the child must be assessed in all areas related to his or her suspected disability including, in part and if appropriate, health and development, communicative status, academic performance, motor abilities, and social and emotional status.  (20 U.S.C. δ1414(b)(3); 34 C.F.R. δ300.532; Ed. Code δ56320, subd. (f).)

In this matter, the District properly evaluated Student in the areas that Student claims were not assessed.  The District was aware, and the Student did not dispute, that he had mental health and/or depression issues.  The District has attempted numerous times to speak with Student's therapist or psychiatrist, to refer Student for county mental health counseling, and to create a program of treatment that incorporated both the private therapists and school counselors.  At the December 2003 IEP meeting where accommodations were discussed for Student who had been moved to a general education English class, the IEP team asked the father to allow the school psychologist to speak with his son's therapist.  In the Psychoeducational Assessment in March 2004, the school psychologist reviewed Student's history of mental health concerns and depression, cited his stress and depression at school, and recommended counseling and a referral for county mental health counseling.   In October and December of the 2004-2005 school year, the school psychologist and teachers became more concerned with Student's mental health; the school psychologist screened him for depression, made another recommendation for county mental health counseling, and asked the father again to speak with the private therapist.   In the 2005-2006 school year, the District conducted another psychoeducational evaluation.   As such, Student has been assessed and given recommendations for mental health counseling and depression within the requirements of special education law.

28

With respect to other suspected disabilities, in December 2005, Student underwent an OT evaluation which, in part, tested his fine motor and visual motor integration and coordination skills necessary for handwriting. He was found to have the underlying components and cognitive skills for writing; OT was not recommended. After the filing of the due process request, in March and April 2006, Student received an assessment of his vision. Regarding hearing, it was not established by the report or testimony of Dr. Rome that Student needed a hearing assessment. There was no probative evidence in the record that Student has had any hearing problems in the classroom or at school. The occupational therapist noted that Student did not have any difficulty following verbal instructions.

Based on Findings 12 – 15, 21, 23, and 40 above, Student was appropriately assessed in all areas of suspected disability. His needs have been identified and he has been offered services in mental health but the father has continuously declined the District's referrals for county mental health counseling as well as offers for school group counseling and coordinated services with private therapists.

3.    Issue No. 2--Here, Student contends that the District failed to fulfill its child find obligations by not properly assessing and providing services to him for depression. Student argues that, after the March 2004 psycho-educational evaluation, the District conducted only a screening in November 2004 and should have undertaken "more in depth formal evaluations." According to Student, the failure to conduct assessments and provide services for depression shows that the District did not take his "emotional/social concerns seriously." Student's contentions do not have merit.

In general, both the IDEA and state law impose upon each school district the duty to actively and systematically identify, locate, and assess all children with disabilities or exceptional needs who require special education and related services, including children with disabilities who may be homeless or migrant, wards of the state, or not enrolled in a public school program. (20 U.S.C. §1412(a) (3); 34 C.F.R. §300.125; Ed. Code §§56300, 56301.) This statutory obligation of a school district to identify, locate, and assess children with disabilities is often referred to as the "child find" or "seek and serve" obligation and applies also to children who are suspected of having a disability and in need of special education even though they may be advancing from grade level to grade level. (34 C.F.R. §300.125(a)(2).) A state must ensure that these child find duties are implemented by public agencies throughout its jurisdiction as part of its general obligation to ensure that FAPE is available to all children with disabilities who reside within the state. (34 C.F.R. §300.300(a)(2).)

For this issue, Student ostensibly complains that the District failed to identify his depression by conducting an appropriate assessment and contends that, if the school district had done so, then he could have received proper services at an earlier date and not have had "to resort to home schooling" for "psychological issues." Student's argument ignores the fact that the District did, in fact, perform proper assessments, identified his social and emotional problems, and offered proper interventions.

In December 2003, when Student's therapist recommended that he be removed from his RSP English class due to reports of bullying, the school psychologist asked to speak with Student's psychiatrist or therapist. The father did not sign the release.   In March 2004, the school psychologist conducted a psychoeducational assessment in which she recounted Student's school history for depression and administered tests including the BASC. The school psychologist found significant concerns for Student for anxiety and depression. At the April 2004 IEP meeting, the school psychologist reiterated her recommendations for DIS counseling and an AB3632 mental health referral. The father declined implementation of DIS counseling, RSP programming, and other special education services offered by the District. In the following school year (2004-2005), Student remained in general education English because the father would not agree to RSP programming.  He did poorly in general education English even with individual tutoring and assistance provided to him by the District. The father again declined offers of counseling and county mental health referral.

At the annual IEP meeting in November 2004, the school psychologist noted Student was showing signs of depression and needed a treatment plan coordinated with his private therapists. The father again declined school counseling and county mental health referral and did not consent to the school psychologist speaking with the private therapists. In November 2004, after teachers stated Student was more depressed in class, the school psychologist tested him and found he had had significant scores for depression on the Adolescent Scale. The school psychologist told the father his son needed mental health help beyond what the District could provide and recommended again the county mental health referral. That month, Student was placed on home instruction pursuant to his psychiatrist's medical order. In April 2004, the father once more declined the District's offer of AB3632 counseling and, by refusing to sign the IEP, declined the DIS counseling services for his son.

Based on Findings 12 – 15, 21, 23, and 40 above, the District properly assessed Student when he was a freshman in March 2004 and identified him as a pupil with significant signs of anxiety and depression.  Over the course of the next eight months, the District continued to recommend RSP programming for English, DIS counseling, and an AB3632 mental health referral. The District also continued to ask the father for permission to speak with Student's therapists to create a coordinated treatment plan. The District developed and offered these services to treat Student's anxiety and depression but could not implement these services without the father's agreement. Moreover, Student has not suggested any other specific services that should have been offered to him for his social emotional issues. Student's own expert witness did not recommend anything more than "treatment in the community" or private therapy and DIS counseling at school.  The District attempted to meet Student's unique needs in the social emotional area but was stymied by the father's decisions for his own son.

4.    Issue No. 3--Student contends that the District failed to provide an appropriate transition plan. The IDEA requires that, no later than the first IEP to be in effect when a child is 16 years old and annually thereafter, his or her IEP include appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, if appropriate, independent living skills.  The IEP must also

contain transition services, including courses of study, needed to assist the child in reaching those goals.

Under state law, Education Code section 56345.1, subdivision (b), provides that, beginning at 16 or younger and annually thereafter, a statement of needed transition services must be included in a pupil's IEP.   Transition services mean a coordinated set of activities that is designed within an outcome-oriented process and promotes movement from school to post school activities, including postsecondary education and employment. (Ed. Code §36314.1, subd. (c)(1).)  Transition services must be based on the individual pupil's needs and includes instruction, related services, community experiences, and development of employment, and other post-school adult living objectives. (Ed. Code §56345.1, subds. (c)(2) and (3).)

In the present matter, Student became 16 years old on August 30, 2005.  On September 28, 2005, the District held an IEP meeting at which the IEP team developed an Individual Transition Plan for him and included the plan as part of the IEP document.  As part of the IEP, the transition plan was based on Student's needs and included statements about what he needed to do to graduate from high school in terms of the high school exit exam and course credits.  The transition plan noted the goal of Student to attend college, recited completed vocational classes, listed documents needed to become independent, and indicated use of a daily agenda and collaboration to complete his high school work.  In addition, the transition plan stated that Student would obtain community and job experience by working for the city recreation department.  In his Due Process Request and Closing Brief, Student has argued that the Transition Plan was inappropriate or inadequate.  However, because he proffered no evidence to support his argument, such as expert testimony or a proposed transition plan, Student's argument was not persuasive.  Based on Findings 33 – 34 above, the District prepared an appropriate transition plan for Student.

5.    Issue No. 4--Procedural violations may warrant relief under the IDEA if the procedural violations deprived the pupil of an educational opportunity, significantly infringe upon the parents ' opportunity to participate in the formulation of the IEP, or impeded the child's right to a free appropriate public education. (20 U.S.C. §1415(f)(3)(D)(ii); *W.G. v. Board of Trustees of Target Range School District, No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.)  Student did not meet his burden of proof on this issue.

First, Student contends that the District violated the parent's procedural rights by failing to give prior written notice to the father that it was discontinuing or refusing speech therapy, counseling, and the FastForward program.  A school district is required to provide prior written notice to the parents of a child with a disability when it proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child. (20 U.S.C. §1415(b)(3).)

In this due process matter, Student complains that, before winter break in December 2005, the District discontinued his speech therapy and counseling when he was placed on home instruction in accordance with his psychiatrist's medical order. The change to home instruction with its concomitant effect on speech and counseling services may be considered to have been a change in educational placement. Student contends that the father wanted these services to resume in January 2006 after winter holiday but the District failed to provide the services for the remainder of the school year.

Student's complaint that speech therapy and counseling were terminated without prior written notice is not supported by the evidence, based on Findings 25 -27 and 30 above. In December 2004, the District gave prior written notice when changing Student's placement to home instruction that speech and counseling services were temporarily suspended during the winter break. Student's placement was changed in accordance with the father's wishes. The next month, in January 2005, the father wanted his son to continue on home instruction and the IEP team advised him in writing that speech and counseling were to resume when Student returned to the high school. Speech and counseling were to be provided but only at the school setting and Student did not return to school to receive services. In February and March 2005, the father did not complain about the lack of these DIS services. And following the annual IEP meeting in April 2005, the father declined the services, indicating that his son did not want to participate in speech and counseling services. As such, at all times relevant herein, the District provided prior written notices to the father in IEP documents that speech and counseling could resume that spring 2005 semester but at the school setting. The District did not promise that those services could be delivered at Student's home and the father did not ask for those services to be provided at his home. Moreover, the father continued to participate in his son's IEP meetings for the remainder of the spring 2005 semester. The evidence demonstrates that neither the father nor Student really wanted speech therapy or counseling.

In May 2005, the father requested the FastForward reading program for his son. By a letter addressed to the father, the special education coordinator denied the program on the basis that the program was not a related service that could not meet Student's goals or needs. Here, the denial of the reading program did not constitute the refusal to initiate or change the identification, evaluation, or educational placement of Student or the provision of FAPE to him. As such, the District was not required to provide prior written notice to the father of the denial of the reading program for his son. Even if the denial were deemed to require prior written notice and the notice found insufficient, Student did not show how this procedural flaw infringed upon the father's opportunity to participate in the IEP process or impeded Student's right to FAPE. Student's own expert witness did not endorse the reading program for him.

Second, Student asserts that the District failed to convene an IEP meeting or develop an IEP within 60 days of the parent's consent for an assessment. Education Code section 56043 provides that a school district must develop a proposed assessment plan within 15 days of referral for assessment, a parent shall have at least 15 days from the receipt of the proposed assessment plan to arrive at a decision, and the school district must develop an IEP

required as result of assessment within 50 days from the date of its receipt of the parent's written consent for assessment.

Here, the father requested complete reassessments of his son and gave his consent to the assessment plan on October 4, 2005. The school psychologist completed the evaluation in December 2005. The student was suspended in December 2005 and his psychiatrist ordered home instruction for him in February 2006. That month, the District held an IEP meeting to discuss Student's return to home instruction and scheduled another IEP to discuss the recent evaluation. In the meantime, Student obtained an independent assessment in November 2005 and filed his due process request in December 2005. While the District did not hold a timely IEP meeting to discuss the school psychologist's evaluation, Student did not demonstrate that how this procedural flaw resulted in any loss of educational opportunity or seriously infringed on the parent's participation in the IEP process. The parent obtained his own independent assessment and Student was placed on home instruction as requested by the parent and the psychiatrist. The findings of the independent assessment were similar to those of the District evaluation. Furthermore, the father has been able to participate and advocate for his son in the IEP process. The procedural flaw in not holding a timely IEP meeting to discuss the school psychologist's evaluation cannot be found to have resulted in the denial of FAPE, based on Findings 40 – 41 and 43 – 44 above.

Third, Student claims that the District failed to convene an IEP meeting within 30 days of the parent's written request in February 2005 as required by Education Code section 56343.5. The problem with this claim is that Student relies upon e-mail communications contained within the District's Exhibit 22 that was withdrawn and not admitted into evidence. Thus, there is no probative evidence to support Student's claim that the District failed to convene a timely IEP meeting in March 2005. The evidence does show that the District held frequent IEP meetings for Student and the father in the past three years.

Fourth, Student claims that the District failed to conduct a timely triennial assessment. Student's claim is not borne out by the evidence, based on Findings 3 and 12 - 15 above. The September 2002 IEP showed that Student received a triennial review in September 2001 when he was in seventh grade and was entitled to his next triennial review in September 2004. The District conducted a triennial evaluation and review of Student's needs in March 2004 when he was in ninth grade. The District's triennial assessment was timely.

6.      Issue No. 5--In his Due Process Request and Closing Brief, Student contends that he was denied a FAPE because the District did not provide speech and language services and counseling after December 2004 and therefore failed to provide special education and related services that conformed or comported with his IEP. Student bears the burden of proving his contentions in this due process hearing. (*Schaffer v. Weast* (2005) 126 S.Ct. 528.) He has not met that burden.

At the triennial IEP meeting in April 2004, when Student was in ninth grade, the District offered once weekly speech and language therapy and twice monthly counseling in addition to RSP programming, classroom modifications and accommodations, including tutors, and an AB3632 county mental health referral. The father did not give his consent to the triennial IEP and the District could not implement the DIS and other services. After Student started tenth grade in September 2004, the father relented and agreed to speech and language for his son but did not agree to counseling or to allow the school psychologist to speak to his son's private therapists. During fall 2004 semester, Student did poorly in general education English and was resistant to speech therapy. He refused speech therapy on a number of sessions and, in November 2004, the therapist discontinued speech therapy due to his lack of cooperation.

At the November 2004 IEP meeting, the District again offered individual speech and language therapy and counseling but the father did not consent to implementation of the IEP. Student's resistance to speech therapy and dislike of school was discussed; the father indicated his son was embarrassed about needing special education. By November 2004, Student had an "F" in general education English and had become withdrawn and depressed. The school psychologist had recommended a referral for county mental health counseling and coordinated treatment plan; she asked to speak to Student's private therapist. Student stopped going to school on November 22, 2004.

On December 10, 2004, the District placed Student on home instruction due to the medical order of his psychiatrist who said Student's condition precluded his attendance at a regular school. The IEP team discussed Student's screening for and reports of depression and, because his mental health issued were affecting his academic performance, recommended a referral for county mental health counseling and asked for permission for the school psychologist to speak to Student's private therapist to coordinate treatment. The father declined. Speech and counseling services were temporarily suspended due to winter break; discussion of speech and counseling as well as educational services for the spring semester were postponed till the next IEP meeting on January 10, 2005. The father did not consent to the IEP, noting that he wanted DIS services to resume on January 10, 2005.

On January 10, 2005, the father reported that the psychiatrist had recommended that his son remain on home instruction. The District continued home instruction for Student and set a goal for him to return to school in about six weeks. The District advised the father that speech and counseling services would resume for his son on February 6 at the school site. Student did not resume speech or counseling services because he did not return to school. At subsequent IEP meetings on February 9 and March 21, 2005, speech and counseling services were not discussed and the father did not complain about his son not receiving those services at home. At the annual IEP meeting on April 4, 2005, the father declined to give consent to implementation of the IEP which contemplated Student's return to the high school with DIS services in speech therapy and counseling. At IEP meetings in the student's junior year in September and October 2005, the father again declined the District's offers of individual speech and counseling. As requested by the father, the District even agreed to provide those DIS services during his son's sixth period

34

when he was a teaching assistant so that he would not miss any academic classes but to no avail.

Based on Findings 5, 7, and 12 – 44 above, the preponderance of evidence in this due process matter established that Student clearly required speech and counseling services to access his curriculum and District consistently offered those services to him in IEP's during the three school years at issue. Just as consistently, the father did not consent to the underlying IEP's offering the services and declined the services. The District did temporarily suspend services when Student was placed on home instruction but offered to provide the services at school. However, he did not come to school to take advantage of the services and the father did not ask for the services. Even when speech services were re-commenced in September 2005, Student missed sessions and did not cooperate, resulting in the discontinuance of the service. The District's offers of speech and counseling services conformed to his IEP's in terms of his identified deficits and needs. The fact that Student declined or elected not to receive the services did not mean that the offered services were not FAPE.

7.    Issue No. 6--On substantive grounds, Student contends the student was denied a FAPE during his three years in high school from September 2003 through December 2005 because the District failed to develop or offer educational programs that were designed to meet his unique needs or reasonably calculated to provide educational benefit. Student's contentions were not borne out by the probative evidence, based on Findings 5, 7, and 12 – 44 above.

More specifically, during the 2003-2004 school year, Student argues that the District "removed" him from his special education English class and "simply placed" him in a general education English without a special education aide. Student avers that the school district did not consider keeping him in special education with the help of an aide or placing him in an alternative special education class. Student also argues that the District failed to give counseling to him so that he could cope with the trauma of bullying.

Here, Student started high school in general education classes with placement in RSP English pursuant to his January 2003 IEP. The school district did not remove him from special education English class but was required to place him in general education English on order of his therapist and request of the father. The District did not consider alternative special education settings due to the therapist's order and because the father wanted him to be placed in general education English. As it turned out, Student did not like or want to be in special education or be identified as a special education pupil. Student does not dispute that accommodations and modifications were provided to him in his general education English class. Student does not acknowledge, however, that perhaps the reason the student did poorly in general education English even with supports was that the appropriate placement for him was RSP English. Moreover, counseling for trauma from purported bullying was not warranted because it was not clearly established whether Student was actually harassed or abused in his special education English or merely fabricated or exaggerated events in order to be removed from special education. Student's expert witness

found that the student was prone to exaggeration and his psychiatrist indicated he was not a good historian and had emotional difficulties with school. Student could not recall details about the alleged bullying. Based on the information available at the time of the medical order and parent request to place Student in general education English, the District offered and provided appropriate instruction and services designed to meet Student's unique social emotional and educational needs and to provide some educational benefit.

For the 2003-2004 school year, Student also incorrectly argues that the District did not provide him with appropriate instruction or services in reading and counseling for social emotional issues following the March 2004 psycho-educational assessment. From the assessment, the District learned that, due to a specific learning disability, Student demonstrated a significant discrepancy between his ability and achievement in reading and writing. He had low scores and deficits in reading, written expression, and language arts. In the social emotional area, the school psychologist found Student had a history of depression and anxiety, showed stress and feelings of inadequacy, and had socio-emotional and motivational challenges. At the April 2004 triennial IEP meeting, the school psychologist recommended and the District offered Student speech and language therapy for his language disorders, RSP programming for his academic classes including English and reading, academic interventions, study skills and motivation training, and use of collaboration and assistive technology. Based on the school psychologist's reports, the IEP team also offered counseling and a referral for county mental health assistance, and interaction with peers to increase socialization skills. Although the father did not consent to implementation of this triennial IEP, what the District offered in terms of education and services met Student's unique needs and were reasonably calculated to provide some educational benefit.

For his sophomore and junior years during the 2004-2005 and 2005-2006 school years, respectively, Student complains that the District offered the same education program and services and that the programming was inadequate. Student started his sophomore year in general education including English and received speech therapy and counseling. Late in the fall semester, he was placed on home instruction pursuant to his psychiatrist's order. Student has argued that the school district discontinued and failed to provide speech and counseling services after the change in placement to home instruction. However, as previously discussed in this Decision, the District temporarily suspended the services due to winter break and offered to resume the services at school but the father and Student did not avail themselves of the services. Student's argument in his Due Process Request that he had unmet needs in social studies and history was not established by any evidence presented in the hearing. His contention that the school district should have provided the Fast ForWord reading program was not supported by the testimony of his own expert witness. For social emotional concerns, the District offered counseling and referrals for county mental health assistance but the father repeatedly declined the referrals based on his belief that his son had sufficient therapy.

For the three school years in question, the evidence demonstrated that the District offered Student educational services and placements that were designed to meet his unique needs in language arts and social emotional areas as determined by assessments and

36

observations. The services comported with his IEP's that included reports of his needs, progress, and goals and were reasonably calculated to provide him with some educational benefit.

In this due process matter, Student has criticized the breadth and nature of the educational programming but the District placed him in general education English as ordered by the student's therapist and on home instruction and independent study as ordered by the psychiatrist. The father agreed with these orders. The District has had to follow the medical orders and appease the father while continuing to develop and recommend special education and related services for Student. The only time that Student did well in English was the first semester of ninth grade when he was in RSP English. For the past three years, the District has provided or offered to provide DIS speech and counseling services but Student did not cooperate and his father did not agree to the services as offered in IEP meetings and documents. In addition, the District has helped Student to progress towards graduation and to pass the high school exit exam and tried to offer services that would aid him in the social emotional area. As such, Student has obtained some educational benefit from the school district's educational programming and services.

As established by the evidence, and corroborated by the observations of his expert witness, teachers, and other health assessors, Student does not enjoy school and objects to being labeled or viewed as a pupil who needs special education or speech therapy. He is apathetic and disinterested about academics and has no motivation to do any school assignments. He did not participate or cooperate with therapists and teachers. He resents his father for what he views as interfering with his schooling.

For his part, the father is a caring parent and a nice man who means well. He has strong-held beliefs about his son and what is best for him. Instead of special education or speech therapy, the father has asked for individual tutoring, speech software, and a reading program. As early as elementary school, the father did not want his son assessed by doctors or for special education. In seventh grade, the father removed his son from speech therapy. In eighth grade, the father and Student moved from another district soon after being identified as a special education pupil. In ninth grade, Student made allegations of bullying and the father asked that he be removed from RSP English. And in tenth and eleventh grades, Student was placed in general education English because his father did not sign IEP's but then had to be moved to home instruction on orders of his psychiatrist due to psychological and stress issues related to school. The father never shared any private psychological information and diagnosis with the District and has declined counseling due to his belief that his son has had enough therapy.

Clearly, Student has required special education and services for his specific learning disability that affects his reading and writing as well as for his mental health issues. However, both Student and his father do not believe that special education and related services, such as speech therapy or counseling, are particularly helpful or necessary and would prefer that he study at home and not receive related services at school in the first place. In the circumstances of this matter, the educational programming offered to Student

was reasonable and appropriate in light of the information available to the District when it developed or amended the IEP's. The District cannot be said to have denied Student a FAPE under the IDEA or state law.

8.      Issue No._7-- Among the remedies set forth in his Closing Brief, Student requests reimbursement for the independent psychoeducational assessment performed by Dr. Robert J. Rome in November 2005. Education Code section 56329, subdivision (b), provides that a parent may obtain an independent educational evaluation from a qualified specialist at public expense if the parent disagrees with an assessment obtained by the public educational agency.

Here, it was not established that Student disagreed with any District assessment. In the spring 2004 semester, the District conducted a triennial evaluation and held a triennial IEP meeting. The evidence did not show that parent disagreed with that evaluation. A year and a half later, in October 2005, the father requested complete assessments of his son. A month later, in November 2005, the father did not wait for the District's reassessment but went ahead and hired Dr. Rome to conduct an independent assessment. In December 2005, the District conducted the requested assessments. The evidence did not establish that the parent disagreed or expressed any disagreement with any District assessment. As a matter of fact, the findings of the independent assessment were very similar to those of the District in its two evaluations. Based on Findings 40 and 48, Student is not entitled to reimbursement for the independent assessment.

## PREVAILING PARTY

Under Education Code section 56507, subd. (d), this Decision must indicate the extent to which each party prevailed on each issue heard and decided in this due process matter. Pursuant to said mandate, it is determined that respondent school district prevailed on each and every issue heard in this matter, as set forth in Conclusions of Law nos. 2 – 8 above.

Wherefore, the Administrative Law Judge makes the following Order:

## ORDER

The due process request of petitioner Student for relief and/or additional or different services from respondent Walnut Valley Unified School District must be denied, based on Conclusions of Law Nos. 2 - 8 above, jointly and for all.  The due process request of petitioner Student, OAH Case No. N2005120382, shall be dismissed.


Dated:  9/6/06

Vincent Nafarete
Administrative Law Judge
Office of Administrative Hearings


## NOTICE OF APPEAL RIGHTS

This is a final administrative decision and both parties are bound by this Decision. Under Education Code section 56505, subdivision (k), either party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt of the Decision.

# EXHIBIT 4

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matter of:

STUDENT,

                    Petitioner,                    OAH No. N 2005090199

vs.

LA CANADA UNIFIED SCHOOL
DISTRICT,

                    Respondent.

## DECISION

Anahid Hoonanian, Administrative Law Judge (ALJ) of the Office of Administrative Hearings (OAH), Special Education Division, State of California, heard this matter on February 2, 3, and 7, 2006, in La Canada, California.

Petitioner (Student) was represented at the hearing by his mother (Mother). Respondent, La Canada Unified School District (District), was represented at the hearing by Patrick J. Balucan, of Atkinson, Andelson, Loya, Ruud & Romo. The District's director of special education, Tamara Jackson, was also present during the hearing.

Before taking evidence in this matter, the ALJ granted the District's motion to limit the time periods at issue in this hearing to those allegations arising after December 2, 2003. The basis of the District's motion was that, on December 2, 2003, Mother and the District entered into a final settlement agreement, whereby Mother released the District of any of Petitioner's claims for a free appropriate public education (FAPE) against the District through the date of the settlement agreement. In addition, the ALJ denied the District's motion exclude evidence and the issue that the District failed to address the bullying and harassment of Student by his peers. The ALJ denied Respondent's motion on the grounds that bullying or harassment may result in a denial of FAPE within the meaning of Education Code section 56501.

During the hearing, Petitioner called the following witnesses: Jennifer Hendler, Student's teacher in the sixth grade; Donna Robinson, principal at Paradise Canyon Elementary School; Mother; Victoria Baca, educational advocate; and Student's father

1

(Father). Respondent called the following witnesses: Jennifer Hendler; Donna Robinson; Kathryn Wullschlager, the speech and language specialist assigned to Paradise Canyon Elementary School; Carol Mispagel, school psychologist; Wendy Sinnette, principal at La Canada High School; and Tamara Jackson, the District's director of special education.

Oral and documentary evidence was received. The parties agreed that the record would remain open until February 17, 2006, pending receipt of their written closing arguments. On February 17, 2006, the ALJ received the District's closing argument, which was timely filed and made part of the record as Respondent's exhibit 31. On February 27, 2006, the ALJ received Petitioner's closing argument, which was not timely filed but nevertheless was made part of the record as Petitioner's exhibit 145.

## PROCEDURAL HISTORY

On February 28, 2005, Petitioner filed this due process complaint with the California Special Education Hearing Office (SEHO). On March 7, 2005, the mediator assigned to this matter informed SEHO that the hearing would be taken "off calendar" so the parties could mediate the matter. On August 1, 2005, the parties reached an interim mediation agreement and the matter remained "off calendar." On August 25, 2005, Petitioner requested a trial setting conference from OAH, because the parties had not been able to reach a final settlement agreement through mediation. On September 21, 2005, OAH convened a trial setting conference and set this matter for hearing beginning on December 6, 2005. On November 22, 2005, OAH conducted a pre-hearing conference.

At the hearing, on December 6, 2005, Petitioner's attorney and Mother informed the ALJ that Mother wished to terminate her attorney's representation and wanted a continuance of the hearing in order to obtain new counsel. Respondent's counsel opposed continuance of the hearing. The ALJ granted Petitioner's request for a continuance, and Mother and Respondent's counsel agreed that the hearing would commence on February 2, 2006. On December 12, 2006, OAH issued a Notice of Continuance of Due Process Hearing and Scheduling Order that, if Mother was unable to obtain counsel by February 2, 2006, Petitioner shall be prepared to proceed to hearing.

On January 30, 2006, Mother made a written request to continue the February 2, 2006, hearing date on the ground that she had not had yet retained new counsel. The Presiding ALJ denied Mother's request for a continuance. On the first day of hearing on February 2, 2006, Mother renewed her request for a continuance. The ALJ determined that the Presiding ALJ had already denied Petitioner's January 30, 2006, request for a continuance and denied Mother's renewed request. The ALJ also denied Mother's request that she be allowed to withdraw her hearing request without prejudice. The hearing proceeded with Mother representing Petitioner herself.

ISSUES [1]

I.    Did the District fail to address the bullying and teasing of Student such that it denied him a Free Appropriate Public Education (FAPE)?

II.    Did the District fail to provide Student with a FAPE since December 2, 2003:

   a.   by failing to design a program to meet all his needs because it failed to adequately identify those needs – visual processing deficits, written language deficits, ADHD combined type, depressive disorder, possible anxiety disorder, and possible auditory processing deficits?

   b.   by failing to provide services, mentor program and counseling, discussed at IEP meetings?

   c.   by employing teachers and staff who have not had the education or ability to respond to Student's needs?

   d.   by committing procedural violations?

III.    Did the District inappropriately determine that Student was no longer eligible for language and speech services (LAS) at the March 2, 2004, IEP meeting?

IV.    Are Student's parents entitled to reimbursement for psychological and educational services they have obtained for Student at their own expense?

FACTUAL FINDINGS

1.    Student is a fourteen-year-old boy who lives within the jurisdictional boundaries of the La Canada Unified School District. Student is a friendly, kind, and polite boy. He works hard to succeed and wants to please others. Student has lagged behind in social skills and can be immature or naïve in his relationships with peers. Student did not speak until he was about two or three years old and was later diagnosed with speech delay.

2.    Student was initially identified as eligible for special education services as a student with a speech and language disorder. According to Student's June 4, 1999, IEP, Student was eligible for special education based on delays in receptive and expressive language as well as a disorder in visual motor integration and auditory processing, which interfered with his achievement in school. Student was later diagnosed with Attention Deficit Hyperactivity Disorder, combined type, (ADHD), and became eligible for special education and services under the category of Other Health Impairment (OHI).

---

[1] Student's issues for hearing have been reorganized for clarity of analysis.

3

3.     Due to his disabilities, Student has a history of struggling with attention issues and problems with peers. Student exhibits impulsivity and has difficulty controlling his actions. This has resulted in Student having poor social skills and difficulty with peer relationships, which usually manifest outside the classroom at recess, lunch, the locker room, and the gym during physical education (P.E.). He relates better to adults as well as to children who are younger than him. Student is easily distracted. He has difficulty remembering information and often forgets things. For example, when given detention for an incident, he did not show up for detention, and the principal had to remind him about attending detention. Student did not show for detention simply because he had forgotten what he needed to do. Even at home, Mother has to repeat the same information to Student two or three times; otherwise, he forgets the information.

4.     Student attended La Canada Elementary School from kindergarten through fifth grade. While attending elementary school, Student was teased and harassed by his peers. As a result of the emotional impact of the bullying and teasing, he required individual psychological therapy, which was paid for by his Parents. In its May 31, 2001, triennial assessment of Student, the District concluded that due to emotional, social, and behavior concerns, Parents "may wish to continue Student's individual therapy, as this appears to be beneficial to him." At that time, the District noted that Student exhibited weaknesses in auditory processing and visual processing skills. The District psychologist found that Student's performance on the cognitive test scores at that time may have been depressed due to "attention issues, as well as auditory and visual processing weaknesses."

5.     In November 2002, Student's pediatrician referred him to educational psychologist, Jane Lewis, Ph.D, for a complete psychological and psychoeducational assessment. Dr. Lewis found that Student's cognitive functioning was affected by ADHD that resulted in problems sustaining attention, working memory deficits, and impulsivity. She also concluded that there was a possibility of auditory processing deficits and that Student's self-esteem was low.

During this assessment, Student reported a long history of teasing by peers. For example, he reported being teased for going to speech therapy when peers told him "the little baby doesn't know how to talk." Other students passed out notes making fun of Student. As a result of the teasing, recess and lunch were the most difficult times for Student. The daily teasing hurt Student, but he would try not to show his hurt feelings. Once he arrived at home, he would cry. Dr. Lewis concluded that the combination of Student's disabilities and teasing made Student's school situation very stressful at that time.

6.     By 2002, the bullying at school had become a chronic problem. Student pleaded with Mother that he not be forced to go to school, because other students picked on him. Student returned home from school sad. His parents took Student to family and individual psychological counseling sessions to deal with the emotional impact of the teasing and bullying.

7.    On or about April 18, 2003, while Student was still attending La Canada Elementary School, the District convened an annual IEP meeting. The IEP provided that Student displayed "significant deficits in his auditory reasoning and processing skills which adversely affect his educational performance." While Student had shown improvement, he had not met all of his educational goals. Student continued to be the subject of teasing and bullying.

At the conclusion of the IEP meeting, the District recommended placement in general education with a resource specialist program (RSP) in language arts and math and agreed to provide Student an instructional assistant for one-on-one help. The Parents disagreed with the proposed placement. Citing the hostile learning environment due to the bullying and harassment, they requested placement in a non-public school instead. The Parents indicated to the District that Student had deteriorated socially and emotionally due to the constant teasing and bullying. The Parents did not consent to the IEP.

*2003-2004 School Year*

8.    Sometime after the April 13, 2003, IEP meeting, the Parents requested a due process hearing. The District and the Parents participated in mediation, and the parties agreed that, beginning in October 2003, a month after school had already begun, Student would transfer from La Canada Elementary to Paradise Canyon Elementary School as a sixth grader. The Parents agreed to transfer Student, because they believed Student would get a fresh start and be free from the ongoing teasing and bullying. The District and the Parents reached a final settlement agreement on December 2, 2003.

In addition to the provision that, during the 2003-2004 school year, Student would attend the sixth grade general education program at Paradise Canyon, the settlement agreement provided that Student would receive resource teacher services for 180 minutes per week; LAS two times per week, 30 minutes per session; one-to-one designated instruction; and (DIS) counseling, one time per week, for 30 minutes. In addition, the District agreed to contract with Education Spectrum, a non-public agency, to provide Student with one 50-minute session per week of social skills training at their clinic. The settlement agreement also provided that Education Spectrum would provide up to four hours of consultation with the school staff and make recommendations for consideration of the IEP team regarding Student's social skills needs. Finally, the agreement also provided that the District would contract for individual tutoring services four times per week, 60 minutes per session, in order to help Student with his transition to Paradise Canyon.

9.    Shortly after Student began attending Paradise Canyon in October 2003, Student became the subject of bullying and teasing. Some of the same students who had been harassing and bullying Student at La Canada Elementary were now attending Paradise Canyon. As early as Student's first week at Paradise Canyon, former peers from La Canada Elementary began teasing and harassing Student. About three weeks into his attendance at Paradise Canyon, the teacher had eleven of Student's peers write letters of apology to

Student, in which they apologized to Student for making fun of him, teasing him, calling him "weird and annoying", and spitting sunflower seeds at him.

10.     At Paradise Canyon Student was chased by a peer with a golf tee. Student's teacher claimed that this was a positive circumstance, because other children had come to Student's aid when he was being chased.

Later in the school year, a male peer ran up behind Student and punched him on his back. The same peer spat at Student and called him a "bastard". Another boy who saw this cheered the bully and gave him a "high five." Student reported the incident to a school staff member, who responded with: "I don't care." Mother notified the principal of this incident, who told teachers to report any other similar incidents to the principal. Later that month, Student was hit on the back of his neck. Father reported the incident to the District's director of special education.

On March 18, 2004, some girls put grass in Student's bag. The next day, the same girls put a sign on Student's back that said "kick me". About one month later, during P.E., a teacher's aide told all the students that, if he did not make a basketball shot, Student would get suspended for three days, and if he did not make the shot, all the students would have to run three laps. The students cheered for the teacher's aide. Student went home demoralized and humiliated by the teacher's aide. After the P.E. class, two boys passed around a sign up sheet to "get Student suspended." While Student was leaving, another boy "flipped" Student off. Mother reported the incident to the principal, who responded that the teacher's aide's remark was very inappropriate, and that she was addressing the "personnel side" of the situation. The principal disciplined the boy who made the gesture at Student and the boys who came up with the idea of passing around a petition to get Student suspended. The next day, the students involved in the incident wrote Student separate notes apologizing for flipping him off and for being mean to him during the school year.

11.     In a questionnaire about Student's behaviors, his sixth grade teacher, Ms. Hendler, wrote: "I really feel he has control over a lot of his behavior. We have seen him behave appropriately and perfectly in front of adults however when adults are not present he engages in very inappropriate and/or annoying behavior this seems manipulative and is a big concern amongst his teacher, principal and social psychologist. He continues to make the same mistakes and verbally indicates he will change his behavior yet his actions do not demonstrate sincere efforts towards this promise."

While Student was in the sixth grade, if he was fidgety or tapping on desk, which are typical symptoms of his ADHD, he could have been re-directed with a gentle hand on the shoulder. Instead, his teacher told Student to leave class and sit outside until he could control himself. Some of the school staff set an example that Student was not desired in group learning experiences. At one point, Student was paired with a peer diagnosed with Touretts Syndrome and seated in the back corner of the classroom and was told that he was too much of a disturbance in the class. The District excluded Student from academic activities due to his behavior.

12.     In 2004, in order to ensure that Student's experience at Paradise Canyon would be a positive one, Parents retained Dr. Barney Rosen, a child psychologist specializing in the treatment of children diagnosed with ADHD, to make a presentation to Student's sixth grade teachers on the needs and behaviors of children diagnosed with ADHD and the strategies that teachers could use in order to assist Student. Dr. Rosen was specifically assisting Student and his Parents in addressing Student's needs related to his ADHD diagnosis. Dr. Rosen gave the Parents guidance with his school program.

During Dr. Rosen's presentation at school, some of Student's teachers interrupted the presentation and indicated that they already knew about ADHD and wanted to express their frustrations in addressing Student's behaviors. Mother felt that the teachers were resentful, because they thought they were being treated as though they did not know how to deal with children diagnosed with ADHD. Mother made Dr. Rosen available to the teachers to give them the latest findings on ADHD and to help them understand how to use positive reinforcement, instead of using a negative behavior chart or check mark system.

13.     In February 2004, the District conducted a triennial evaluation of the Student. As part of that evaluation, Student reported that he did not get along well with others, was teased a lot, and was not liked by others. Student's academic skills ranged from the low average range in math reasoning and written expression to the average range in all other areas. The District considered eligibility under the category of Emotionally Disturbed; however, since the behaviors were not evident "across all settings," and particularly since Parents did not note behaviors in the home, the District did not find Student eligible for special education and services under the category of emotionally disturbed.

14.     As part of this triennial assessment, the District's psychologist, Ms. Mispagel, administered the Berry Test of Visual Motor Integration in order to test Student's visual motor skills. Student scored in the 5th percentile, indicating this that was an area of weakness for him. According to Ms. Mispagel, the fact that Student's score was low did not necessarily indicate that he had a visual processing deficit, because this was just one test that involved copying shapes. In looking at his other tests that involved visual processing, Student scored in the average range. For example, on the symbol search on the Wechsler Intelligence Scale, which is a test of visual motor processing speed, he scored in the average range. On the perceptual reasoning subtest on the Wechsler Student scored a 90 out of an average score of 100. In her opinion, if Student had a deficit in visual processing, it would have been apparent on the Berry Test. Ms. Mispagel concluded that there was no indication that Student had a visual processing disorder. Ms. Mispagel's testimony in this area was credible and persuasive.

15.     For Student's triennial evaluation, Kathryn Wullschlager, the District's speech and language specialist, conducted a speech and language assessment. She concluded that Student had made significant progress in speech and language skills and that he no longer met eligibility criteria as a student with language impairment.

7

Ms. Wullschlager administered the Word Test, to measure Student's semantic abilities, i.e. his knowledge of how words, such as synonyms and antonyms, are used. His standard score of 103, which was at the 52nd percentile, indicates that he is within age level range. Previously, he had a standard score of 93 corresponding to the 26th percentile, which demonstrates that he made improvement in semantics. Ms. Wullschlager also administered the Expressive One Word Vocabulary test. Student obtained a standard score of 105, which corresponds to the 63rd percentile rank or 13.1 age level equivalency.

Ms. Wullschlager administered the Test of Auditory Reasoning and Processing, which tests the ability to use common sense, ingenuity and insightfulness in solving problems. Student's score was in the 37th percentile, with a standard score of 95 out of 100, indicating to Ms. Wullschlager that Student's auditory processing was within the average range. Based on the tests she administered, Ms. Wullschlager concluded Student was within age level expectancy and did not continue to qualify for LAS. In her opinion, there were no reasons to make him eligible for LAS.

16.     Ms. Wullschlager testified she did not see any indications that Student had an auditory processing issue. According to Ms. Wullschlager, she could identify the possibility of an auditory processing weakness in a younger student by the fact that when one speaks to the student, the student would know that that the person was speaking, but the student would not know what the speaker was saying. However, with someone closer to Student's age, she would expect that the student would be able to cover up the auditory processing deficit with inappropriate behaviors or by talking about another topic. She testified that she can usually spot whether a student is covering up an auditory processing deficit, but that she did not observe this with Student. At the same time, Ms. Wullschlager testified that Student had preferential seating, which is a modification the District would provide when a student is diagnosed with auditory processing. However, she testified that she was not aware that Student was diagnosed with auditory processing deficits and that he had only been diagnosed with a speech and language delay. The ALJ determines that Ms. Wullschlager's testimony regarding Student's lack of auditory processing issues was not credible.

17.     On October, 28, 2003, Ms. Wullschlager began providing Student with speech therapy during the time Student was scheduled to be in P.E. class. According to Ms. Wullschlager, from the second grade on, the students were required to get to their speech therapy sessions on their own. The evidence established that, from November 20, 2003, to February 4, 2004, Student did not show for eight consecutive speech therapy sessions, even though he was in school. According to Ms. Wullschlager, if a student was a "no show" for two speech sessions, she would send a note to the student's homeroom teacher, who would remind the student that he or she has speech. There was no evidence that either Ms. Wullschlager or any other District employee took any measures to address why Student missed eight consecutive speech therapy sessions. The District did not inform the Parents that Student had missed eight consecutive LAS sessions.

*March 2004 Triennial IEP*

18.    After the triennial assessment, the District convened an IEP team meeting on March 2, 2004, to review the assessment results and propose a placement and services for the Student. The IEP was reconvened twice and finally concluded on March 17, 2004.

19.    Student's March 2004 IEP included the following goals:

(i) Personal/social goal: During class, Student will raise his hand before talking and will talk with peers only when appropriate 90% of the time. Under the heading of "current level of performance" the IEP states that during class time, Student frequently talked out and liked to joke with others but did not seem to know when to stop or when it was appropriate to joke.

(ii) Personal/social goal: Student will improve peer interactions. Under the heading of "current level of performance" the IEP states that Student had difficulty regulating his behavior with peers.

(iii) Academic goal: Student will write a paragraph essay with 80% complete sentences. Under the heading of "current level of performance" the IEP states that Student had improved his writing and understood how to put together a one or two paragraph essay, though he used fragments and omitted words.

20.    At the March 2004 IEP meeting, Nathan Roettger of Education Spectrum Mr. Roettger presented a report to Student's IEP team. The IEP team agreed with and adopted his report. Mr. Roettger made recommendations to assist in developing Student's social skills. He noted that Student readily sought friendships and attention from peers and desired to be part of the peer group. However, Student was not able to read subtle social cues in determining when particular behaviors were either not appropriate or were no longer wanted by the peer group and would continue to engage in the behavior. For instance, rather than understanding that the group no longer considered a topic amusing, Student read that as a signal to heighten his level of action on the topic in order to get the same response.

Student was struggling due to his challenges with both reading social cues and self-directing during less structured interactions with peers. Student also displayed difficulty interpreting situations. Mr. Roettger determined that this could result in having a hard time making and maintaining peer relationships. He recommended the teaching of specific skills related to appropriate social behavior be part of Student's educational program. Education Spectrum reported that Student was beginning to make progress in the group social skills sessions he was attending.

21.    The IEP noted that "talking out in class, inappropriate interactions with peers, such as teasing and joking, were behavioral concerns which impeded Student's learning. At

the IEP meeting, the parents vehemently disagreed with the District's proposed use of a behavior chart. However, the District began using the behavior chart, which required that at the end of each period, Student to go up to the classroom teacher for a "daily check out" to rate his behavior.

22.    At the March 2004 IEP meeting, the District offered Student placement in a general education sixth grade class at Paradise Canyon Elementary School, social skills training through Education Spectrum at one 50 minute session per week, DIS counseling one time a week in 30 minute sessions, RSP at five times week in 50 minute sessions in the RSP room, and transportation. In order to address Student's needs, the District offered modifications and accommodations including preferential seating, positive reinforcement when he raises his hand, extra time on tests, extra time on assignments, and study guides before big tests.

As set forth in the December 2003 settlement agreement, the District had provided Student with academic tutoring through January 2004. However, at the conclusion of the IEP on March 17, 2004, while the Parents still believed that Student continued to need academic tutoring, the District believed that Student was "doing well academically", and therefore, did not offer tutoring.

23.    Based on Ms. Wullschlager's speech and language assessment, the District also recommended that Student be exited from speech and language services. The District's speech and language therapy attendance report verified that on March 11, 2004, Student was "dismissed" from LAS. Mother did not agree with the District's March 2004 determination to terminate LAS. Mother attended the IEP meeting, but did not sign the IEP. However, at the conclusion of the IEP on March 17, 2004, Father consented to the IEP. Father signed the IEP, because he believed that, unless he signed the IEP, Student would not be receiving any special education services until the Parents and the District were able to reach an agreement.

Shortly after the March 17, 2004, IEP meeting and after thinking about the IEP, Father called the principal's office to inform the District that he was rescinding his consent to the IEP. He then faxed a letter to the principal's office revoking his consent and received verbal confirmation from the principal's office that the school had received his letter.

24.    In a memorandum dated June 1, 2004, Education Spectrum wrote Ms. Jackson to inform her that Student had missed three of his four social skills groups at Education Spectrum. Education Spectrum assumed that Student was not returning to the social skills group. After receiving the memorandum, and based on the information in the memorandum, Ms. Jackson, the District's director of special education, had the impression that Student was no longer attending the social skills program. Thus, the District discontinued funding the social skills group at Education Spectrum. The District funded the social skills group at Education Spectrum from October 2003 through May 2004. However, the Parents paid for the social skills group at Education Spectrum themselves, and Student continued to attend the program.

25.    On June 11, 2004, three months after the March 2004 IEP meeting, during a meeting or conversation with school officials, the District informed Father that the District was not aware of Father's faxed letter revoking his consent to the IEP. On the same day, Father provided the District with a hand-written note "re-affirming" his rescission of the IEP. On June 11, 2004, when the District received Father's letter revoking his consent to the March 2004 IEP, the District began providing Student with speech therapy. Student did not receive speech therapy for three months from March 11, 2004, to approximately June 11, 2004.

*2004-2005 School Year*

26.    On August 31, 2004, the District convened another meeting of Student's IEP team. Parent's requested Student to be in a "directed studies class" for seventh grade and to be in regular math and language arts classes. In directed studies class, which would be Student's homeroom, Student could get help with his class work without being in "special education" or RSP class. Because the District had found Student no longer qualified for speech and language services and due to being teased for being a special education student, the IEP team agreed that it would appropriate to give Student a chance to see if he would be successful in general education. Mother consented to the addendum to the IEP.

27.    Shortly after starting seventh grade in general education, in an email dated September 13, 2004, Mother informed the principal that, Student continued to experience bullying and teasing in school. Mother explained that it was very difficult for Student to report the incidents to anyone, because Student feared that the bullying would only get worse. Mother stated that the constant harassment was affecting Student's sense of well-being. Student's pediatrician had informed the Parents that the daily anxiety that Student felt at school made him hypersensitive, and if it continued, it would lead to depression.

A few days later, as suggested by one of the teachers, Mother reported a list of recent bullying incidents directly to the principal. Mother reported that, a male peer put ketchup on Student's back; two male peers repeatedly pulled Student's backpack off; a male peer threw dirt at Student; another peer told Student that he was the "loser of the school"; later, a male peer spat on Student. Student reported the incidents to one of the school staff.

28.    By January 2005, Student told his father that the harassment in school was becoming unbearable. Other students hit Student as he walked to his classes. Student pleaded with his parents to stay home from school. On January 20, 2005, a male peer kicked Student during P.E. Later, four other peers took his gym clothes and threw them around teasing Student. One of the peers took his gym clothes, rubbed them on his genitals, and shoved them in Student's face. He then threw the gym clothes so Student had to go pick them up. Then, other students took Student's backpack and threw it so far that his books fell out. Student reported this to a teacher, who knew who the boys were and was not surprised. Mother reported these incidents to the principal and explained that the harassment and bullying was making Student feel unsafe and anxious about going to school. Following the

11

reporting of these incidents, the principal assured Mother that the school would investigate and discipline the culpable students.

*FAA*

29.    While Student was attending La Canada Junior High School as a seventh grade student, his parents were concerned that Student was not evaluated by any outside evaluator and that he was only being labeled as a behavior problem by his teachers. The District contracted with Dr. Roy Mayer to perform an independent Functional Analysis Assessment (FAA). Dr. Mayer is a professor at California State University at Los Angeles and is well known for conducting FAAs. In a report dated February 22, 2005, Dr. Mayer presented his evaluation and recommendations. Dr. Mayer found that Student tends to imitate what has been done to him, and he will tease another student in a manner in which he was teased. Dr. Mayer determined that, due to his poor social skills, Student was being perceived by his peers as irritating, annoying, and different. As a result, he was being teased, bullied, and excluded by some of his peers.

30.    As part of his FAA, Dr. Mayer observed Student on February 3, 2005, in his P.E. class for forty minutes. He observed the following:

(a) As students waited to be called into the gym by the coach, three male peers threw small objects at Student. Student ignored them initially, but then told them to stop. The peers smiled, ran off, and then returned to toss small objects at him again.

(b) Once students were called into the gym, Student stood near his locker talking to several other students. A peer came up behind him and pushed and poked him. Again, after ignoring it for some time, Student said: "[s]top! leave me alone." The peer continued the harassment.

(c) When Student took his lock to the coach, a peer removed an item from Student's locker and threw it on top of the lockers where it could not be seen.

(d) On the way from the lockers to the field, several other students held the gym doors shut for about a minute so Student could not get out. As Student was walking to the field, a peer ran by him and spat on him. Student yelled at him to not spit on him.

(e) On the field, another peer poked at Student. Again, Student ignored it and then eventually yelled at him to stop. The peer ran off laughing and kept returning until the coach arrived. During this time, Student interacted appropriately with other classmates.

(f) Most students ignored what was going on, some interacted positively with Student, but a few were constantly teasing and harassing Student until the coach completed the locker checks and joined the group.

31.     Dr. Mayer noted that language delays can delay the development of appropriate social skills.  He determined that Student was teased and bullied during non-structured and non-supervised times.  Dr. Mayer also found that negative comments by teachers and peers may have prompted some of the teasing and bullying by peers, while other teasing and bullying may have been prompted by Student's lack of awareness of social cues.  He recommended specific intervention goals to teach Student peer relationship skills, such as recognition of cues from other students to stop what he is doing and respecting an individual's space, decision-making skills, and various ways of responding to the bullying.

32.     In his report, Dr. Mayer stated that bullying is serious, not only for the victim, but also for the bullies and bystanders.  The victim may experience depression, low self-esteem, and a desire not to go to school.  In fact, Student's doctor prescribed an anti-depressant for him.  Student suffered from poor self-esteem and pleaded with his Mother not to go back to school.  Dr. Mayer opined that bullying interferes with the school's learning environment.  Even the District's director of special education agreed that bullying, like any other emotional problem, would impact learning.  Dr. Mayer emphasized in his report that to reduce bullying, the school climate must be changed.  He noted that it is "NOT just a few problem students causing the problem.  The problem is pervasive and needs to be addressed school wide. *The school administration has the responsibility to assure that all students are provided an opportunity to attend school free from fear and intimidation.*"  (Emphasis in original).

33.     In his FAA report, Dr. Mayer listed a series of recommendations as to what administrators can do, including:  assessing the level of bullying at the school by conducting focus groups, surveys, and class meetings; notifying students and parents of the school rules regarding harassment, intimidation, and assaultive-type behavior; ensuring that the school has all the legally required policies and grievance procedures for such acts; establishing a climate throughout the school that promotes understanding, acceptance, and appreciation of individual differences; encouraging the development of a school environment that provides positive recognition of inclusive, cooperative, respectful, and caring student behaviors; providing close monitoring of cafeterias, playgrounds, and "hot spots" where bullying is likely to occur away from direct adult supervision; encouraging teachers to develop classroom rules that address bullying, and establishing a confidential reporting system

34.     Dr. Mayer recommended that pupils who commit bullying should be taught social skills, such as assertiveness, negotiating, sharing, taking turns, inviting others, asking for permission, in place of aggression and intimidation.  Additionally, Dr. Mayer made specific recommendations regarding what teachers can do to prevent bullying in school, including the following:

(a)  Posting and discussing clear rules regarding how students should behave, such as helping others who are being bullied by getting adult assistance or speaking out, and trying to include all students in activities.

13

(b) Reinforcing students who follow the rules for positive inclusive behavior. In addition to praise and social recognition, teachers could send home certificates or positive notes that might address one or more anti-bullying behaviors.

(c) Conducting weekly class meetings to discuss bullying and what to do about it.

(d) Modeling respect for individual differences.

(e) Pairing isolated students with friends, outgoing prestigious peers, or an older student, and not including victims and bullies in the same group and ensuring that the buddy has been taught the importance of reporting any instance of bullying to teachers.

35.     In order to implement his recommendations, Dr. Mayer also recommended that the District assign a school staff member the responsibility of over-seeing and assuring program implementation. Specifically, the staff person overseeing the program implementation would collect data to monitor the progress of the program, keep a record of social skills taught, and evidence of the anti-bullying program.

Finally, Dr. Mayer recommended periodic consultations and reviews of the anti-bullying program. Specifically, he recommended that the school psychologist and counselor meet and confer with the teachers to support the implementation of the social skills training in the classroom. These meetings could occur about twice a week to provide support in reinforcing Student's social skills. Once the teachers become skilled in recognizing and reinforcing Student's social skills, the meetings could occur less and less frequently. If major modifications were needed, an IEP team meeting would be called.

36.     The Parents agreed with Dr. Mayer's assessment report, and the District accepted Dr. Mayer's recommendations, but implemented only two of Dr. Mayer's recommendations. First, the District utilized Dr. Mayer's report in developing Student's March 2005 IEP. Second, on October 25, 2005, the District provided in-service or training to the teachers at La Canada Junior High School by having Dr. Mayer present information to the staff regarding bullying prevention. The in-service was about two hours. In the last three years, this has been the only in-service training provided by the District regarding bullying.

*Independent Speech and Language Assessment*

37.     In February 2005, and around the same time that Dr. Mayer conducted the FAA, Student's parents continued to disagree with the District's decision in March 2004 to terminate Student's LAS. Parents requested an independent educational evaluation (IEE) in speech and language. After mutually agreeing upon the assessor for the IEE, the District contracted with Suzanne Barnes, Speech & Language Associates, to perform an independent speech and language assessment.

38.     In February 2005, Ms. Barnes administered the Test of Adolescent and Adult Language 3rd Edition (TOAL-3). Student's Overall General Language Score, which

14

measures global competence relative to reading, writing, listening, and speaking, was 74, which is 25 standard points below the norm. Student's Listening Quotient, the ability to understand the spoken language of other people, and Speaking Quotient, the ability to express one's ideas orally, both fell 27 points below the norm.

Student's Spoken Language Quotient (the ability to listen and speak) fell 30 standard points below the norm, while his Written Language Quotient (the ability to read and write) fell only 18 points below the norm. Student's Vocabulary Quotient (the ability to understand and use words properly in spoken and written communications) fell 17 points below the norm. Ms. Barnes concluded that poor vocabulary skills should be of concern, because vocabulary growth is an indicator of language development in general and of success with written language. Student's Grammar Quotient (the ability to understand and generate proper Standard English syntactic structures in both spoken and written communications) was significantly low, falling 32 points below the norm.

39.    Ms. Barnes also administered the Test of Auditory-Perceptual Skills – Upper Level (TAPS-UL), which measures the ability of the brain to understand and interpret what the ears hear, and, based on the understanding and interpretation, the ability to express the meaning. Student's overall auditory perceptual quotient was 88, which fell within the low average range. The percentile rank of 21 indicates that 21 percent of children his age scored below him on this assessment. Student scored within the average range on three of the subtests (auditory number memory reversed subtest, auditory word discrimination subtest, and the auditory processing subtest.) He presented with significant difficulties on all of the other subtests, scoring below the average range from one to two standard deviations. Ms. Barnes concluded that Student's performance indicated that he has auditory working memory problems as well as language problems.

40.    In addition, Ms. Barnes also administered the Expressive One-Word Picture Vocabulary (EOWPVT). Student's standard score of 108 fell within the average range. His percentile rank of 70 indicates that 70 percent of children scored below him on this assessment. His performance was equivalent to that of a 15 year 3 month old child, approximately 2 years above his chronological age.

Finally, Ms. Barnes administered the Receptive One-Word Picture Vocabulary Test (ROWPVT) to assess Student's receptive vocabulary skills. Student's standard score of 94 fell within the average range. His percentile rank of 34 indicates that 34 percent of children scored below him on this assessment. Student's performance was equivalent to that of an 11 year old 11 month old child, approximately 1 year and 4 months below his chronological age. Ms. Barnes determined that the significant discrepancy between the expressive and receptive scores may further indicate auditory processing issues. The evidence established that the District has not evaluated Student's needs in the area of auditory processing.

41.    Based on her independent speech and language assessment, Ms. Barnes concluded that Student has a significant language disorder characterized by poor listening, speaking, reading, and grammar skills. She explained that, although Student's overall

auditory processing score fell within the low average range, his performance on several of the subtests indicates a moderate auditory memory and processing disorder. Ms. Barnes also found that Student's social and pragmatic skills also appear to be below average. Student appears naïve and presents with reduced abilities to understand social cues, sarcasm, and nonverbal language. Ms. Barnes recommended that Student receive speech therapy two times a week, one hour per session.

42.    On February 25, 2005, Petitioner filed a complaint requesting a hearing.

*March 2005 IEP*

43.    On March 9, 2005, the District convened a meeting of Student's IEP team. The IEP team reviewed the FAA by Dr. Mayer and the independent speech assessment conducted by Ms. Barnes. The District offered Student general education placement with RSP directed studies for one period daily, speech and language services for one and a half hours per week, and DIS counseling one 30-minute session per week. At that time, Student was participating in a social skills group provided by the school psychologist intern and the school counselor for one hour per week.

44.    The IEP team relied on Dr. Mayer's FAA and developed a goal to help Student in the way he responds to the bullying and teasing he receives in school. The goal provided that Student will verbalize and use his decision making skills when problems arise and use strategies suggested in Dr. Mayer's report. Another social skills goal provides that Student will identify personal and peer space, contribute appropriate comments, increase turn-taking, and begin to learn to read non-verbal cues to regulate behavior.

45.    At the March 9, 2005, IEP meeting, the team also developed speech and language goals based on Ms. Barnes' speech report. The District offered Student LAS based on the report from Ms. Barnes that showed Student would benefit from having the speech pathologist working with him in the areas of reading verbal and non-verbal cues and semantics, because these are all part of social skills.

46.    At the March 2005 IEP, the IEP team discussed the fact that sometimes Student needs the teacher to stay with him while he works on academic problems. When Student does not know how to work on a particular academic problem, he gets frustrated. Student's teacher was concerned about having the time to work with Student independently. The IEP team knew that Student receives outside tutoring for one and a half hours a day, five days a week. The evidence showed that, at the March 2005 IEP meeting, the District knew that Student required one-to-one attention from the teacher and did not provide the Student with one-to-one academic support. Instead, the District depended on the Parents to provide academic tutoring in order to maintain his academic performance.

47.    Student's Parents were in attendance at the March 2005 IEP meeting; however, they did not consent to the IEP, because they had concerns with the LAS goals and objectives. Specifically, Mother believed that the percentages stated in the goals needed to

be modified. Mother discussed this issue with the District's director of special education and the speech therapist. The District agreed to revise the goals and objectives. However, the District did not present the Parents with a revised and final version of the IEP for their consent and signature.

48.    On June 6, 2005, after exiting the school bus, two boys hit and kicked Student and left him at a dumpster behind a real estate office. One of the real estate agents in the office found Student and took him home. Mother reported the incident to the police and the school. The District expelled one of the assailants from riding the school bus and suspended both boys from school.

Shortly after this incident, a female peer defaced Student's yearbook by writing in his yearbook "you are such an asshole! I hate you so much! You really need to go and #$%& your mom! Fag!" Mother was angry that Student had to receive what she saw as vile and humiliating treatment at school. Mother told the school that the District had failed to protect Student from bullying and harassment. The principal offered to repair the yearbook and the female peer covered up her offensive writing. However, Mother was more concerned with the emotional damage the peer's words caused Student. This episode highlighted to the Parents what they saw as the devastating amount of pain and suffering Student carried with him as he continued to struggle to get through the days at school. She noted that Student's emotional turmoil had been debilitating at times, many times ending in Student's pleas to stay home from school in order to avoid the teasing, hitting and name calling. On June 17, 2004, the principal informed Mother that she had punished the girl severely. The principal told Mother that she was not sure what else Mother wished her to do, because the principal had already suspended 14 students who had harassed Student.

*2005-2006 School Year*

49.    For the current 2005-2006 school year, Student is an eighth grader at La Canada Junior High School. While the number of incidents of bullying has decreased during the current school year, peers continue to tease and bully him.

On the first day of school on August 30, 2005, Student was hit by a senior on the school bus. Two eighth grade students paid the senior to "hit" or "mess up" Student. Both boys were counseled, given detention, and wrote apology letters to Student. The principal warned the two students that suspensions would be issued for future transgressions.

A few days later, a male peer followed Student around and called him names ("stupid," "nerd," "stupid Jew," "big nose"), touched the Student's belongings, kicked Student's gym clothes around, and pushed Student during P.E. Later in the same month, on or about September 9, 2005, Student went home and had an emotional breakdown due to the frustration of having other students tease him on a daily basis. His peers had taken his P.E. clothes and thrown them on the floor, kicked his tennis shoes around, and opened his locker, and threatened to take Students belongings. Student yelled at them "[s]top!" hoping someone could hear but, there was no response.

50.    Less than a month later, on October 4, 2005, when Student was on the school bus, a student came over and sat next to Student and began harassing him by saying derogatory things about his mother and also teasing Student about being homosexual. A ninth grader told Student that he should handle his own problems and accused Student of getting one of the boys involved in the June 2005 beating incident expelled from riding the school bus.

51.    On or about January 25, 2006, Student went home and was acting strange. He told Mother that he was tired of his peers teasing and bullying him, but when they made horrible remarks about his mother, it really made Student angry and depressed. At around the same time, Student was accosted and threatened with a beating while he was in line to get on the school bus. If it had not been for the school bus driver being there and intervening, Student would have had to hit back in order to defend himself. Ms. Sinnette, the principal, assured the Parents that she would speak to the other student involved and would also ask the bus driver to keep a close watch to make sure Student is not hit again.

52.    In addition to privately funding visits with psychologists to address the emotional impact of the bullying and harassment, Student's Parents have provided him with outside tutoring since the fifth grade. As set forth in the December 2003 settlement agreement, the District funded academic tutoring through January 2004; however, Parents continued funding the tutoring after January 2004. Student expends so much emotional focus and energy defending himself from bullying that, without tutoring, he would not keep on track academically. Parents persuasively testified that, through the academic tutoring, Student has been able to keep up with his peers academically. Parents believe that if Student is able to keep his grades up, his peers and teachers will be able to include Student in the classroom and school as opposed to having to also address his academic needs if he were to fall behind.

53.    In addition to tutoring, Parents have provided Student with specialized summer camp programs to help him with his communication and social skills. The Parents first sent Student to Super Camp in 2004 and they discovered that the students in Super Camp were not functioning at the same level as Student. The Parents then searched out other camps that would appropriately address Student's social and academic needs. The Parents placed Student at the summer camps because they were trying to support his academic learning. At these camps, the Student received one-to-one academic tutoring and participated in group learning activities such as role playing to practice social skills.

The Parents have also had Student evaluated at the Lindamood-Bell program. However, they have not provided Student with this program, because it would require Student to miss school for a few weeks.

54.    As a result of the constant bullying and harassment, Student sometimes has emotional breakdowns when he returns home from school. It takes Mother an hour and a half holding Student to soothe him as he cries. Student is sometimes afraid to report the

bullying incidents, because his peers already call him a "tattle tale" and think of him as "an idiot". During the current academic year, Student has been able to establish a relationship with the principal. He trusts her enough to tell her of some of the incidents of bullying and abuse taking place in school.

55.     In addition to the depression and anxiety caused by the bullying, Student has suffered a loss of self-esteem. Sometimes Student would say to his parents that maybe he should be dead because no one wants his "germs" or wants to touch him at school. Recently, Student's emotional response to the teasing and bullying has turned into anger. Student is older now and his peers have discovered that, if they verbally tease Student about his mother, Student gets greatly upset. This, in turn, angers Student. Recently, on a school field trip to San Diego, some peers threatened to throw Student out of a third story balcony. The Principal spoke with the peers. This year Student is more afraid and angry more than in the past. The daily incidents of bullying happened throughout the 2003-2004, 2004-2005 and have continued in the current school year. Student is an easy target of bullying and harassment. The number of incidents has decreased this year and Student is not reporting incidents daily. The incidents are occurring once every two or three days. The Parents attribute the decrease of the bullying incidents to the principal at La Canada Junior High School. During the current school year, the principal walks around the campus to make sure that no inappropriate conduct is taking place.

56.     As a result of the chronic bullying and teasing, Student has been diagnosed with anxiety and depression. His Parents have taken Student to a child psychiatrist, Dr. Leonard Baker, who has evaluated Student and seen him on a number of follow up visits since 2004. Due to the increase in Student's anxiety and depression from the teasing at school, Dr. Baker prescribed Student anti-depressant medication. Instead of having Student take the anti-depressant, the Parents have provided him with individual counseling sessions with psychologists who have seen Student regularly in order to assist him and his family in addressing his anxiety and fears about going to school.

In order to address Student's self-esteem and anxiety related to the teasing and bullying at school, Parents have provided Student with private therapy. For a short while, Student saw two psychologists, Dr. Kessler and Dr. Rosen. Student saw Dr. Rosen on Saturdays and Dr. Kessler on Wednesdays in order to maintain his school work and remaining emotionally and psychologically stable.

Dr. Kessler helped Student to deal with the emotional frustration, depression, and anxiety that Student felt as a result of the bullying. Dr. Rosen helped to address Student's anxiety about school and about the teasing and bullying he received from his peers. Dr. Rosen informed Parents that the bullying and harassment could lead to depression. After the weekly therapy session with Student, Dr. Rosen also met with Mother and discussed what Mother can do at home to support the strategies that Dr. Rosen presented to Student during the therapy sessions. Already, Dr. Baker had recommended that Student take anti-depressant medication.

LEGAL CONCLUSIONS

1.      Under both State law and the federal Individuals with Disabilities Education Act (IDEA), students with disabilities have the right to a Free Appropriate Public Education (FAPE). (20 U.S.C. §1400; Ed. Code, § 56000.) The term "Free Appropriate Public Education" means special education and related services that are available to the student at no cost to the parents, that meet the State educational standards, and that conform to the student's Individualized Education Program (IEP). (20 U.S.C. § 1401(9).) "Special education" is defined as specially designed instruction, at no cost to parents, to meet the unique needs of the student. (20 U.S.C. § 1401(29).)

Likewise, California law defines special education as instruction designed to meet the unique needs of individuals with exceptional needs coupled with related services as needed to enable the student to benefit fully from instruction. (Ed. Code, § 56031.) The term "related services" includes transportation and other developmental, corrective, and supportive services as may be required to assist a child to benefit from special education. (20 U.S.C. § 1401(26).) California Education Code section 56363, subdivision (a), similarly provides that designated instruction and services (DIS), California's term for related services, shall be provided "when the instruction and services are necessary for the pupil to benefit educationally from his or her instructional program." These services include psychological services. (Ed. Code, § 56363, subd. (b).)

2.      In *Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley* (1982) 458 U.S. 176, the United States Supreme Court addressed the level of instruction and services that must be provided to a student with disabilities to satisfy the requirement of the IDEA. The Court determined that a student's IEP must be reasonably calculated to provide the student with some educational benefit, but that the IDEA does not require school districts to provide special education students with the best education available or to provide instruction or services that maximize a student's abilities. (*Id.* at pp. 198-200.) The Court stated that school districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instructional and related services which are individually designed to provide educational benefit to the student. (*Id.* at p. 201.)

Federal special education law requires states to establish and maintain certain procedural safeguards to ensure that each student with a disability receives the FAPE to which he is entitled and that parents are involved in the formulation of the student's educational program. (*W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1483).) The Supreme Court in *Rowley* also recognized the importance of adherence to the procedural requirements of the IDEA. However, procedural flaws do not automatically require a finding of a denial of a FAPE. (*Id.* at p. 1484.) Procedural violations may constitute a denial of FAPE if they result in the loss of educational opportunity to the student or seriously infringe on the parent's opportunity to participate in the IEP process.

3.      Therefore, the inquiry under the IDEA is twofold. The first question is whether the school district has complied with the procedures set forth in the IDEA. The

second is whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the student to receive an educational benefit. To determine whether the District offered Petitioner a FAPE, the analysis must focus on the adequacy of the District's proposed program. If the District's program was designed to address Petitioner's unique educational needs, was reasonably calculated to provide him some educational benefit, and comported with his IEP, then District provided a FAPE, even if Petitioner's parent preferred another program and even if his parent's preferred program would have resulted in greater educational benefit. The District was also required to provide Petitioner with a program which educated him in the least restrictive environment, with removal from the regular education environment occurring only when the nature or severity of her disabilities was such that education in regular classes with the use of supplementary aids and services could not be achieved satisfactorily. (20 U.S.C. § 1412(a)(5)(A); Ed. Code, § 56031.) Therefore, under the IDEA and *Rowley*, the program the District offered must have met the following four requirements to be have constituted an appropriate educational program for Student: (1) be designed to meet his educational needs; (2) be reasonably calculated to provide him some educational benefit; (3) comported with his IEP; and (4) provided him an education in the least restrictive environment.

*Issue I: Did the District Fail to Address the Bullying and Teasing of Student such that it denied him a FAPE since February 2, 2003?*

4.    Petitioner alleges that the District has denied Student a FAPE by not addressing the bullying, teasing and harassment to which Student has been subjected. The District contends that it investigated every incident of bullying and punished the peers who were teasing and bullying Student.

5.    There is no dispute that Student is a polite and bright boy. Also, it is undisputed that, due to his disability, Student has a lack of impulse control, is unable to read social cues, and has difficulty with peer relationships. The District does not dispute the fact that Student has been subjected to teasing, harassment, and bullying. Student's Parents have been providing him with intensive academic tutoring and ongoing psychological counseling in order to make sure that despite the chronic bullying, Student can maintain his academic work.

6.    Educational benefit is not measured only by grades and scores on standardized tests. (*Seattle School District No. 1 v. B.S.* (9th Cir 1996) 82 F3d 1493, 1500.) The term "unique educational needs" shall "be broadly construed to include the handicapped child's academic, social, health, emotional, communicative, physical and vocational needs." (*Ibid.*, *citing* R.Rep. No. 410, 1983 U.S.C.C.A.N. 2088, 2106.)

In *M.L. v. Federal Way School District* (9th Cir. 2005) 394 F.3d 634, the Ninth Circuit Court of Appeals addressed whether a pupil who was subject to teasing was denied a FAPE. The Court noted that neither the IDEA nor any court has directly addressed the question whether unremedied teasing can constitute a denial of FAPE. The Court then referred to a Seventh Circuit Court of Appeals decision holding that "'at least in principle

21

relief is available under the IDEA' when a teacher invited her pupils to express their complaints about a disabled student which led to humiliation, fistfights, mistrust, loss of confidence and self-esteem, and disruption of his educational progress." (*Cf. Charlie F. ex rel. Niel F. v. Bd. Of Educ.* (7th Cir 1996) 98 F3d 989, 993.) In *M.L. v. Federal Way School District*, the Ninth Circuit Court of Appeals held that by removing the pupil from his school after only five days, the parents failed to give the District a reasonable opportunity to find a way to prevent the other students from teasing the pupil.

7.    As set forth in Factual Findings 32 and 55, the evidence established that Student has low self-esteem. He has pleaded with his Parents not to go to school and be subjected to more bullying and teasing. As a direct result of the emotional difficulties caused by the constant bullying and teasing, Student's doctor has recommended that he take anti-depressant medication. See Factual Findings 35 and 56. He has had to seek the help of a psychologist and psychiatrist as well as educational tutors in order to maintain his emotional balance and his grades. Student has made comments such as he should be dead, because no one wants his germs at school. Given Student's willingness to perform well and his cognitive abilities, Student has been able to maintain his grades due to the outside help that his Parents have provided him. See Factual Finding 36. However, the District has completely failed to prevent the bullying and teasing and has failed to address his social skills needs. As a result, Student has developed new areas of concern, such as anxiety and depression due to the emotional harm caused by the chronic bullying and teasing.

8.    The District asserts that it is due to Student's own behaviors that he has been teased. The District points to the very needs of Student, his inability to respect the others' space, his lack of impulse control and his inability to read other's cues, as the reason for the bullying. See Factual Findings 11 and 12. This belies the District's failure in addressing Student's primary needs in social interaction, social skills, and pragmatic communication skills. The District addressed the bullying only after bullying incidents occurred and only after Student sustained more emotional damage and trauma. The District has not taken any adequate measures to prevent bullying from happening. It only implemented one of Dr. Mayer's school-wide recommendations by having Dr. Mayer provide one short in-service to its staff. The District has failed to address Student's emotional issues. After abruptly terminating Student's social skills program at Education Spectrum, the District also failed to properly address Student's social skills needs. The evidence established that Student continues to have needs in the area of social skills and that he would continue to benefit from social skills training.

9.    As set forth in Factual Findings 3 and 31, the District knew that the bullying and teasing occurred while Student was at recess, lunch, on the school bus, on the playground or at other unsupervised and unstructured times, such as the P.E. class. The Parents asked the District to provide appropriate supervision at those times when the bullying was more likely to take place. With adequate supervision, the District could have prevented up to eleven other students teasing and bullying Student. The District knew that Student was an easy target for bullying, yet it did not offer any additional support or supervision to prevent the bullying. Only in the current academic year has the District, through the efforts

22

of the principal, taken some minimal measures in addressing the prevention of bullying. For example, the principal has been walking around the campus to make sure that no inappropriate acts are taking place. The ALJ finds that Student has made de minimis progress, largely due to the emotional harm he has suffered as a result of the daily bullying and teasing.

As set forth in Factual Findings 56 and 56, the ALJ finds that, due to the fact that the District has not prevented the chronic bullying and teasing directed toward Student, Student suffered harm and did not benefit from his education. Accordingly, the District has not provided Student with a FAPE .

*Issue II(a): Did the District Fail to Provide Student with a FAPE Since December 2, 2003, by Failing to Identify and Address Student's Needs?*

11.    Petitioner alleges that the District failed to design a program to meet all of the Student's needs because it failed to adequately identify all of Student's needs, including visual processing deficits, written language deficits, ADHD combined type, depressive disorder, possible anxiety disorder, and possible auditory processing deficits. The District contends that it has identified Student's needs and has designed a program that would meet those needs.

12.    A local educational agency must assess a special education student in all areas related to his suspected disability, including the student's social and emotional status. (Ed. Code, § 56320, subd. (f).) An evaluation must be sufficiently comprehensive to identify all of the student's special education and related services needs, whether or not commonly linked to the eligibility category of the student. The school district must use technically sound testing instruments that demonstrate the effect that cognitive, behavioral, physical, and developmental factors have on the functioning of the student. The school district must use assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the student. (34 C.F.R. § 300.532(h), (i), & (j).) In addition, the school district must use a variety of assessment tools and strategies to gather both relevant functional and developmental information about the child, including information provided by the parent. (34 C.F.R. § 300.532(a), (b), (g), (h), (i), and (j).)

*Auditory Processing*

13.    The February 28, 2005, independent speech assessment conducted by Suzanne Barnes states that although Student's overall auditory processing score fell within the low average range, his performance on several of the subtests indicates a moderate auditory memory and processing disorder. Student scored in the 70th percentile in the Expressive One-Word Picture Vocabulary test, indicating that his performance was approximately two years above his chronological age. However, on the Receptive One-Word Picture Vocabulary Test Student scored in the 34th, indicating that his performance was approximately 1 year and 4 months below his chronological age. As set forth in Factual

Findings 15, 39, and 40, Student exhibits auditory processing issues and the District has not assessed Student in this area.

14.    The District asserts that, when pressed by Petitioner's parents to explore Student's needs in the related to auditory processing, the District offered to conduct a Central Auditory Processing Disorder assessment. The District contends that to date, Parents have not provided their consent to that assessment. Mother maintains that the reason Petitioner's parents did not consent to the assessment is due to the District's failure to provide Parents with information regarding the qualifications of the evaluator the District recommended.

15.    The independent speech and language assessment by Ms. Barnes establishes that Student's auditory processing is an area of concern. The ALJ determines that the District did not assess Student in all areas of his suspected disability, specifically in the area of auditory processing.

*Anxiety and Depression*

16.    Dr. Baker, psychologist, began seeing Student in March 2004, and by then Student had been diagnosed with depression. As a result of the impact of the bullying and teasing, Student became anxious and discouraged, prompting Dr. Baker to prescribe him medication for his anxiety. Student's emotional and the underlying social and behavior concerns were not new information for the District. Even in its own triennial evaluation conducted in 2001, the District stated: "[D]ue to reported emotional social and behavior concerns, parents may wish to continue Student's individual therapy, as this appears to be beneficial to him."

17.    The testimony of the school psychologist, Ms. Mispagel, that there were no concerns related to anxiety is not persuasive. As part of the 2004 triennial assessment, Ms. Mispagel administered the Achenbach Behavior Rating Scale, which was completed by Student. She also provided the Behavior Evaluation Scale, which was completed by Student's teachers and by Mother. Ms, Mispagel testified that Student's scores fell within the average scale, except for social problems (getting teased a lot and not being liked by others) and semantic complaints – where Student complained of physical anomalies like being tired, his stomach hurting. As set forth in Factual Findings 55 and 56, Student's areas of need included the anxiety and depression brought on by the chronic bullying and teasing.

18.    Therefore, the ALJ determines that the District did not address Student's emotional needs, including the anxiety and depression, which resulted from the bullying and teasing at school.

*Visual Processing, Written Language, and ADHD*

19.    As set forth in Factual Finding 14 and 19, Petitioner did not present any evidence regarding visual processing and written language deficits that were not identified or addressed. Student's IEPs included objectives to address his writing deficit. Furthermore, as

set forth in Factual Finding 22, the evidence did not support Petitioner's contention that the District failed to adequately identify Student's needs related to his ADHD.

*Issue II(b):  Did the District Fail to Provide Student with a FAPE Since December 2, 2003, by Failing to Provide Student a mentor program and counseling as promised in his IEP?*

20.    At the hearing in this matter, Petitioner contended that the District denied Student a FAPE since December 2003 by failing to provide services it had promised. Specifically, Parents allege that the District offered Student a mentor program, where an older student would be paired up with Student to support Student with his social difficulties.

21.    Sometime in the 2004-2005 school year, Mother and the District's director of special education discussed a mentor program. Once the IEP team develops an IEP and the parents consent to the IEP, the school district must implement the IEP as soon as possible. (Cal. Code Regs., tit. 5, § 3040, subd. (a).)  However, the District did not offer Student a mentor program in any of his IEPs.  The evidence did not establish that the District offered Student the mentor program as part of its obligation to provide Student a FAPE.  Since Student's IEPs do not specifically state that the District would provide Student with a mentor program, the ALJ finds that the District did not deny Student a FAPE by failing to provide him with a mentor program.

22.    As to the allegation that the District failed to provide Student with counseling services, Petitioner did not present any evidence on this issue.

*Issue II(c):  Did the District Fail to Provide Student with a FAPE Since December 2, 2003, by Employing Teachers and Staff Who Have Not Had the Education or Ability to Respond to Student's Needs?*

23.    Petitioner contended that District staff and teachers did not have the education or the ability to respond to Student's needs.  Petitioner did not present sufficient evidence to prove this allegation.

*Issue II(d):  Did the District Fail to Provide Student with a FAPE Since December 2, 2003, by Committing Procedural Violations?*

*Prior Written Notice*

24.    Petitioner contended that when the District dismissed Student from LAS in March 2004, it did not provide the Parents with prior written notice.  The District asserted that since Ms. Wullschlager's assessment results and the District's determination to terminate speech therapy were discussed at the March 2004 IEP meetings, it was not required to provide a separate written notice to the Parents.

25.    The Supreme Court in *Rowley* recognized the importance of adherence to the procedural requirements of the IDEA.  (*Board of Educ. of the Hendrick Hudson Central Sch.*

*Dist. v. Rowley* (1982) 458 U.S. 176, 201.) Federal special education law requires states to establish certain procedural safeguards to ensure that each student with a disability receives the FAPE to which the student is entitled and that parents are involved in the formulation of the student's educational program. (*W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1483.)

Procedural errors on the part of the District that seriously infringe on the parent's opportunity to participate in the IEP process or that result in the loss of educational opportunity to the student may result in the denial of FAPE. (*Id.* at 1483-1484.) One of the procedural rights afforded to parents of students with disabilities is written prior notice when the district proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of a FAPE. (20 U.S.C. § 1415(b)(3)(A) and (B).)

A school district is required to provide written prior notice to the parents of a child with a disability when it proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, or educational placement of the child or the provision of a FAPE to the child. (20 U.S.C. § 1415(b)(3).)

26.    In this case, Student's March 2004 annual IEP meeting began on March 2, 2004. The meeting was continued on March 11, 2004 and it finally concluded on March 17, 2004, when Father consented to the IEP. At the IEP meeting, the IEP team reviewed the results of Student's assessments, including the speech and language assessment conducted by Ms. Wullschlager. As set forth in Factual Finding 23, Parents participated in the IEP, and Father consented to the IEP. Petitioner did not establish that he was denied a FAPE due to the District's failure to provide Parents with prior written notice of its decision to terminate Student's speech therapy.

*Measurable Goals and Objectives*

27.    At the hearing in this matter, Student contended that the goals and objectives in Student's April 2003 and March 2004 IEPs were not measurable. Special education law requires that an IEP contain, among other things, the present levels of a student's performance, including how the pupil's disability affects the pupil's involvement and progress in the general curriculum, and measurable annual goals, including benchmarks or short-term objectives related to meeting the student's needs that result from the student's disability to enable the pupil to be involved and progress in the general curriculum. (Cal. Ed. Code, § 56345, subd. (a).) The purpose of short-term objectives or benchmarks is to provide a mechanism for a child's teachers and parents to monitor the child's progress – or lack thereof – in special education over the course of the year. (34 C.F.R. § 300, Appendix A to Part 300 of the Federal Regulations.)

28.    The April 2003 IEP contained six goals. The math goal provides: "[I]mprove skills for class work and long term assignments." The baseline for the goal provides: "[D]ifficulty understanding math concepts and successfully doing math work." The objectives for this goal address the ability to solve problems involving addition, subtraction,

multiplication, and division and explain why a particular operation was used for a given situation 4 out of 5 times. The ALJ determines that, while the objectives are measurable, the baseline and the goal are not measurable. The issues for this hearing were limited to claims arising after December 2, 2003. Therefore, the ALJ's determination regarding the inadequacy of the April 2003 IEP only applies to the time period from December 2, 2003.

29.     The March 2004 IEP contains four goals. Student's social goal provides that Student "will improve peer interactions." The baseline or current of level of performance provides that Student "has difficulty regulating his behavior with peers." One of the objectives for this goal provides: "[I]n peer situations, [Student] will participate in a game/activity using appropriate personal space and social language in 3 out of 5 opportunities." The ALJ finds that while the objectives for this goal are measurable, the baseline and the goal itself are not measurable.

30.     The ALJ concludes that the lack of accurate baseline information and measurable goals were not de minimis errors. It is unclear how the IEP team could have adequately tracked progress.

*Issue III: Did the District Inappropriately Determine that Student Was no Longer Eligible for Language and Speech Services at the March 2, 2004, IEP Meeting?*

31.     Petitioner contends that the District inappropriately determined that Student was no longer eligible for language and speech services at the March 2004 IEP. The District asserts that it appropriately assessed Student in the area of speech and language and the fact that Student was again found eligible for speech and language services is not inconsistent with that determination.

32.     In Ms. Wullschlager's opinion, the fact that about one year after she found Student did not need speech and language therapy, an independent evaluator found Student eligible did not affect the accuracy of her evaluation. In Ms. Wullschlager's opinion, at the time she administered the tests, assessment results were accurate and that she had administered the appropriate tests to Student. Ms. Wullschlager believed that the test results were valid. The ALJ determines Ms. Wullschlager's testimony in this area was persuasive and credible.

33.     The evidence did not establish that the District's February 2004 speech and language assessment was inappropriate. After the District's assessment, the March 2004 IEP team discussed the assessment and determined that Student would not receive speech and language therapy. Father initially consented to the IEP. Once the District was informed of Father's revocation of his consent, the District began providing Student with speech therapy.

34.     Since then, the District funded a speech and language independent assessment conducted by Ms. Barnes. The March 2005 IEP team accepted the Barnes' assessment report and relied on it to develop goals and objectives, because it found that Student would benefit from having the speech pathologist work with him on reading verbal and non verbal cues and

semantics because semantics and pragmatics are part of social skills. At the March 9, 2005 IEP meeting, based on the Barnes' speech assessment report, the District agreed to provide speech and language services.

*Missed LAS Sessions*

35.    As set forth in Factual Finding 17, at the hearing in this matter, it was established that Student missed eight consecutive sessions of speech therapy from November 20, 2003 to February 4, 2004. The evidence established that one of the manifestations of the Student's disability is that he has difficulties with memory. Yet, the District expected that any student from the second grade on would have to remember to go to their speech therapy sessions. Even after Student missed eight consecutive speech therapy sessions while he was attending Paradise Canyon, none of the District staff or teachers took any steps to address his absences from speech therapy. No one contacted or informed Student's parents that he had missed the sessions. Ms. Wullschlager testified that she was ready to provide Student with his speech therapy sessions and that Student simply missed those sessions. She testified that there was nothing to indicate to her that if left to his own devices Student would not go to the speech therapy sessions. In light of the evidence regarding Student's memory problems, this testimony is not credible. As set forth in Factual Finding 3, the evidence established that Student forgets things and needs to be prompted and reminded.

36.    Given Student's disability and needs, the District inappropriately assumed that Student would be able to remember and attend his speech therapy sessions. Student's main areas of deficit are his social skills and his deficits in perceptive language, his inability to read social cues and use pragmatic speech. Missing eight speech therapy sessions denied Student a FAPE because he was not able to improve his social skills and pragmatic communication skills. Student's Parents continued to provide Student with daily tutoring by tutors experienced in teaching pupils diagnosed with ADHD. The Parents continued to provide Student with social skills at Education Spectrum. It is due to these outside services that Student's skills have not deteriorated any further.

*Issue IV: Remedies*

37.    Petitioner requested that, as a remedy for the District's denial of FAPE, the District do the following:

(a) Provide Student with a mentor program;
(b) Provide school staff with in-service regarding how to address needs of Students diagnosed with ADHD;
(c) Reimburse Parents for costs of specialized camps, academic tutoring, social skills training from Education Spectrum, psychological counseling and therapy, and educational advocacy they obtained for Student.

38.    Parents may be entitled to appropriate relief, including reimbursement for the costs of placement or services that they have independently procured for their child, when

28

the school district has failed to provide a FAPE and the private placement or services are determined to be proper under IDEA and are reasonably calculated to provide educational benefit to the child. (*School Committee of the Town of Burlington v. Department of Education* (1985) 471 U.S. 359, 369, 105 S. Ct. 1996; *Student W. v. Puyallup School District* (9th Cir. 1994) 31 F. 3d 1489, 1496.)

In *Florence County School Dist. Four v. Carter* (1993) 510 U.S. 7, 13, 113 S.Ct. 361, the Supreme Court specifically exempted parents from having to meet certain requirements of the IDEA in their unilateral placements. For example, parents are not required to conform their unilateral placement to the content of the student's IEP or provide a placement that is certified by the state. (*Ibid.*) The Court has recognized that the parents' placement does not have to meet a standard as high as a school district's must meet; however, the parents' placement must still meet other requirements of the IDEA, such as providing a placement that addresses the student's needs and provides the student educational benefit. *Id.*

39.    The evidence established that Student received educational benefit from the social skills training, psychological counseling, specialized camp, and tutoring obtained and paid for by Parents.

40.    The ALJ determines that Parents are entitled to reimbursement for the following:

(a) specialized camp costs accrued after December 2, 2003, at Super Camp for the session from July 25, 2004, through August 3, 2004, at $2,195.00; SOAR camping program for the Summer of 2005 at $2,150.00; and Wilshire Boulevard Temple Camps for the session from June 22, 2005, through July 10, 2005, at $3,075.00;

(b) academic tutoring costs accrued after January 2004;

(c) social skills training provided by Education Spectrum after May 2004; and

(d) psychological counseling and therapy provided by Dr. Rosen and Dr. Kessler after December 2, 2003.

41.    Petitioner did not establish that he is entitled to the following: mentor program, in-service for school staff regarding how to address the needs of Students diagnosed with ADHD, and any costs accrued before December 2, 2003. In addition, the ALJ determines that Parents are not entitled to reimbursement for costs of retaining an educational advocate. Parents are entitled to obtain only attorney's fees if they prevail in the due process hearing. (20 U.S.C. § 1415 (i)(B).) An educational advocate is not an attorney. Therefore, Petitioner's request for reimbursement for advocacy services provided by an educational advocate is denied.

PREVAILING PARTY

Pursuant to California Education Code § 56507(d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. The following findings are made in accordance with the statute:

Issue I:        The Student prevailed.

Issue II (a):   The Student partially prevailed on this issue.

Issue II (b):   The District prevailed.

Issue II (c):   The District prevailed.

Issue II (d):   The Student partially prevailed on this issue.

Issue III:      The District partially prevailed on this issue.

Issue IV:       The Student prevailed.

ORDER

1.      Within 30 calendar days from the date of this Decision, the District shall convene an IEP meeting in order for the IEP team to select a mutually agreed upon non-public-agency to provide Student with social skills training.

2.      Within 30 calendar days from the date of this Decision, the District shall convene an IEP meeting in order for the IEP team to select a mutually agreed upon independent assessor to conduct a Central Auditory Processing Disorder. Following the completion of the independent assessment, the District shall pay for the attendance of the independent assessor at an IEP at Student's school of attendance.[2]

3.      Within 30 calendar days from the date of this Decision, the District shall convene an IEP meeting in order to select a mutually agreed upon non-public-agency to provide Student with eight 30-minute sessions of speech and language therapy. The District shall arrange for and pay all necessary fees and transportation costs in relation to the eight sessions of speech and language therapy.

4.      Within 30 calendar days from receipt of invoice and cancelled check(s), the District shall reimburse Parents for their expenses as follows:

---

[2] California special education law requires that the IEP required as a result of an assessment of a pupil shall be developed within a total time not to exceed 60 days from the date of receipt of the parent's written consent for assessment, unless the parent agrees, in writing, to an extension. (Ed. Code § 56344.)

(a)  specialized camp costs accrued after December 2, 2003, at Super Camp for the session from July 25, 2004, through August 3, 2004, at $2,195.00; SOAR camping program for the Summer of 2005 at $2,150.00; and Wilshire Boulevard Temple Camps for the session from June 22, 2005, through July 10, 2005, at $3,075.00;

(b)  academic tutoring costs accrued after January 2004;

(c)  social skills training provided by Education Spectrum after May 2004; and

(d)  psychological counseling and therapy provided by Dr. Rosen and Dr. Kessler after December 2, 2003.

## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction.  If an appeal is made, it must be made within 90 days of receipt of this Decision. (Ed. Code, § 56505, subd. (k).)

DATED:  April 11, 2006

_____
Anahid Hoonanian
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

31